Exhibit A

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
Daniel Edward Nersoyan on 10/15/2020

```
 1                 UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3

 4     DANIEL NERSOYAN,                )
                                       )
 5                      Plaintiff,     )
                                       )
 6             v.                      )  Case No. 19-CV-08109
                                       )
 7     COUNTY OF LOS ANGELES, a        )
       county corporation; et al.,     )
 8                                     )
                        Defendants.    )
 9     _____)

10

11

12

13

14              DEPOSITION OF DANIEL EDWARD NERSOYAN

15                      VIA REMOTE/ZOOM

16                 THURSDAY, OCTOBER 15, 2020

17

18

19

20

21

22

23
       REPORTED BY:
24     LAURIE BETH KAY,
       CSR NO. 8427
25
```

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
Daniel Edward Nersoyan on 10/15/2020

Page 2

1   Videotaped deposition of DANIEL EDWARD
2   NERSOYAN, taken on behalf of Defendant, all
3   parties appearing remotely, commencing at
4   11:00 a.m., Thursday, October 15, 2020,
5   before Laurie Beth Kay, CSR No. 8427,
6   pursuant to Notice.
7
8
9
10   APPEARANCES OF COUNSEL:
11
12   FOR PLAINTIFF:
13        WEX LAW A PROFESSIONAL LAW CORPORATION
          BY:  MICHAEL S. DEVEREUX, ESQ.
14        9171 Wilshire Boulevard, Suite 500
          Beverly Hills, California 90210
15        (213) 986-9844
          mike@wex.law
16
17
18   FOR DEFENDANT COUNTY OF LOS ANGELES:
19        COLLINSON, DAEHNKE, INLOW & GRECO
          BY:  LAURA E. INLOW, ESQ.
20        21515 Hawthorne Boulevard, Suite 800
          Torrance, California 90503
21        (424) 212-7777
          laura.inlow@cdiglaw.com
22
23   ALSO PRESENT:
24        Sahil Singh, Videographer
25

Page 3

1              I N D E X
2
3   WITNESS:
4   DANIEL EDWARD NERSOYAN
5             EXAMINED BY:          PAGE:
6             MS. INLOW:               5
7
8
          EXHIBITS FOR IDENTIFICATION:
9
             (None offered.)
10
11
12
13
14   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
15             (None.)
16
17
18        INFORMATION REQUESTED:
19             (None.)
20
21
22
23
24
25

Page 4

1        Thursday, October 15, 2020, 11:00 a.m.
2              Via Remote/Zoom
3
4        THE VIDEOGRAPHER:  This begins the remote
5   deposition of Daniel Nersoyan in the matter of
6   Nersoyan vs. County of Los Angeles.  Today's date is
7   October 15, 2020, and the time on the video monitor
8   is 11:00 a.m.
9        My name is Sahil Singh.  I am the
10   videographer.  The court reporter today is Laurie
11   Kay.  We are here with Huseby Global Litigation.
12        Counsel, please introduce yourselves,
13   after which the court reporter will swear in the
14   witness.
15        MR. DEVEREUX:  Michael Devereux, on behalf of
16   Plaintiff, Daniel Nersoyan.
17        MS. INLOW:  Laura Inlow, on behalf of
18   Defendant.
19
20              DANIEL EDWARD NERSOYAN,
21   called as a witness on behalf of Defendant, having
22   been first duly placed under oath, was examined and
23   testified as follows:
24   / / /
25   / / /

Page 5

1              EXAMINATION
2   BY MS. INLOW:
3        Q.   Can you please state and spell your full
4   name, Mr. Nersoyan?
5        A.   Daniel Nersoyan, D-a-n-i-e-l, last name
6   N-e-r-s-o-y-a-n.
7        Q.   Do you have a middle name?
8        A.   Yes, Edward, E-d-w-a-r-d.
9        Q.   Have you ever had your deposition taken
10   before?
11        A.   No.
12        Q.   All right.  Even though I hope that you
13   have had an opportunity to speak with Mr. Devereux,
14   I am going to take just a few minutes here at the
15   beginning to kind of go over some few rules, if you
16   will, to try to make today go more smoothly.
17        Initially, as we are remote, it is even
18   more important than before for only one person to be
19   speaking at a time.  So if you will please wait and
20   make sure I am completely done with my question, I
21   will wait and make sure you are completely done with
22   your response.  Will you do that for me?
23        A.   I know.
24        Q.   We need you to give your answers in
25   words.  So was your answer just now a yes?

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
**Daniel Edward Nersoyan on 10/15/2020**

Page 14

```
 1  that you have completed?
 2      A.  High school.
 3      Q.  Have you taken any formal education since
 4  high school?
 5      A.  No.
 6      Q.  Are you currently employed?
 7      A.  Self-employed.
 8      Q.  In what business are you self-employed?
 9      A.  I am a jeweler.
10      Q.  Do you have a company?
11      A.  I do.
12      Q.  What is the name of your company?
13      A.  The Nersoyan Group.
14      Q.  How long have you been self-employed as
15  The Nersoyan Group?
16      A.  Seven, eight years.
17      Q.  And is The Nersoyan Group just a dba for
18  you, is it a corporation, is it --
19      A.  A corporation.  A corporation.
20      Q.  So it's an Inc., The Nersoyan Group, Inc.?
21      A.  Yes.
22      Q.  Are there any other partners or
23  shareholders other than yourself?
24      A.  No.
25      Q.  What is the place of business of The
```

Page 15

```
 1  Nersoyan Group?
 2      A.  Downtown Los Angeles.
 3      Q.  What is the street address?
 4      A.  It's not there no longer.  My office is
 5  not open now.  But it was at 511 West Sixth.
 6      Q.  Was there a suite?
 7      A.  Suite 213 -- 321.  I'm sorry.
 8      Q.  321?
 9      A.  Yes.
10      Q.  When did you close that office?
11      A.  I didn't close the office.  I was --
12          (A conference was held between
13          the witness and his counsel.)
14      THE WITNESS:  Yeah, let's say the 17th -- May
15  2017.
16  BY MS. INLOW:
17      Q.  Okay.  You were just conferring with your
18  attorney; correct?
19      A.  Yes.
20      Q.  Okay.  I would prefer that you not confer
21  while there's a question pending.
22          Is the office closed because of COVID?
23      A.  No.
24      Q.  Why is the office closed?
25      A.  Because I had to close the office because
```

Page 16

```
 1  I was taken into custody.
 2      Q.  So what was the date you were taken into
 3  custody?
 4      A.  May 3rd -- either the 2nd or the 3rd --
 5  2017.
 6      Q.  And who took you into custody?
 7      A.  The Los Angeles Homeland Security,
 8  Sheriff's Department, L.A.P.D.  It was a joint task
 9  force.
10      Q.  And were you facing criminal charges?
11      A.  I was.
12      Q.  What were the criminal charges?
13      A.  Having guns while being a felon and
14  conspiracy.
15      Q.  Was that conspiracy to distribute heroin?
16      A.  Yes.
17      Q.  Were you convicted?
18      A.  I was.
19      Q.  Was that by jury trial, or did you plead
20  guilty?
21      A.  I plead guilty.
22      Q.  And what was your sentence?
23      A.  The sentence was 22 months.
24      Q.  And was that 22 months in a federal
25  prison?
```

Page 17

```
 1      A.  Yes.
 2      Q.  Did you serve time in federal prison?
 3      A.  I did..
 4      Q.  How many months did you spend in federal
 5  prison?
 6      A.  Sixteen months.
 7      Q.  Where was that?
 8      A.  MDC.
 9      Q.  So you are saying the MDC, which is the
10  Metropolitan Detention Center?
11      A.  Correct, yes.
12      Q.  Are you now on federal probation?
13      A.  I am, yes.
14      Q.  When were you related from MDC?
15      A.  I was released October.  The exact date --
16  the 2nd, 3rd, or 4th day of the month of October.
17      Q.  And that was 2019?
18      A.  '19.
19      Q.  What are the terms of your probation?
20      A.  Standard probation.  I mean, I won't be
21  able to give you verbatim what it is.  I cannot be
22  around guns, I cannot be around felons, and I've got
23  to lock -- (inaudible)
24      Q.  Did you plead guilty to both the felon in
25  possession of firearms and the conspiracy to
```

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
Daniel Edward Nersoyan on 10/15/2020                                    Pages 38..41

Page 38

1  business?
2       A.   I have work to do.  I am just waiting for
3  my legal proceedings to be finished because I don't
4  want to be under probation while I am operating
5  downtown, because I carry very large binders of
6  jewelry, and I don't want another policeman to do
7  what this policeman did.  So I don't feel
8  comfortable doing any business -- I had expressed
9  that to my probation officer -- until my probation
10  is done where I have my civil rights and I cannot be
11  intruded on.
12       Q.   When is your probation scheduled to end?
13       A.   It should be ending in less than a year.
14       Q.   Do you know the date?
15       A.   Exactly, no.  They don't give us that.
16       MR. DEVEREUX:  It's three years probation?
17       THE WITNESS:  Yeah.
18  BY MS. INLOW:
19       Q.   Between 2011 or '12, whenever you started
20  the company, and 2014 -- so let's say between 2012
21  and 2014, for the first two years you were in
22  operation, when you had to transport jewels or cash,
23  did you use a courier company?
24       A.   No.
25       Q.   Did you ever use an armored car?

Page 39

1       A.   No.
2       Q.   Did you retain a private security company?
3       A.   No.
4       Q.   So between 2012 and 2014, when you would
5  have to transport expensive jewels, as you just
6  referenced, how would you do it?
7       A.   Well, usually they come to my office.  I
8  didn't transport.
9       Q.   Did you ever transport jewels between 2012
10  and 2014?
11       A.   Okay.  Do you know -- have you been to the
12  downtown jewelry district?  If you have been there,
13  you would see the small community that it's in.  So
14  in that area to walk from one building to the other
15  building is not much of a transportation.  So if I
16  am being helped on business, I will not need that.
17  And that's usually how I did my business, in the
18  wholesale marketplace.
19       Q.   You are a jewelry wholesaler?
20       A.   Yes, I am a wholesaler.
21       Q.   So are you saying that between 2012 and
22  2014 you did all of your business transactions
23  within walking distance of your office in the
24  jewelry section of downtown L.A.?
25       A.   Predominantly.

Page 40

1       Q.   I'm sorry?
2       A.   Predominantly, yes.
3       Q.   Between 2012 and 2014, did you ever have
4  to transport any large amounts of cash?
5       A.   Yeah, I have, absolutely.
6       Q.   Okay.  So when you had to transport large
7  amounts of cash between 2012 and 2014, did you use a
8  licensed bonded courier service?
9       A.   I did not, no.
10       Q.   Did you ever use an armored car?
11       A.   No.
12       Q.   Did you ever use private security?
13       A.   No.
14       Q.   So prior to May of 2014, how did you
15  transport large amounts of cash?
16       A.   Myself.
17       Q.   Between 2012 and, let's say, May 1st of
18  2014, for what purposes would you be transporting
19  large amounts of cash?
20       A.   Buying.  Buying.  That's what I do.  I
21  buy.
22            Most of it -- okay.  You have to
23  understand the business.  When the price of gold
24  went up, a lot of people began to sell their jewelry
25  more than buy, so the price of gold skyrocketed.  So

Page 41

1  the We Buy Gold sign, I'm the one who goes in and
2  buys all that gold from them.  Then I refine it, I
3  extract all the other metals from it, I refine it
4  and resell it at a higher -- (inaudible)
5       Q.   And was the bulk of your business
6  transactions between 2012 and, say, May 1st of 2014
7  done in cash?
8       A.   A lot of it was.
9       Q.   Did you have any business associates in
10  2014?
11       A.   No, I was doing it myself.
12       Q.   So just you.  You did all the buying, you
13  did all the financials, you did all the
14  transactions.
15       A.   I did all the transactions, correct.
16       Q.   All right.  Now, pursuant to the First
17  Amended Complaint that you have filed and that you
18  said you reviewed in preparation for your deposition
19  today, you state, in paragraph 29, that on or about
20  May 28 of 2014 Mr. Nersoyan had provided a business
21  colleague with over 150,000 dollars to purchase
22  jewelry for plaintiff's jewelry business.  Okay?
23            So on what date did you give the colleague
24  the cash?
25       A.   I don't remember the exact date.  I did

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
**Daniel Edward Nersoyan on 10/15/2020**          **Pages 42..45**

Page 42

1  not make a note of it, so I can't be comfortable
2  giving you a date.
3       Q.   Did you keep any records in your business
4  of when you would give cash to other people?
5       A.   Of course.  I kept all those records.
6  But --
7       Q.   Okay.  Well, what records do you have
8  about giving this colleague cash on or about May 28
9  of 2014?
10      A.   When you say records, what do you mean
11  records?  Like documents?
12      Q.   A written document.  Any kind of written
13  document.
14      A.   A paper.  Nothing.
15           My office got robbed twice.  I am sure
16  that you have a record of that.  And in that robbery
17  my office was cleaned upside down of everything --
18  everything I need.  That's why I suspected -- and I
19  told my attorney -- that it could have been them
20  that robbed it because of everything that they stole
21  from my office.  Documents.  Everything.
22  Everything.  They stole everything from my office.
23  They came once, and then a week later they came in
24  again, they robbed it again.  So two times.  So
25  every document, everything I would need was taken

Page 43

1  from me.
2       Q.   Okay.  So let me get some specifics here.
3           So you have alleged that you were robbed
4  of the money on May 28, 2014; correct?
5       A.   Yes.
6       Q.   Okay.  How long before that date, or was
7  it on that date that you gave the colleague the
8  cash?
9       A.   I gave it on that date.
10      Q.   Okay.  So what time of day did you give it
11  to your colleague?
12      A.   It could not have been no later than one
13  or two o'clock.
14      Q.   In the afternoon?
15      A.   Yes.
16      Q.   Okay.  And at that time on May 28, 2014,
17  what documents would you have generated about that
18  cash?
19      A.   I would have had a signature with -- it
20  would have been very short.  It would have had his
21  name, his signature, and the date.  That's it.
22      Q.   You wouldn't put the amount?
23      A.   And the amount, naturally, yes.
24      Q.   What was the exact amount of money that
25  you claim you gave to this colleague?

Page 44

1       A.   158,000 dollars.
2       Q.   And how do you know that that is the
3  amount if you don't have any records?
4       A.   I gave it.
5       Q.   You recall it, yes?
6       A.   Yes.
7       Q.   Okay.  So in your Complaint you said it
8  was over 150,000.
9       A.   Uh-huh.
10      Q.   And in other places you have referred to
11  approximately 160,000.  So --
12      A.   Yeah, I did not.  My attorney took the
13  liberty of writing that.  My numbers have been the
14  same all throughout, 158,000.
15      Q.   Okay.  And what would you have called the
16  document that you would have generated on May 28 of
17  2014 with the colleague's name, the date, and the
18  amount and the signature?
19      A.   I'm sorry, I don't understand the
20  question.
21      Q.   You said that on May 28, 2014, you would
22  have created a document with the person's name, the
23  signature, the date, and the amount of money that
24  you gave him; correct?
25      A.   Yes.

Page 45

1       Q.   What would you have called that document?
2       A.   A memo.
3       Q.   And where did you keep your memos in May
4  of 2014?
5       A.   On my desk in my office, or in my safe.
6  It could have been in my safe.  But I know this
7  because it was on my desk.
8       Q.   How many other memos were on your desk?
9       A.   I don't know.  I can't remember that.
10      Q.   What was the name of the colleague?
11      A.   The one that I gave it to or the one that
12  I sent?
13      Q.   The one you just --
14      A.   The one I gave it to?  Okay.  I don't
15  even know what his name was, but I sent Hyrum, my
16  employee, with him.
17           Now, I don't know his name.  Darryl?
18  Darren?  Something like that.  I don't know the
19  exact name.  I don't remember the exact name.
20      Q.   Okay.  In May of 2014 how many employees
21  did you have?
22      A.   I have three employees.
23      Q.   And who were they?
24      A.   Actually, two employees.  It was three of
25  us.

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
**Daniel Edward Nersoyan on 10/15/2020**          Pages 46..49

Page 46

1  So the three of us. Hyrum, and then my
2  other employee was Anto, Andy Bidinsarian
3  (phonetic).
4      Q.  Okay. First of all, spell Hyrum's name
5  for us.
6      A.  H-y-r-u-m.
7      Q.  What's his last name?
8      A.  D-u -- I don't know how to spell it --
9  D-u-b-o, or something like that.
10     Q.  Is it D-u-b-o-n?
11     A.  I believe so, Dubon.
12     Q.  Okay. And who was your other employee?
13     A.  Andy Bagdisarian (phonetic), B-a-b-a- --
14         Let me see.
15         I could be wrong, B-a-g-a-d-a-r-i-a-n.
16     Q.  How long had Hyrum worked for you as of
17  May of 2014?
18     A.  A few years. Three years, two years.
19     Q.  And Andy?
20     A.  Same time. Same. Three years.
21     Q.  To your knowledge did Hyrum have any
22  criminal record at the time he worked for you?
23     A.  No, he did not, to my knowledge.
24     Q.  What about Andy?
25     A.  No, he did not. I know he did not

Page 47

1  because (inaudible) --
2      Q.  All right. So as of May 28 of 2014, how
3  many times had you given cash to someone else as
4  part of a business transaction?
5      A.  Someone else, other than these two?
6      Q.  No. How many times --
7          Well, let me back up. What was the
8  purpose of giving money on May 28, 2014, to Hyrum
9  and/or whoever else went with him?
10     A.  To make a purchase.
11     Q.  Where were they supposed to go?
12     A.  They were supposed to go somewhere not far
13  from where I was to purchase a diamond necklace. It
14  was a tennis necklace.
15     Q.  So where exactly were they supposed to go?
16     A.  I don't know the address. I just -- I
17  don't know.
18     Q.  Where were you when you gave the 158,000
19  in cash?
20     A.  In my office.
21     Q.  And to whom did you hand the cash to?
22     A.  I gave it to the broker in between me and
23  the person selling the jewelry, the person who set
24  it up, the person who found it and the broker.
25     Q.  What was the broker's name?

Page 48

1      A.  I don't remember.
2      Q.  Do you have any documents with the
3  broker's name?
4      A.  I don't. I don't. That document would be
5  it that would have his name on it, the original
6  document, the original memo.
7      Q.  Who was the seller?
8      A.  The seller, I do not know the seller
9  personally. They know him. So I did not know the
10  seller.
11     Q.  Had you ever seen the necklace?
12     A.  Of course I had.
13     Q.  When did you see the necklace?
14     A.  A week, maybe ten days before, a week, I
15  gave them a round price.
16     Q.  And did you meet with the seller at that
17  time?
18     A.  No. He wanted it to stay confidential
19  because he was a famous rapper at the time. So
20  someone who was famous and did not want people to
21  know -- they didn't want people to know the
22  situation.
23     Q.  Did you ever engage in the purchases of
24  unregistered, stolen, or illegal jewelry?
25     A.  Never. Never.

Page 49

1      Q.  What paperwork had you seen about the
2  diamond necklace to show that it was a legitimate
3  purchase for you?
4      A.  Okay. When you -- well, first of all,
5  everything has certificates as far as the GIA. They
6  certify everything, the color, the clarity, its
7  karat size. They engrave it. They (inaudible) make
8  sure that each stone is so --
9          I did all my homework on that, and it was
10  a very -- it was good business for me, so I went
11  ahead with the deal.
12     Q.  Okay. I am not asking about whether or
13  not the necklace was real. I am asking about the
14  legality of the seller's ability to sell it to you.
15         Did you see any --
16     A.  Ma'am, I mean, he's a rapper. If he
17  wanted to sell it, I'm not going to go ahead and
18  tell him give me a receipt if I'm going to buy it
19  from you. It's not my business to do that. If I
20  did that, I should just close my doors.
21     Q.  Okay. So you just took the broker's word
22  for it; correct?
23     A.  Yes. Yes.
24     Q.  All right. So was there an arranged time
25  that the broker was going to come to your office?

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
**Daniel Edward Nersoyan on 10/15/2020**                    **Pages 50..53**

Page 50

1    A.   Yes.
2         Q.   So the unnamed broker came to your office
3    somewhere around one or two p.m.; correct?
4         A.   Yes.
5              Again, this is a long time ago.  And if I
6    knew, I would have made a mental picture of this.
7    But I don't have no punctual answers for you, so I'm
8    giving you roundabouts, just for you to know.
9         Q.   But this is the first time you have ever
10   been robbed, correct, in your business?
11        A.   Yes.  First time, yes.
12        Q.   Okay.  So pretty memorable; correct?
13        A.   Yes, but, still, a long time ago.
14        Q.   All right.  So when the broker came to
15   your office, did he come alone?
16        A.   No, he came with someone else.
17        Q.   Who did he come with?
18        A.   That is the million dollar question on my
19   part, also with the FBI agents that I discussed this
20   with.  That's what this is all about.  We wanted to
21   know who that third person was because that third
22   person was pretty much the one who led the -- the
23   one who did all this to me.  He was the one that
24   swore he was taking the custody and this, that, and
25   the other.

Page 51

1         Q.   Okay.  So you think, what I am hearing, is
2    that your theory is that this unidentified person
3    who came to your office with the broker was somehow
4    in cahoots with Kenneth Collins.
5         A.   One hundred percent in my mind.
6              And this, again, like I said, FBI agents
7    and I spent many hours going over this.
8         Q.   Okay.  So when the broker and this
9    unidentified person came to your office, was anyone
10   else present?
11        A.   Yes, there was someone present.  Hyrum was
12   present.
13        Q.   Who else was present?
14        A.   Hyrum.
15        Q.   Hyrum was present?
16        A.   Yes.
17        Q.   Where does Hyrum live currently?
18        A.   I have no idea where he lives.
19        Q.   When did he stop working for you?
20        A.   He stopped working for me after I -- oh,
21   he stopped working for me -- I fired him a year
22   before my arrest.  Maybe seven or eight months
23   before my arrest he got fired.
24        Q.   So sometime in 2016 --
25        A.   Yes.

Page 52

1         Q.   -- or late 2015?
2         A.   Yeah, sometime in 2016.
3         Q.   Why did you fire him?
4         A.   Because he was drinking.  He smelled like
5    alcohol.
6         Q.   Have you spoken with him at all since
7    2015?
8         A.   He called me one time.  And it was very
9    short.  The phone cut off, and I never heard from
10   him after that.
11        Q.   Did it ever come to your attention that
12   Hyrum had a criminal record?
13        A.   No, it didn't.
14        Q.   How did you give the broker and this
15   unidentified person the cash?
16        A.   What do you mean how did I do it?  In what
17   form?  In a box?
18        Q.   Yes, how did you give it.
19        A.   Okay.  He had a bag with him.  I gave it
20   to him in a bag, in a leather case.
21        Q.   Was it a duffel bag?
22        A.   No, no.  It was like a leather briefcase.
23        Q.   And in what denominations did you give the
24   money?
25        A.   Well, I had just gotten them down at the

Page 53

1    bank, so they were all crisp, brand new, never been
2    used, never circulated, with the 10,000 bands all in
3    the middle of them, all in 100 dollar bills, all of
4    it.  All new -- just brand new bills.
5         Q.   What bank were you using at that time?
6         A.   I used Chase.
7         Q.   And was the account in the name of The
8    Nersoyan Group, Inc.?
9         A.   Yes, it was.
10        Q.   Does that account still exist?
11        A.   No longer, no.
12        Q.   When did you close that account?
13        A.   I closed it a year after.
14        Q.   In 2015?
15        A.   2015 -- '15 -- I don't know the exact
16   date, but I closed it all the way after that.
17        Q.   Where did you bank thereafter?
18        A.   I bank with Wells Fargo today.
19        Q.   Between 2015 and the present, has The
20   Nersoyan Group, Inc., banked at Wells Fargo?
21        A.   Yes.
22        Q.   And which Chase branch was it?
23        A.   Branch?  The one on Balboa.  The one on
24   Balboa.
25        Q.   And which Wells Fargo branch?

**Page 58**

1 BY MS. INLOW:
2    Q.   Okay.  Mr. Nersoyan, you appreciate you
3 are still under oath?
4    A.   Yes.
5    Q.   In 2014, did you keep any of your records
6 on computer?
7    A.   No.
8    Q.   Have you ever up to this time kept any
9 records on computer?
10    A.   No.  I don't even know how to work a
11 computer up to today.  I do not do anything with a
12 computer.
13    Q.   So between 2014 and 2016, did that memo
14 that you had the unnamed broker and the unnamed man
15 sign stay on the desk of your office?
16    A.   Well, it stayed in my office.  On the
17 desk, in the drawer, in the safe -- it would be in
18 my office the whole time, absolutely.  There would
19 be no reason for it to go anywhere else.
20    Q.   Well, where did you file memos such as
21 that?
22    A.   Okay.  A memo is a memorandum of
23 something, a transaction I have done.  I mean, you
24 just -- usually, you will keep them in the drawer,
25 you do it, you bring it out, you sign this, give

**Page 59**

1 them the copy, and that's that.  So you do it right
2 there, right there on your desk on the spot.
3    Q.   Right.  And after that, where did you
4 store your copy?
5    A.   On my desk, in my drawer -- wherever I put
6 it.
7    Q.   So you don't know where you kept that
8 memo between --
9    A.   No, I know where I kept it.  It could be
10 either on my desk or in my drawer -- in my office
11 someplace.  But I can't find it now.  It's gone.
12    Q.   And was that memo a duplicate form such
13 that the broker got a copy as well?
14    A.   There were three copies, actually.  There
15 was a yellow, a pink, and a white, yes.
16    Q.   The broker got one; correct?
17    A.   Yes.
18    Q.   And where did the other two copies go?
19    A.   Okay.  Now, the broker got one if the
20 transaction had taken place.  You get my point?
21 Because once the transaction has finalized over
22 there, okay, now the person who took it has the
23 paper in his hand, has the sheet of the cash that's
24 going there.  But the person I'm buying it from,
25 okay, never received that.  They never showed up,

**Page 60**

1 this person I am buying the jewelry from.  My
2 business would depend.  They were just in the
3 middle.  I wasn't doing business with the person
4 taking the jewelry to them.  They were the broker.
5 They were the middleman.  So my business was with
6 the person selling it.
7    Q.   Are you done?
8    A.   Yes.
9    Q.   Okay.  My question was, the form that you
10 had the broker sign that day was a triplicate form;
11 correct?
12    A.   Correct.
13    Q.   Did you give a copy of that signed
14 triplicate memo form to the broker when he left your
15 office --
16    A.   Yes.
17    Q.   -- on May 28 --
18       Please let me finish my question.
19    A.   Go ahead.
20    Q.   Did you give a copy of that signed
21 triplicate memo to the broker when he left your
22 office on May 28, 2014?
23    A.   Yes, I did.
24    Q.   Did you ever contact him to get his copy
25 back after your office had been robbed?

**Page 61**

1    A.   He left.  I could not get in contact with
2 him.  He ran off.  I have not been able to get a
3 hold of him in any way.
4       And that's why I told the FBI that this is
5 the person who -- you know, they identified the
6 person.  They found me a picture, and everything.
7 So they know who it is.  They have all that.
8    Q.   Well, do you think it was the broker that
9 was in cahoots with Kenneth Collins or --
10    A.   I believe it was --
11    Q.   -- was it the unidentified --
12       Please let me finish my question.
13    A.   I'm sorry.
14    Q.   The court reporter cannot get an accurate
15 record if we are talking at the same time.
16    A.   All right.
17    Q.   So please let me complete my questions.
18 Okay?
19       So let me ask again.  You told me earlier
20 that you believed it was the unidentified person who
21 was with the broker who you believed was in cahoots
22 with Kenneth Collins.  Correct?
23    A.   Yes.
24    Q.   Do you also think that the broker was in
25 cahoots with Kenneth Collins?

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
**Daniel Edward Nersoyan on 10/15/2020**                  **Pages 62..65**

Page 62

1    A.    Yes.
2    Q.    Okay.  To your knowledge were the broker
3  or this unidentified person identified by the FBI?
4    A.    Yes --
5    Q.    Did they tell you --
6    A.    -- to my knowledge.
7    Q.    Did they tell you those persons'
8  identities?
9    A.    They came.  Showed me his picture.  They
10  told me is this the person.  I said yes.  They said,
11  okay, we've got all the information on him.  And
12  they said that it's confirmed that you were robbed,
13  Kenneth Collins confessed to it, everything you said
14  was 100 percent accurate.  And that was the reason
15  why they were --
16          (A conference was held between
17          the witness and his counsel.)
18    THE WITNESS:  -- and so he said everything you
19  said, it was as you said it was, so they were now
20  pursuing this person.
21  BY MS. INLOW:
22    Q.    Was that the broker or the unidentified
23  man?
24    A.    That was the broker.
25    Q.    Did they ever ID the other man?

Page 63

1    A.    No, they are still in pursuit of his
2  identification to my knowledge.
3    Q.    Did the FBI tell you the name of the
4  broker?
5    A.    They did not give me the name, no.
6    Q.    When was it that you had this conversation
7  with the FBI?
8    A.    When I was in custody.
9    Q.    On May 28 of 2014, had you done any
10  cocaine?
11    A.    No.
12    Q.    How do you remember?
13    A.    Because I usually don't do cocaine when
14  it's light outside.
15    Q.    Is that something you did at night?
16    A.    It's something I would do at night, after
17  it.
18    Q.    Had you had cocaine the night before?
19    A.    Possibly.  I can't remember.  It's
20  possible.
21    Q.    How many times prior to May 28, 2014, had
22  you given cash to a broker that you did not know to
23  make a purchase for you?
24    A.    Several.  It's a regular practice.
25    Q.    Because I had asked you earlier who had

Page 64

1  done any of the transactions, and you told me you
2  did them all yourself.
3    A.    Yeah, I do -- the transaction, I do, but I
4  don't run from one building to the other building to
5  the other building.  I have people who go there.
6  Like I'm not doing the footwork.  I'm not doing
7  the footwork.
8    Q.    I had asked you before, and you told me
9  you did it all in the same small area of downtown
10  L.A.
11          So now you are telling me that it was a
12  regular practice for you to use a broker; correct?
13    A.    No, I did not say it is a regular practice
14  for me to use a broker.  A broker's function is
15  someone who is arranging the deal.  An employee is
16  different, someone who goes with somebody, do me a
17  favor, take this package, six or seven buildings,
18  give it to -- he's going to pay for you.  That's my
19  worker doing my footwork.  But a broker is when
20  there's a deal and he brought the deal to me, called
21  me up, says I have this guy, I go okay, let me see
22  what deal it is, and now that person becomes the
23  broker.  He is arranging the deal.
24    Q.    How many times prior to May 28, 2014, had
25  you used a broker?

Page 65

1    A.    Several times I have used a broker,
2  someone arranging a deal for me.
3    Q.    Had you given that person cash, a broker
4  cash, before May 28, 2014?
5    A.    Yes.  Yes.
6    Q.    Who left your office with the money on May
7  28, 2014?
8    A.    My employee Hyrum, the broker, and the
9  person the broker bought it from.
10    Q.    And where was it that they were going to
11  go to get the necklace?
12    A.    I do not know.
13    Q.    So you didn't know where the necklace was?
14    A.    I did not know where it was coming from,
15  the exact location.  But I did know in terms of
16  time, they told me it should be no longer than an
17  hour.
18    Q.    Was it your understanding that it was
19  somewhere in the jewelry district of downtown?
20    A.    No, it hadn't been in the jewelry
21  district.  It was outside of the jewelry district.
22    Q.    You didn't know where but you knew it
23  wasn't in the jewelry district.
24    A.    Yes.
25    Q.    And when was it -- you said you had seen

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
**Daniel Edward Nersoyan on 10/15/2020**                      **Pages 66..69**

Page 66

1   the necklace seven to ten days earlier?
2       A.   Uh-huh.  They had brought it to downtown.
3       Q.   Who brought the necklace -- so somebody
4   had brought you the necklace seven to ten days
5   before?
6       A.   Okay.  What happened is like this.  First
7   they will show me a picture of it with all the
8   information on it.  Okay?  Based on what I read,
9   that information, if it's a reputable company, like
10  GIA or BGL, I take that verbatim.  Based off that
11  paper, I will make the purchase.  I don't have to
12  see it here.  Just that paper is good enough for me
13  because I have a relationship and the relationship
14  in that company where all I've got to do is tell my
15  people check this out for me, and they will do all
16  the research for me and tell me if it's a good buy.
17  And that's how I do my business.
18           So what happened is, first they brought me
19  the paperwork on it.  I liked what I saw.  From then
20  on he brought me and showed it to me via picture.
21  He did not bring the necklace itself.
22      Q.   Okay.  First you said they brought you
23  some paperwork.  Who is the "they"?
24      A.   Okay.  When I say they, I mean the people
25  that I am doing business with, the broker and

Page 67

1   whoever those two people were.
2       Q.   Basically, who was it that you met with
3   to look --
4       A.   The broker.  The broker.
5       Q.   Okay.  So the broker who you can't tell me
6   his name; correct?
7       A.   Correct.
8       Q.   And was that paperwork about seven to ten
9   days before?
10      A.   Yes.
11      Q.   And did you ever see a purchase receipt or
12  anything else showing the providence of the
13  necklace, meaning that this was legally owned by
14  whoever it was who was trying to sell it?
15      A.   Okay.  Well, you asked me that question,
16  and, really, I am thinking back about it, because I
17  cannot -- I cannot -- everybody who comes to sell me
18  their jewelry, I cannot tell them show me your
19  receipt.  It's not the way I do business.  I don't
20  think anyone in downtown does it like that.
21           So I do not do that, so I did not ask for
22  that, no.
23      Q.   So as far as you know, it could have been
24  stolen.
25      A.   As far as I know, everything in downtown

Page 68

1   could have been stolen.  I mean, there's no telling.
2       Q.   All right.  Then did the broker return at
3   some point with a photograph?
4       A.   He did not return.  He came with the
5   photograph already.
6       Q.   So did you meet with the broker one time
7   before May 28, 2014?
8       A.   No, I met the broker a few times.
9            It was percolating, something we
10  discussed.  Once I knew who the person was, I knew
11  for a fact that it's a high money person.  I knew
12  his name.  We knew it every day.  So for me to ask
13  for a receipt would almost be -- it would almost be
14  insulting to them.  And, you know, how can I do
15  that.  It would insult them.
16      Q.   What was the name of the person who was
17  trying to sell the necklace?
18      A.   I cannot give that information.
19      Q.   Why not?
20      A.   Because it's something that I promised I
21  would not.  I cannot do that.
22      Q.   Did you sign a nondisclosure agreement?
23      A.   Yes -- I cannot --
24      Q.   You did?
25      A.   I cannot -- I cannot just tell you who it

Page 69

1   is.
2       Q.   Did you sign a nondisclosure agreement.
3            (A conference was held between
4            the witness and his counsel.)
5       MR. DEVEREUX:  Asked and answered.
6       THE WITNESS:  Yeah.
7       MR. DEVEREUX:  Did you sign one.
8       THE WITNESS:  No, I did not sign one, but I
9   gave my word that I would not let his name out.
10  BY MS. INLOW:
11      Q.   So are you refusing to tell me the name of
12  the rap star you claim was trying to sell the
13  necklace?
14      A.   I mean --
15      Q.   It's a yes or no.
16           Are you refusing?
17      A.   Yeah, I'm refusing to.
18           I mean, I can tell you -- yeah, I don't
19  know his legal name.  I know his street name.
20      Q.   So how many times did you meet with the
21  broker before May 28, 2014?
22      A.   Two or three times.
23      Q.   And presumably on the last time you agreed
24  to purchase the necklace for 158,000 dollars;
25  correct?

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
**Daniel Edward Nersoyan on 10/15/2020**                    Pages 70..73

Page 70

1     A.    Right.
2     Q.    And then did you make an agreement for him
3  to come to your office on May 28, 2014, to try to
4  close the deal?
5     A.    Yes.
6     Q.    Okay.  So you met with him two or three
7  times before May 28, and you met with him on May 28;
8  correct?
9     A.    Yes.  Yes.
10    Q.    And you still can't tell me his name.
11    A.    Okay.  I can tell you it's G-Unit.  I can
12  give you that, G-Unit was what they call him.
13  That's all.
14    Q.    Are you saying G, as in the letter G,
15  Unit?
16    A.    Yes.
17    Q.    What does that mean?
18    A.    That's the group they come from, the rap
19  group.
20    Q.    Oh, you're talking about the rapper.
21    A.    Yeah.
22    Q.    I'm asking you -- so of the probably four
23  times that you met with the broker, you can't tell
24  me his name; correct?
25    A.    The broker's name?

Page 71

1     Q.    Yes.
2     A.    Yeah, I told you, it's -- it was Melvin --
3  the FBI gave me his name.  The FBI showed me his
4  picture.  His name was Melvin.  Melvin.
5     Q.    I asked you multiple times if you knew the
6  broker's name, and you told me no.  I asked if the
7  FBI had ever told you his name.  You told me no.
8         So let me ask again.  Do you know the name
9  of the broker to whom you claim you gave 158,000
10  dollars in cash on May 28 of 2014.
11    A.    Yes.  His name is Melvin.  Mervin or
12  Melvin.  Something along those lines.
13    Q.    And what's his last name?
14    A.    I don't know.
15    Q.    Had you ever done business with him
16  before?
17    A.    Yes, I have.
18    Q.    How many times had you done business with
19  him before?
20    A.    A few times.  A few times.
21    Q.    How many is a few?
22    A.    Maybe three or four times.
23    Q.    Did you ever do business with him after
24  May 28 of 2014?
25    A.    He disappeared.  I can't get a hold of

Page 72

1  him.  Nothing.
2     Q.    Did you ever contact --
3         Did he have a boss, or a group?  Or who
4  did the broker work for?
5     A.    He was their friend, I guess, an associate
6  of theirs.
7     Q.    Of the rapper?
8     A.    Yes.
9     Q.    So you had bought jewelry from the rapper
10  before?
11    A.    Not that particular rapper.  Other rappers
12  before.
13    Q.    Okay.  So this broker brokered jewelry
14  sales from multiple rappers?
15    A.    Not this broker.  I have done business
16  with other rappers before but not from this broker.
17  This broker brought his --
18         I mean, I don't know what you are asking
19  me.
20    Q.    Let me ask again, because I want to be
21  clear.  Prior to May 28 of 2014 had you ever done
22  business with this particular broker, Melvin or
23  Mervin, before.
24    A.    Yes.
25    Q.    How many times?

Page 73

1     A.    Three, three times.  Three or four times
2  before.
3     Q.    Did the broker work for a company or
4  organization, or was he an independent human that
5  you believe just knew a lot of rappers and helped
6  them sell their jewelry?
7     A.    I would not be able to tell you.  I don't
8  know.  I have no idea.
9     Q.    Other than the one memo that you have
10  already told me about, was there any other written
11  documentation generated by you with regard to the
12  alleged purchase of the necklace from the rapper?
13    A.    No.
14    Q.    And you don't know the exact destination
15  of where the broker and Hyrum were going when they
16  left your office; correct?
17    A.    No, I do not know.
18    Q.    But you expected them to return with the
19  necklace within the hour; correct?
20    A.    Yeah.
21    Q.    What was the first knowledge that you had
22  that something had gone wrong?
23    A.    When I called the broker's home, and they
24  weren't answering, and I called Hyrum's home, and he
25  wasn't answering.  Then all of a sudden I get a

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
Daniel Edward Nersoyan on 10/15/2020

Page 74

1  call.  Over an hour and a half has passed, and now I
2  am kind of getting a little bit nervous.  So I get a
3  call from the broker, from the broker, saying, look,
4  we got into a little problem here, I'm getting
5  pulled over.  I said okay, you are getting pulled
6  over, just stay cool and, you know, make sure that
7  everything is all right.  What took you so long?
8  Well, no, we stopped to go get gas.  There was a lot
9  of traffic on the 110.  I said, okay, whatever it
10  is, as long as you guys are still okay.  I hung up
11  the phone.  The next thing you know Hyrum calls me,
12  my employee.  Calls me --
13      Q.  Let me stop you there.
14          And you are speaking really fast.  So if
15  you could slow down, it would make it a lot easier
16  for the court reporter.
17      A.  All right.
18      Q.  So how long was it after they left your
19  office that you got this phone call from the broker
20  telling you he was being pulled over?
21      A.  Approximately an hour and a half.
22      Q.  Do you know the phone number of the
23  broker?
24      A.  I did at the time when I turned it over to
25  the FBI.

Page 75

1      Q.  Where were you when you got the call from
2  the broker?
3      A.  Sitting at my desk in my office.
4      Q.  Did you think it was odd that the broker
5  was calling you to tell you that he was being pulled
6  over?
7      A.  I did.  I did.  I felt it very odd.
8      Q.  Because as far as you were concerned, this
9  was a fully legal transaction; correct?
10      A.  Uh-huh, absolutely.
11      Q.  Is that yes?
12      A.  Yes.
13      Q.  Okay.  So there would have been no reason
14  for the broker to be nervous by the fact that he was
15  being pulled over for a traffic stop; correct?
16      A.  Correct, except for the cash being in his
17  custody.  And that's why -- that's why I gave him a
18  bunch of my receipts, a bunch of receipts for all
19  the cash.
20          I said if you need me, guys, to come
21  there, I will come there, I said, and show -- and
22  give documents of where the cash came from if
23  there's any problem of having all that big amounts
24  of cash.  Okay?
25      Q.  Let me back up.  Did you say that you had

Page 76

1  given the broker receipts showing where the cash
2  came from when he left your office that day?
3      A.  I did give him a receipt, yes.  I did give
4  him a receipt as well.  I did.
5      MR. DEVEREUX:  Let me stop you there.  That's
6  not what she asked you.
7      THE WITNESS:  What did she ask me?
8      MR. DEVEREUX:  Listen to the question.
9      THE WITNESS:  She asked if I gave the broker a
10  receipt.
11      MR. DEVEREUX:  Would you repeat your question,
12  Laura.
13  BY MS. INLOW:
14      Q.  When the broker left your office with
15  158,000 dollars in cash --
16      A.  Yes.
17      Q.  -- what document, if any, did he also have
18  in his possession?
19      A.  He had the cash, and he also had the one
20  receipt from Chase that I had just got because I had
21  just pulled the money out at the last moment.  I
22  said here is the receipt for this last -- that's
23  what I remember, it was the 40,000, 50,000, I can't
24  remember -- that last amount of money for me to get
25  to the threshold that I needed to, and I had left

Page 77

1  that with him.  I left that with him.
2      Q.  Okay.  So let me get it straight.  So when
3  the broker left your office, in addition to the
4  158,000 dollars in cash, you had given him the
5  withdrawal slip from Chase showing you had withdrawn
6  40- or 50,000 dollars that day.
7      A.  Okay.  Let me stop this here.  Again, when
8  you are saying broker, I mean to say my employee,
9  Hyrum, because he is with the broker.
10          The one that is representing me is Hyrum.
11  So Hyrum had -- I had given Hyrum the receipts, so
12  Hyrum would have it.
13          When you say broker, I am considering them
14  both one and the same at that point.
15      Q.  Okay.  So Hyrum could show a withdrawal
16  slip for 40- or 50,000 from Chase that day; correct?
17      A.  Yes.  Yes.
18      Q.  Could he have shown any documentation for
19  the balance of the cash?
20      A.  No, he could not.
21      Q.  Did you give Hyrum the only copy of the
22  withdrawal slip that you had?
23      A.  No, I have a copy.
24      Q.  You kept a copy.
25      A.  Of course.  I have a copy of all the

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
**Daniel Edward Nersoyan on 10/15/2020**                    **Pages 78..81**

Page 78

1  withdrawals I have.
2      Q.   At that time, in 2014, did you keep your
3  records by purchase, meaning would you have had a
4  file folder, since you said you didn't keep anything
5  on a computer, with regard to the purchase of this
6  particular necklace from the rapper?
7      A.   Yes.
8      Q.   Okay.  So what documents would have gone
9  in that folder?
10     A.   The document -- the only document that
11 would have been in that folder regarding this would
12 only be the amount of money I had taken out with the
13 picture of the necklace that I was supposed to be
14 getting.  That's all that would be there.
15     Q.   So all you would have had in that file was
16 the picture of the necklace, a copy of the
17 withdrawal slip -- and then would you have put the
18 memo you had signed that day in the --
19     A.   All that, yes.  Yes.
20     Q.   Would that be the sum total of the
21 documentation that you would have had for the
22 purchase of a 158,000 dollar necklace?
23     A.   Yes.
24     Q.   And when they left your office, you
25 believe that the cash was in a leather briefcase;

Page 79

1  correct?
2      A.   Yes.
3      Q.   Whose briefcase was it?
4      A.   It was -- it was Darryl's.  It wasn't
5  mine.  It wasn't a briefcase I provided.  It was
6  something that they provided.
7      Q.   Was the briefcase locked?
8      A.   No, it wasn't.  It was soft.  It was soft
9  leather.  It wasn't a lockable type.
10     Q.   To your knowledge, were any of the three
11 men -- the broker, the unidentified person, or
12 Hyrum -- armed when they left your office?
13     A.   Not to my knowledge.
14     Q.   All right.  So you get the call from the
15 broker telling you he is being pulled over.  You
16 tell him to keep cool.  Right?
17     A.   When they --
18         MR. DEVEREUX:  Let her ask the questions.
19 BY MS. INLOW:
20     Q.   Right?  You told him to keep cool;
21 correct?
22     A.   Yes.
23     Q.   Okay.  And you asked what had taken so
24 long; correct?
25     A.   Yes.

Page 80

1      Q.   He told you they had stopped to get gas
2  and there was a lot of traffic, I think you said on
3  the 110.
4      A.   Yes.
5      Q.   So did you know at that time where they
6  were going?
7      A.   Well, I asked him where were they, where
8  were you guys.  He goes we are at a gas station, and
9  he goes there's a policeman behind me and I think he
10 is going to pull me over.  I say okay, no problem.
11 He goes I am putting gas now.  Okay?  And that was
12 it.  Then --
13         Okay.  I'll stop.
14     Q.   Let me stop you there.
15         So now you are saying that the broker
16 called you from the gas station.
17     A.   Okay.  It's difficult to just say.  You
18 will see once you see the DVD.  When they pulled
19 over to get gas, the policeman -- afterwards I saw
20 this -- the policeman pulled in behind them in the
21 gas station.  So he called me while he's getting gas
22 that there's a policeman right here.  That's why he
23 was nervous.
24     Q.   So he saw a police car, and he assumed
25 that it was there for him; correct?

Page 81

1      A.   Yes.
2      Q.   And did you have any other conversation
3  with the broker when he called you from the gas
4  station?
5      A.   No.
6      Q.   How long was it until you got the next
7  phone call?
8      A.   About 30 minutes after that.
9      Q.   And that was from Hyrum?
10     A.   From Hyrum.
11     Q.   And what did Hyrum tell you?  And speak
12 slowly.
13     A.   Okay.  He told me that, Mr. D, he goes, we
14 got pulled over, the policeman took the money.  And
15 I told him is the policeman there?  Are you there
16 right now?  He goes yeah.  I go put this policeman
17 on the phone or make sure he gives you a receipt for
18 the money.  I go make sure he gives a receipt.  If
19 he's not giving you a receipt for the money, I go
20 give the phone to the policeman, let me talk to the
21 policeman, I said.  He said no, he is taking off
22 right now.  He goes, Mr. D., he's stealing it, he's
23 stealing, he's taking the money.  I go what do you
24 mean he's taking the money?  I go the policeman, are
25 you it's a policeman?  He goes yeah.  I go are you

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
**Daniel Edward Nersoyan on 10/15/2020**                    **Pages 82..85**

Page 82

1   100 percent sure that it's a policeman? He goes
2   yes. I go, okay, did he give you a card, or
3   anything? He goes nothing. I go what do you mean
4   nothing? I said are you lying to me? Are you guys
5   lying to me? And then I started getting mad. I
6   think they're lying to me, or something.
7              I'll stop there.
8       Q.   No, keep going.
9       A.   Okay. And then I said I'll call you back.
10  I called the Sheriff's Department immediately. I
11  said what area are you in. I forget the street he
12  told me, Slauson, or something. So I called the
13  sheriff, and I go which department patrols that
14  area, because someone just got pulled over and
15  someone was taken into custody and they took a large
16  amount of cash from me and he did not give my
17  employee the receipt. I said if anyone had been
18  brought in, was anyone arrested, can you please,
19  I'll come there, okay, to get my money and all the
20  paperwork I need to legitimize everything. They
21  said no one has been arrested, no one has come in.
22  An hour passed. I keep calling now, and they're not
23  picking up my phone calls. Okay? And I'm freaking
24  out. Hyrum is not picking up, either. He was
25  scared because he felt like, well, he's been being

Page 83

1   honest. So I didn't hear from them no more. That
2   was the end of it.
3              I called the police all night long, and
4   then the FBI told me he heard all of the phone calls
5   to the Sheriff's Department I made. They had a
6   record of all of it.
7       Q.   Let me stop you there.
8              So where exactly did you call, which
9   sheriff's station did you call?
10      A.   Whichever one is in that area. I can't
11  remember which one. There's three or four of them.
12      THE REPORTER:  You have to slow down a little
13  bit.
14  BY MS. INLOW:
15      Q.   And I didn't hear any of that.
16             Well, I am asking you to tell me
17  specifically what station you called.
18      A.   Okay. I don't know what station I called.
19  There were three or four different stations I
20  called.
21      Q.   Did you tell the officers that answered
22  the phone that the robbery or the theft had taken
23  place on East Slauson?
24      A.   Yes.
25      Q.   And did they tell you that that was an

Page 84

1   area that they patrolled?
2       A.   I can't remember what they told me. I
3   can't remember what they told me.
4       Q.   Did anybody at the Sheriff's Department
5   ever tell you that this was an area patrolled by the
6   L.A.P.D.?
7       A.   I can't remember that now.
8       Q.   Did you ever call the L.A.P.D.?
9       A.   I did not because they told me it was the
10  sheriffs that pulled them over.
11      Q.   So Hyrum told you it was a sheriff.
12      A.   Yes.
13      Q.   Because all you said before was a
14  policeman.
15      A.   Yeah. I meant to say sheriff. Sheriff.
16  Sheriff.
17      Q.   So in the call with Hyrum now, he told you
18  it was a sheriff; correct?
19      A.   Yes.
20      Q.   Did he tell you anything about the
21  sheriff?
22      A.   He told me it was -- he gave me a brief
23  description of the sheriff.
24      Q.   What did he say?
25      A.   He said he was a Cuban African American

Page 85

1   with freckles on his face.
2       Q.   I didn't understand --
3       A.   African American with freckles on his
4   face.
5       Q.   Anything else?
6       A.   That's basically it. That's it.
7       Q.   How did Hyrum know that it was a sheriff?
8       A.   Because the car said Sheriff on it, and he
9   was wearing a Sheriff's uniform.
10      Q.   So how did you decide which Sheriff's
11  Department to call first?
12      A.   I didn't decide. I just called -- I just
13  kept trying to hit. I just called whichever one was
14  in the area. I called a few of them. So whichever
15  one. And none of them told me there was an arrest
16  made, so I kept going to the next one, the next one.
17      Q.   Did you call 911?
18      A.   No.
19      Q.   Did you look it up in a phone book or on
20  the computer? How did you get the numbers for the
21  different Sheriff's Departments.
22      A.   I got it from Information, from the phone.
23      Q.   So you called Information and got a number
24  for which station first?
25      A.   Whichever station would be in that area.

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
**Daniel Edward Nersoyan on 10/15/2020**          **Pages 86..89**

Page 86

1  Q.  How many different sheriff's stations did
2  you call on May 28, 2014?
3     A.  I cannot recollect.
4     Q.  Was it more than two?
5     A.  Yes.
6     Q.  Was it more than four?
7     A.  No.
8     Q.  So it was about two or three or four?
9     A.  It was three or four.
10    Q.  Do you remember the names of anyone you
11  spoke with in any station of the Sheriff's
12  Department on May 28, 2014?
13    A.  No names at all.
14    Q.  But each of them told you that no officer
15  had come in with a large amount of cash; correct?
16    A.  Yes, and that no officer -- the question
17  that I was asking is, has anyone been arrested,
18  first, because he had arrested one of the people
19  that were in the car, so based on that, on them
20  being arrested, and because he also took money.
21  That's the way I did the question.  It wasn't only
22  money.  It was also has anyone been arrested.
23    Q.  Which person in the vehicle was arrested?
24    A.  The individual that I did not know.
25    Q.  So it was the unidentified guy with the

Page 87

1  broker; correct?
2     A.  Yes.
3     Q.  Have you ever heard the name Dante Miller?
4     A.  Dante Miller.  That does sound familiar,
5  yes.
6     Q.  Who is Dante Miller?
7     A.  That could have been the person's name
8  that was with them, Dante.  Now that I hear the
9  name, it does sound -- Dante, I think that was the
10  name they had used was Dante.
11    Q.  So you think now, now that I have said
12  that name, you think that's the name of the
13  unidentified person --
14    A.  Yes.
15    Q.  -- with the broker?
16    A.  Yes.  As I recall now, yes.
17    Q.  Where had you heard that name before?
18    A.  I don't know, but I know that -- I don't
19  know.  Maybe they told me.  Maybe they told me when
20  I first met them and now I am remembering it,
21  maybe.
22    Q.  Who is they?
23    A.  Maybe when I was -- it could have been
24  when I was -- once they told me he had been
25  arrested, I go what's his name so I tell the

Page 88

1  policeman.  That's how -- I think how I got the name
2  Dante.  So I asked, has Dante been arrested.  So I
3  was asking for his name so I can find out has he
4  been arrested.
5     Q.  So let me get this straight.  You think
6  you asked the broker or Hyrum on the phone --
7     A.  Yes.
8     Q.  -- what the guy's name was?
9     A.  Yes, what's his name so I can see if he's
10  been arrested.
11    Q.  Okay.  So did they tell you that in the
12  call you had with each of them?  Because you said
13  that --
14    A.  Yeah, I can remember --
15    Q.  Let me finish my question, please.
16       Let me break it down.  In the first call
17  that you got from the broker from the gas station
18  when he told you he was nervous because there was a
19  cop behind him in the gas station, did he tell you
20  the name of the gentleman who was with him?
21    A.  At that moment that he told me, no.  There
22  was no reason for him to tell me.
23    Q.  At any time in that phone call did he tell
24  you the guy's name?
25    A.  In that first phone call?

Page 89

1     Q.  Correct.
2     A.  No.
3     Q.  Did you ever speak with the broker again
4  that day?
5     A.  Yes.
6     Q.  Because I thought you told me he never
7  called you again and he took off and you never
8  talked to him again.
9     A.  I never saw him again.
10    Q.  How many different conversations did you
11  have with the broker by phone after he left your
12  office on May 28, 2014?
13    A.  That day, three or four or five different
14  calls, all that day.  After that day I never heard
15  from him or saw him ever again.
16    Q.  Okay.  So he called you the first time
17  from the gas station.  Have you told me everything
18  that transpired in that conversation?
19    A.  Yes.
20    Q.  When was the second time that the broker
21  called you?
22    A.  After the money was taken, after the
23  gentleman was brought into custody, and now they are
24  letting me know what happened.  I told them to go to
25  the police station and fix this problem.

Page 90

1　　Q.　So what exactly did the broker tell you in
2　the telephone conversation?
3　　A.　He told me that he took the money.　He
4　didn't really say much.　I mean --
5　　Q.　That who took the money?
6　　A.　The sheriff took the money.
7　　Q.　Did he describe the sheriff to you?
8　　A.　No, he did not.　I did not ask him for a
9　description.
10　　Q.　Did you ask the broker in that
11　conversation for the name of the person that had
12　allegedly been arrested?
13　　A.　Yes.　Yes, I did.
14　　Q.　What did he tell you?
15　　A.　That's when I believe I remember now he
16　said Dante.　So that's when I called the departments
17　saying has anybody by the name of Dante been
18　arrested.
19　　Q.　You had told me many times today that the
20　FBI was still trying to identify the person that had
21　been with the broker.　So did you share the name of
22　Dante with the FBI?
23　　A.　Yes, I did.　I do remember I did, yes.
24　　Q.　Do you know if Dante has a record?
25　　A.　I have no idea.

Page 91

1　　Q.　Have you now told me everything that took
2　place in the second phone call with the broker?
3　　A.　Yes.
4　　Q.　When was the next time that you spoke with
5　the broker?
6　　A.　The broker, it was sometime throughout
7　that night.　It was very late.
8　　To me, it was something very hard and
9　blurry because I was so -- I was in a panic state.
10　I was falling apart, practically.
11　　So a few more times, telling him, look,
12　man, I know -- you're in L.A., you've got goods
13　booked for me.　And now I was already accusing him
14　because I felt as though I have been duped.
15　　Now I was getting to question whether it
16　was the sheriff.　I didn't know what to believe
17　anymore.　At that point I thought that everything
18　was a lie.　That's when I took the next step.
19　　Q.　Where did the broker go after the theft?
20　　A.　I have no idea.　They both disappeared.
21　　Q.　Did you ever ask them to come back to
22　your office?
23　　A.　Of course I did.　Of course I did.　They
24　never did.
25　　Q.　Did you give the police the name of the

Page 92

1　broker so that they could investigate whether he was
2　involved?
3　　A.　Of course.
4　　MR. DEVEREUX:　Did you tell the police?
5　　THE WITNESS:　You mean the FBI, not the police.
6　　MR. DEVEREUX:　Was the question did he give
7　the names to the police?
8　　MS. INLOW:　Yes.
9　　Q.　Like on all these multiple phone calls to
10　the Sheriff's Department, did you give the names of
11　these people so that they could try to investigate
12　what had happened?
13　　A.　Okay.　The police, over the phone, did not
14　make any -- they didn't even pay attention to what I
15　said.　They didn't do anything about it.
16　　Q.　One thing at a time.
17　　So you had multiple calls with the broker
18　that night, each time he just told you he didn't
19　know what had happened, you accused him.　Anything
20　else?
21　　A.　No.　That's basically it.
22　　Q.　Did you ever ask him to meet you at a
23　police station?
24　　A.　No.
25　　(A conference was held between

Page 93

1　　the witness and his counsel.)
2　　MR. DEVEREUX:　He is asking for a break.　Can
3　we take a break?
4　　MS. INLOW:　Sure.　Ten minutes?
5　　MR. DEVEREUX:　Thank you.
6　　THE VIDEOGRAPHER:　We are now off the record.
7　The time is 1:03 p.m.
8　　(A brief recess was taken.)
9　　THE VIDEOGRAPHER:　We are back on the record.
10　The time is 1:13 p.m.
11　BY MS. INLOW:
12　　Q.　Okay.　Mr. Nersoyan, you appreciate you
13　are still under oath?
14　　Mr. Nersoyan, can you hear me?
15　　(A discussion was held off the record.)
16　　MS. INLOW:　Let's go off the record until they
17　get back in.
18　　THE VIDEOGRAPHER:　We are now off the record.
19　The time is 1:14 p.m.
20　　(A brief recess was taken.)
21　　THE VIDEOGRAPHER:　We are now back on the
22　record.　The time is 1:40 p.m.
23　　MS. INLOW:　Mr. Devereux, you had something you
24　would like to say?
25　　MR. DEVEREUX:　Yes, I would.　My apologies,

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
**Daniel Edward Nersoyan on 10/15/2020**          **Pages 102..105**

Page 102

1    Q.    When you had had insurance, which
2    insurance company was it with?
3        A.    I don't remember.
4        Q.    What type of insurance had you had?
5        A.    The basic one I needed.  I don't know what
6    it's called, but the basic.  The bare necessity one.
7        Q.    In a typical day, let's say early in 2014,
8    how much cash did you have in the office?
9        A.    Anywhere from 10,000 to 7-, 800,000.
10       Q.    In a typical day in early 2014, how much
11   in value would you have of jewelry in the office?
12       A.    Oh, about a million dollars.
13       Q.    So you could have had close to 2 million
14   dollars' worth of assets in your office and you had
15   no insurance; correct?
16       A.    I did not.  I did not have insurance, no.
17       Q.    Did you ever learn the name of the other
18   person in the car?
19       A.    You mean Dante?
20       Q.    Well, you think Dante was the unidentified
21   person; correct --
22       A.    Yes.
23       Q.    -- or was that the broker, actually?
24       A.    That was Dante, Dante, and then there was
25   the broker, and then there was Hyrum.

Page 103

1    Q.    Have you ever heard the name Delvin,
2    D-e-l-v-i-n, Williams?
3        A.    Yes.
4        Q.    How do you know that name?
5        A.    That's the name of the broker.
6        Q.    Did you give that name to the FBI, or did
7    the FBI give that name to you?
8        A.    I think at that time the name was fresh in
9    my mind, so I could have given it to the FBI, yes.
10       Q.    Whose car were they in at the time of the
11   alleged traffic stop?
12       A.    I do not know.
13       Q.    Had you provided Hyrum with a car?
14       A.    No.
15       Q.    So it had to belong to either Delvin or
16   Dante; correct?
17       A.    Correct.  Yes.
18       Q.    What time of day was it when you first
19   called the Sheriff's Department?
20       A.    It was starting to get to like four or
21   five o'clock already.  You know, maybe four or five.
22       Q.    And you think that you called 411
23   Information and asked for a sheriff's station near
24   Slauson; is that correct?
25       A.    Yes, or whatever substations there were in

Page 104

1    the area.
2        Q.    And when you called, tell me exactly what
3    you said to the person who answered the phone.
4        A.    Okay.  I can't tell you exactly because I
5    cannot be exact in my memory, but I can give you
6    around that same, yes.  A car was pulled over and
7    somebody was taken into custody, I said, and I gave
8    the location, and I said the officer who took the
9    person in custody also confiscated, seized, my cash,
10   and I gave the amount.  And they said, well, nothing
11   like that's happened here.  I said can you please
12   find out.  And she goes, well, I'm looking in the
13   computer, and she goes no one has been taken into
14   custody in that area.
15       Q.    And you were speaking with a female?
16       A.    Yes.
17       Q.    Anything else that you said to them?
18       A.    I can't specify it.
19       Q.    So then you called how many other
20   sheriff's stations?
21       A.    Maybe two, two more.
22       Q.    And did you basically have that same
23   conversation, asking if somebody had been arrested
24   with an officer bringing in a large amount of cash?
25       A.    Yes.

Page 105

1    Q.    And you were told nothing like that had
2    happened at that station; correct?
3        A.    Correct.  Yes.
4        Q.    Did you ever say I want to make a police
5    report and report a theft?
6        A.    I may have.  Well -- I may have done
7    that.  I may have.
8        Q.    Well, did you ever actually go to a
9    station and make a written report of a theft?
10       A.    No, I did not.
11       Q.    Did you ever, in the two to three
12   sheriff's stations that you spoke with, did you ever
13   ask for a detective to come to you so that you could
14   make a report of a theft?
15       A.    I was not even sure of the story they were
16   telling me.  So I didn't know if what I was even
17   hearing was true.
18       Q.    So is that a no, you never asked a
19   sheriff's --
20       A.    Yes.  No, I never did, no.
21       Q.    Did you make any other attempts or actions
22   with regard to the alleged theft on May 28, 2014?
23       A.    On that day, no.
24       Q.    Did you make any writings about the theft
25   that day?

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
**Daniel Edward Nersoyan on 10/15/2020**                    **Pages 106..109**

Page 106

1    A.  No.
2    Q.  When was the next time you took any action
3  with regard to the alleged theft?
4    A.  The next time was the next day.
5    Q.  So that would be May 29 --
6    A.  Yes.
7    Q.  -- of 2014?
8    A.  Yes.
9    Q.  What did you do that day?
10   A.  I went to the location -- actually, I sent
11  my other employee to the location, and they told me
12  that there was a camera located at that location,
13  and then they actually went and got the footage of
14  what happened and brought it to me.
15   Q.  So are you saying you sent Andy?
16   A.  Yes.
17   Q.  Where does Andy live today?
18   A.  I have no idea.
19   Q.  When is the last time you saw Andy?
20   A.  I haven't seen him in a few years.
21   Q.  How did Andy come to no longer be in your
22  employ?
23   A.  When I got arrested, we just went our
24  separate ways.
25   Q.  What became of the cash and jewelry that

Page 107

1  was in your office on the day of your arrest?
2    A.  The police department confiscated it.
3    Q.  How much cash was in your office on the
4  date of your arrest?
5    A.  In the office, there was no cash.  No more
6  of that after the robbery.
7    Q.  Did you ever come to learn how you were
8  the subject of this joint task force sting that
9  ended up in your arrest?
10   A.  No, I don't know how I got caught up in
11  it.
12   Q.  Do you have any reason to believe that
13  anyone at the Sheriff's Department knew that Kenneth
14  Collins was going to steal money from you on May 28,
15  2014, before it happened?
16   A.  I don't even know how to answer that.  I
17  don't understand the question.
18   Q.  In any of your dealings with Andy, Hyrum,
19  the FBI, Grant Valencia -- anybody -- did you --
20   A.  Oh.  No.  No.
21   Q.  Let me ask it again so we have a clear
22  answer.  As you sit here today, did you ever come
23  into any information that led you to believe that
24  anybody in the Sheriff's Department knew that
25  Kenneth Collins was going to steal money from you on

Page 108

1  May 28, 2014.
2    A.  No.
3    MR. DEVEREUX:  What was that question again?
4  I'm sorry.
5        (The question was read.)
6    MR. DEVEREUX:  Thank you.
7  BY MS. INLOW:
8    Q.  And you admit that Kenneth Collins never
9  wrote any official reports with regard to the money
10  or the alleged arrest of somebody from the car that
11  day; correct?
12   A.  Yeah, nothing comes out.
13   Q.  All right.  So Andy went to the location
14  the next day; correct?
15   A.  Correct.
16   Q.  What is your understanding of where the
17  location was?
18   A.  I really don't have an understanding.  I
19  didn't ask him about the location.  To me, it was
20  irrelevant.
21   Q.  Well, how did Andy know where to go?
22   A.  Hyrum told him.
23   Q.  Did Hyrum ever tell you?
24   A.  He told me, but I never went there.
25   Q.  Do you know from what business or source

Page 109

1  Andy located a video?
2    A.  One -- I believe one was the gas station
3  and the other was a -- I don't know.  I don't know
4  the details -- (inaudible) -- and they were kind
5  enough to give the DVD coverage.
6    Q.  How many videos pertaining to the alleged
7  theft have you ever seen?
8    A.  I have seen one DVD video.
9    Q.  So one tape or two different -- one
10  footage or two pieces of footage?
11   A.  One footage -- well, two pieces of
12  footage, one was at the gas station and the other
13  was the pull-over.
14   Q.  Okay.  Do you know which gas station it
15  was?
16   A.  I don't.
17   Q.  All right.  In paragraph 31 of your First
18  Amended Complaint, you said Mr. Nersoyan, on his own
19  volition, since he was informed and believed that
20  the L.A.S.D. had no interest in investigating the
21  matter, scoured the neighbor -- I think it meant
22  neighborhood -- and discovered a business that had
23  video surveillance.
24       So my first question is, did you yourself
25  actually go and look for the footage, or was it

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
**Daniel Edward Nersoyan on 10/15/2020** Pages 110..113

**Page 110**

1  Andy?

2  A.  It was Andy.

3  Q.  Okay.  So you did not actually scour the

4  neighborhood ever; correct?

5  A.  No, I didn't.

6  Q.  You did not discover that a business had

7  video surveillance; correct?

8  A.  Yes.

9  Q.  What made you believe by May 29 that the

10  Sheriff's Department had no interest in

11  investigating the matter?

12  A.  I got actually no response from them.

13  They didn't reach out to me.  They didn't call me.

14  They didn't do anything.

15  Q.  You asked them if anyone had been arrested

16  and an officer had brought in a large sum of money,

17  and they told you no; correct?

18  A.  Right.

19  Q.  And that's all you asked them; right?

20  A.  Yes.

21  Q.  So you didn't ask them to do anything

22  else; correct?

23  A.  No, I did not.

24  Q.  Okay.  So then, in paragraph 32, it says

25  Mr. Nersoyan procured that video and presented the

**Page 111**

1  video to the L.A.S.D.

2  So did you give video to the Sheriff's

3  Department?

4  A.  No.  I gave it to the FBI.

5  Q.  When did you give it to the FBI?

6  A.  A month -- it was in that month, within

7  that month.

8  Q.  Within, so --

9  A.  It was within a 30-day period.

10  Q.  So was that June of 2014?

11  A.  I would believe so, yes.

12  Q.  What contact were you having with the FBI

13  in 2014?

14  A.  I had friends who had friends who were in

15  the FBI.  I asked if I can meet with one.  I had met

16  with an agent, showed the DVD.  They were growing

17  raid buys, so they had made a formal meeting with

18  them, with me.  Sat down, and I said, look, please,

19  I need this fixed, you know.  My life is an open

20  book to you guys.  You know, check anything you

21  want.  This is my money I need.  It's going to ruin

22  me.  This is going to ruin me.  And they did.

23  Q.  Who did you meet with in the FBI --

24  A.  I don't know his name.

25  Q.  Let me finish my question, please.

**Page 112**

1  In June of 2014, who did you meet with in

2  the FBI?

3  A.  I don't have his name.  I'm sorry.

4  Q.  It was a man?

5  A.  Yes, it was.

6  Q.  In your discovery responses, you listed a

7  few FBI agents.

8  Who is Special Agent David -- and I am

9  going to spell his last name -- D-a-h-l-e?

10  A.  Who is that?

11  Q.  Yes.

12  A.  How would I know that?  I mean, he was an

13  agent that that name was given to me.

14  Q.  All right.  My interrogatory number six to

15  you was for you to identify all individuals within

16  the FBI with whom you had ever discussed Kenneth

17  Collins or the alleged theft.  Your answer, after a

18  ridiculous objection, was, quote, to the best of my

19  knowledge, Special Agent David Dahle, Special Agent

20  Elizabeth Roe, R-o-e, and Special Agent Ramon

21  Johnson.

22  So my question to you is, who is Special

23  Agent David Dahle.

24  A.  He was the agent, I suppose, that came and

25  looked at the DVD and helped me, I suppose.

**Page 113**

1  Q.  Are you guessing?

2  A.  I am guessing, yes.

3  Q.  So you don't know who that is; correct?

4  A.  I don't know their names.  I did not

5  memorize their names at all.

6  Q.  Where did the name come from to be put

7  into these interrogatory responses?

8  A.  My other attorney, Nareg, at the time.

9  Q.  So who was your attorney in 2014?

10  A.  Nareg, N-a-r-e-g.

11  Q.  And what's his last name?

12  A.  Goujian, G-o-u-j-i-a-n, or j-i-n.

13  Q.  I have it as G-o-u-r-j-i-a-n.

14  A.  Yes.

15  Q.  Is that correct?

16  A.  That's correct.

17  Q.  So does Mr. Gourjian still have a file

18  pertaining to the Kenneth Collins theft?

19  A.  I am sure he does.  He would have to keep

20  it.

21  Q.  Have you made any attempt in this lawsuit

22  to get copies of the documents that Mr. Gourjian

23  has?

24  A.  No, because I let Mr. Devereux handle it

25  from this time forward.

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
**Daniel Edward Nersoyan on 10/15/2020**          Pages 114..117

Page 114

1    Q.    Okay.  Because I also had done a request
2    for production to you for any documents pertaining
3    to your contacts with the FBI about Kenneth Collins
4    or the alleged theft by Kenneth Collins, and I was
5    told that all documents were either in the
6    possession of the FBI or Mr. Gourjian.
7             As the client, you can obtain your own
8    files from Mr. Gourjian.
9             So in order to respond to my request for
10   production, did you have your current attorney,
11   Mr. Devereux, make any attempt to obtain your file
12   from Mr. Gourjian?
13       A.    Not -- no, I don't know.  No.
14       MS. INLOW:  Counsel, I am going to request
15   that that effort be made forthwith and that I be
16   provided with those documents as a supplemental
17   response to the request for production.
18       Q.    All right.  So you never gave a copy of
19   the two videotapes, the one from the gas station and
20   one from a business or the street, or wherever,
21   allegedly showing the traffic stop to the Sheriff's
22   Department; correct?
23       A.    Correct.
24       Q.    Who is Special Agent Elizabeth Roe?
25       A.    I don't know.

Page 115

1    Q.    Who is Special Agent Ramon Johnson?
2    A.    That name for some reason, Ramon, I
3    believe he was one of the agents I gave it to.
4    Q.    At MDC?
5    A.    No, not MDC.
6    Q.    Oh, in 2014.
7    A.    Yes.
8    Q.    So other than the two videotapes, what did
9    you give to the FBI --
10   A.    That's all I gave.
11   Q.    -- in 2014?
12   A.    I gave two videotapes, and I gave my
13   banking, my bank documents, to substantiate the
14   legitimacy of the currency.  Because I knew that it
15   was a large currency, and it might raise eyebrows.
16   I mean, I'm not stupid.  I understand.  I understand
17   with both Williams it crosses his mind.  So I
18   explained it to them, and I showed them all the
19   documents I need to substantiate and validate my
20   claim.
21   Q.    Did you have any further contact with the
22   FBI at any time in 2014 about what their
23   investigation had been showing?
24   A.    Yes.
25   Q.    What --

Page 116

1    A.    I called them and asked them what is the
2    status of my case, because I wanted to take legal
3    action.  My business -- I am now losing my business
4    as a result of what's happening to me.
5             My diamond -- I remember diamond club --
6    my diamond club rating, from being standard number
7    one, dropped all the way down in the gallery, and my
8    business was falling apart.  I was spiraling out of
9    control.  And now I am back into drugs, and so on
10   and so forth, and all the way to this point to where
11   I am right now, starting from you and having to
12   answer your questions.
13   Q.    Okay.  Why did the theft of this 158,000
14   dollars make your diamond club rating drop?
15   A.    I will tell you why.  Because in the
16   diamond business, you are dealing with a lot of
17   Hasidic Jewish people, and your word is very
18   important, your timing and every little thing that
19   comes out of your mouth.  So when I promise A, B,
20   and C, I've got to produce A, B, and C.  If I
21   don't -- okay? -- that's it.  It's pretty much --
22   there is no second chance.  You know what I mean?
23   If they are trusting you with -- that's say they
24   give me a five karat fancy brilliant yellow canary
25   on a signature.  With one signature they give me a

Page 117

1    million dollar diamond.  They have to trust me --
2        THE REPORTER:  Please slow down.
3        THE WITNESS:  For them to give me a 2 million
4    dollar diamond, my credibility, my reputation has to
5    be impeccable.  Well, it was no longer impeccable.
6    It was surrounded by question marks now, well, how
7    could this happen to me.
8    BY MS. INLOW:
9        Q.    Well, how did anybody else know about this
10   alleged theft?
11   A.    Well, because everyone pretty much finds
12   out.  The word gets out.
13   Q.    Are you saying that Dante Miller or Delvin
14   Williams were Hasidic Jews?
15   A.    No.  No, they are not.  The people on the
16   other end who took my word.
17   Q.    What did this stuff have to do at all with
18   any relationship you would have had with any Hasidic
19   Jews?
20   A.    They are purchasers of what I was going to
21   purchase, the back end of the deal, which, again --
22   Q.    Are you saying the rap star was a Hasidic
23   Jew?
24   A.    No.  No.  The back end of the deal.  That
25   means if I buy that I will have someone waiting for

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
**Daniel Edward Nersoyan on 10/15/2020        Pages 118..121**

Page 118

1  it.
2      Q.   Oh.  Okay.  So you are saying that you had
3  also arranged a sale of the necklace after you had
4  obtained it.
5      A.   Absolutely.
6      Q.   Okay.  Who were you going to sell the
7  necklace to?
8      A.   It was still -- it was still not a
9  definite buyer, but there was interest.  The entire
10 diamond market was interested.  So there's not one
11 person.  There was a group of people.
12     Q.   So how would that have affected -- all you
13 had to tell them is I'm not selling or I already
14 sold it, don't worry about it.
15     A.   It doesn't work that way.
16     Q.   So you had not had a contract to sell it;
17 correct?
18     A.   No.
19     Q.   And you told me that at times you had as
20 much as 800,000 dollars in your safe --
21     A.   Yes.
22     Q.   -- so the loss of this 158-, what
23 percentage of your cash holdings was this loss?
24     A.   That's irrelevant.  It's irrelevant to the
25 point.  You see, I know why you are asking.

Page 119

1      You see, if there's 800,000 in my safe,
2  that 800,000 belongs to me.  It might have been a
3  purchase.  It might be something for leverage.  Not
4  everything is done in cash, but everything is done
5  by cash when it comes to gold.  They will give you a
6  time, and you sell and you buy.
7      So if I want to just answer your question,
8  it's all of it up to 800,000 dollars, yes, there has
9  been, all the way down to 10,000.  So that was the
10 range.
11     So 150,000 dollars is a lot of money to
12 some people.  So if I am giving my word on the
13 100,000 that on this day you will have it, okay,
14 and I don't produce it, my credibility is now
15 shaken.
16     So it does make a dig difference.
17     Q.   On May 28, 2014, what was the total value
18 of The Nersoyan Group, Inc.?  What you had in the
19 bank, merchandise on hand, cash on hand.  Total
20 assets, what was the value?
21     A.   There was about 2-1/2 million in the
22 bank.
23     Q.   About 2-1/2 million in the bank; correct?
24     A.   In the bank.  And then, again, there's
25 maybe, in merchandise, maybe another million or so.

Page 120

1      So about three or four million.
2      Q.   But you claim that this theft was ruining
3  your life, your business, and making you spiral out
4  of control; correct?
5      A.   That's correct.
6      Q.   All right.  So in paragraph 32 of the
7  First Amended Complaint, where it says Mr. Nersoyan
8  procured that video and presented the video to the
9  L.A.S.D., that is incorrect; correct?
10     A.   That is incorrect.  I did not show it to
11 the L.A.S.D.
12     Q.   Okay.  At any time in May of 2014, did you
13 ever talk to the Sheriff's Department about what you
14 had seen on the video?
15     A.   No.
16     Q.   At any time in June of 2014, did you talk
17 with anyone in the Sheriff's Department about what
18 you had seen in the video?
19     A.   Well, I may be incorrect there.  I could
20 be misremembering.  I could have called them
21 afterwards, after I saw the DVD, look, I have it all
22 in front of me that this guy -- in front of me, I'm
23 watching it.
24     I do remember having a conversation of
25 that sort with somebody from the Sheriff's

Page 121

1  Department.  I do remember that.
2      Q.   Okay.  So I will represent to you that you
3  filed your first government tort claim against the
4  county in November of 2014.  Is that correct?
5      A.   I believe so.
6      Q.   At any time between May 28, 2014, and
7  before you filed that government tort claim in
8  November, did you have any discussions with anyone
9  at the Sheriff's Department about what you had seen
10 on the video?
11     A.   I think I had.  I just told you, I
12 remember having one conversation.  Yes.
13     Q.   When was that?
14     A.   I don't know.  I can't remember.
15     Q.   With whom was the call?
16     A.   I don't remember.  I didn't write any of
17 that stuff down.
18     Q.   Was it by phone or in person?
19     A.   It was by phone.
20     Q.   What station did you call?
21     A.   I can't remember.
22     I wish I knew this would happen.  I would
23 have kept all this in mind.  I did not know I would
24 come here, so --
25     Q.   Well, this is what you are suing about,

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
Daniel Edward Nersoyan on 10/15/2020          Pages 122..125

Page 122

1  Mr. Nersoyan.  What did you think we were going to
2  talk about today?
3      A.   I wish I would have paid more -- I did not
4  know the process.  Again, this is new to me.  This
5  is my first time in a lawsuit.  So I'm sorry.
6      Q.   All right.  So you called some random
7  sheriff's station and spoke to a random person on a
8  random date you think maybe before November 2014; is
9  that correct?
10     A.   Okay.  You use the word random, but it was
11  a person.  And, yes, it was a random person.
12     Q.   And you have no notes about that phone
13  call?
14     A.   I do not write notes, no.
15     Q.   So you didn't tape record it?
16     A.   No.
17     Q.   All right.  So did you just call the main
18  number of the sheriff's station?
19     A.   I called anybody where there was a sheriff
20  on the other end.  What number it was, where it was,
21  I don't know.  I just needed to tell an authority.
22  I believe I asked for a watch commander or someone
23  who would take notice of the situation.
24     Q.   And what did you tell the Sheriff's
25  Department person on the phone at some point before

Page 123

1  November of 2014?
2      A.   That I had been robbed of a large amount
3  of money and I had it on tape to prove it.
4      Q.   And what did they say?
5      A.   I don't remember.  Something along the
6  lines of I will have somebody get back to you or --
7  I don't know.  I don't remember.  I just don't
8  remember.
9      Q.   Okay.  Anything else that you can recall
10  about that telephone conversation?
11     A.   Just the fact that I was hot, you know, I
12  was very hot, very upset.  And they did not react
13  the way I expected them to, so I even got a little
14  more -- I could have -- I know myself, I could have
15  maybe been a little more belligerent in my tone
16  because of the frustration I felt.
17     But that was just about it.  From there, I
18  took it to the FBI.
19     Q.   So you think that call was before you went
20  to the FBI.
21     A.   Oh, yes.  Oh, yes, for sure.
22     Q.   What were you asking the Sheriff's
23  Department person to do on that phone call?
24     A.   I don't think I asked them to do anything.
25  I mean, who am I to do that?  I think I was just

Page 124

1  expressing my situation and what do I do from here.
2      I was waiting for him to tell me what to
3  do.  And they said they would get back to me, and
4  they never did.
5      Q.   Did you leave your phone number?
6      A.   Of course.
7      Q.   So that part of the conversation you
8  remember vividly, that you left your phone number?
9      A.   Well, of course.  I remember I left my
10  phone number because they would automatically have
11  my phone number by me calling them.
12     Q.   Is that the only telephone call you had
13  with the Sheriff's Department after getting the
14  video and before you filed your government tort
15  claim?
16     A.   Yes, it was.
17     Q.   Did you ever send any letters or emails to
18  the Sheriff's Department?
19     A.   I don't -- again, like I said, I haven't
20  sent an email in my life.  So no.  And there have
21  been no letters.
22     After that, like I said, once I had
23  already turned it over to the federal agency, I let
24  them dictate what I do and don't do.
25     Q.   When you went to meet with the FBI, did

Page 125

1  your attorney, Mr. Gourjian, go with you?
2      A.   Yes, he was present.
3      Q.   So in paragraph 32 of your Complaint,
4  after you said that you presented the video to the
5  L.A.S.D. --
6      Which we know is incorrect; right?
7      A.   That, yes, that is not correct.  I did not
8  give it to them.
9      Q.   Okay.
10     -- the next line says, the L.A.S.D. denied
11  that person in the L.A.S.D. uniform, Deputy Collins,
12  was employed by their agency; in addition, the
13  L.A.S.D. denied anyone from their agency took part
14  in the theft, despite the overwhelming video
15  evidence which included a uniformed L.A.S.D. deputy
16  and an L.A.S.D. squad car.
17     So did any of that actually happen, since
18  they never saw the video?
19     A.   Not that I recall.  None of that happened
20  that I recall.
21     Q.   So, then, the next paragraph says,
22  paragraph 33, the L.A.S.D. convinced Mr. Nersoyan
23  that no one from their agency was involved in the
24  theft.  That's not true, either; correct?
25     A.   Well, no, they did say to me that there's

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
**Daniel Edward Nersoyan on 10/15/2020**                    **Pages 126..129**

Page 126

1  no one who has brought any money in, no one was
2  arrested, so what you are saying is that we have no
3  way of believing what you are telling us, is what
4  they told me.
5      Q.   But you now know that that was correct;
6  right?   Nobody was arrested and nobody brought
7  money in; correct?
8      A.   Well, now I know that, yes.
9           You see -- I don't want to say if that's
10  wrong.
11          I wasn't even sure of this person.  I had
12  no idea.
13     Q.   So they didn't mislead you, they were
14  telling the truth; correct?
15     A.   No -- well, what happens is, they never
16  even came to -- they never made the effort.  They
17  didn't call me.  They didn't even call me.
18     Q.   And you never gave them the video; right?
19     A.   Well, I would have given -- (inaudible)
20  the videos if they had called me and said see me.
21     Q.   My question to you is, they never misled
22  you, they told you the truth; correct?  Collins
23  never did bring in an arrestee, and he never turned
24  in the cash; correct?
25     A.   That's correct.

Page 127

1      Q.   So after you met with the FBI at some
2  point in June of 2018, what was the next thing you
3  heard from the FBI about the case?
4      A.   They said that they were 100 percent
5  absolutely sure that there was nefarious activities
6  and the sheriff did conduct the stop unproperly and
7  that was definitely something that -- there was more
8  to the situation than meets the eye, and they told
9  me that the second after they saw me leave.
10     Q.   My question is --
11          I'm sorry.  Go ahead.
12     A.   What's your question.
13     Q.   After that first meeting, what was the
14  next thing you heard from the FBI?
15     A.   The next thing was, we are investigating,
16  we are going through all the phone records, we are
17  going through everything, and we will get a hold of
18  you.  And they did.
19     Q.   When was the next time you spoke with
20  the FBI?
21     A.   I don't have the date by heart.  I did
22  not think I am going to be asked this question.
23          When you tell me, are you asking for a
24  date?
25     Q.   Was it a week later, a month later, a year

Page 128

1  later.  How long --
2      A.   A month, maybe, let's say.
3      Q.   Calm down.
4           So you met with them sometime in June.
5  Approximately how much later was it that you had
6  your next contact with the FBI?
7      A.   A month, let's say.
8      Q.   And approximately a month later did they
9  call you, or did they call your attorney?
10     A.   They called my attorney, they called me,
11  and they called Hyrum.
12     Q.   And what did you learn at that time?
13     A.   That they were absolutely sure that
14  something had happened and that their investigation
15  was moving forward.  I told them, well, what do I do
16  for them?  They said wait there, sit tight, and
17  we'll let you know.  And in the meantime, by that
18  time, this other thing happened to me.  So I don't
19  know.
20     Q.   What other thing happened to you?
21     A.   I got arrested.
22     Q.   So you talked to the FBI in June of 2014?
23     A.   Yes.
24     Q.   And when were you arrested?
25     A.   2016.

Page 129

1      Q.   Okay.  So are you saying that there was
2  approximately two years where you had no contact
3  again with the FBI?
4      A.   No, I'm not saying that.
5      Q.   Okay.  So I asked you after the call,
6  about a month later -- so it would be approximately
7  July of 2014 -- when was the next time you had
8  contact with the FBI, and you told me it was when
9  you were arrested.  Is that now incorrect?
10     A.   That's not what I said.  I did not say the
11  next time I had contact with the FBI.
12     Q.   Let's do it again.  Let's do it again.
13     A.   Okay.
14     Q.   After you spoke with the FBI in
15  approximately July of 2014, when was the next
16  contact you had with the FBI pertaining to the
17  alleged theft and/or Kenneth Collins.
18     A.   As I said, they called me and Hyrum in a
19  month or so later to go in for further discussions.
20     Q.   So are you saying that that was now in
21  August of 2014?
22     A.   Again, I can't answer that.  I can't
23  remember the month.  You keep asking for a month.  I
24  can't remember the month.
25     Q.   Okay.

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
**Daniel Edward Nersoyan on 10/15/2020**                    **Pages 130..133**

Page 130

1      A.   I can't remember.
2      Q.   I am confused, because you said you made
3   the original report to the FBI in approximately June
4   of 2014.  Correct?
5      A.   Approximate.  Again, the dates is where
6   I'm not good at.  I can't tell you.
7      Q.   You thought it was the next month.  So I
8   am saying approximately.
9      A.   Okay.  Okay.
10     Q.   Then approximately a month later -- so
11   that would be approximately July of 2014 -- they
12   called you and your attorney and Hyrum in; correct?
13     A.   Yes.
14     Q.   After that, what was the next contact you
15   had with the FBI?
16     A.   There were several times that I had
17   contacts with them, just on what the status is, when
18   do I go to the Sheriff's Department.  They said we
19   are investigating, we would rather you did not.
20          You know, I wanted to go to the Sheriff's
21   Department that same second, but --
22     Q.   But the FBI said due to their
23   investigation they would prefer you did not go to
24   the Sheriff's Department; correct?
25     A.   Yes.  They wanted to get to the bottom of

Page 131

1   what happened.
2      Q.   Okay.
3      A.   So I rather I had been complying to the
4   FBI rather than the Sheriff's Department.
5      Q.   Okay.  So did anything change by November
6   of 2014?
7      A.   Nothing changed.
8      Q.   So why did you come to do a government
9   tort claim in November of 2014?
10     A.   Because I did not know anymore what to do,
11   and I had needed some remedy.  So my attorney said
12   file the suit now.  So I said, okay, file it.
13          I had to do it.  There was no way I could
14   ignore it.
15          I called the FBI beforehand.  I told them,
16   look, I need clarity on this.  I have showed people
17   what happened to me, I have showed the officers what
18   happened to me, all of the people who think I've
19   taken off with the money -- I need to be able to
20   substantiate what happened.  And that's it.  He
21   wrote that.
22     Q.   And when you told the FBI you were going
23   to file the government tort claim, what did they
24   say?
25     A.   They said wait.  They told me to wait.

Page 132

1      Q.   But you didn't.
2      A.   But I didn't.
3      Q.   So by the time you filed the government
4   tort claim, you had the tape from the gas station;
5   correct?
6      A.   Yes.  They had it, too.
7      Q.   I'm just asking about you.
8          You had the tape showing the alleged
9   traffic stop; correct?
10     A.   Correct.
11     Q.   And you had been told by the FBI that they
12   agreed with you that somebody from the Sheriff's
13   Department had stolen your money --
14     A.   Yes.
15     Q.   -- and that they were investigating it;
16   correct?
17     A.   Yes.
18     Q.   All right.  So did you do the government
19   tort claim, or did your attorney?
20     A.   My attorney.
21     Q.   When was the first time you heard from the
22   Sheriff's Department after you filed your government
23   tort claim?
24     A.   I haven't heard from the Sheriff's
25   Department till today.  I have never heard from the

Page 133

1   Sheriff's Department.  Until today, I haven't heard
2   from them.
3      Q.   Okay.  So you filed your claim, and to
4   this minute -- so from 2014 to October 15, 2020 --
5   you have had absolutely no contact with the
6   Sheriff's Department; is that correct?
7      A.   Yes, absolutely none.
8      Q.   Do you ever call them?
9      A.   No.
10     Q.   Did anyone from the Sheriff's Department
11   ever call you?
12     A.   No.
13     Q.   Did you ever receive any written
14   correspondence from anyone at the Sheriff's
15   Department?
16     A.   No.
17     Q.   To your knowledge, did your attorney ever
18   have any communication with anyone at the Sheriff's
19   Department?
20     A.   Not to my knowledge.
21     Q.   Did your attorney ever have any written
22   correspondence with anyone from the Sheriff's
23   Department?
24     A.   Not to my knowledge.
25     Q.   Did you ever get any sort of response to

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
**Daniel Edward Nersoyan on 10/15/2020**                    **Pages 134..137**

Page 134

1  your claim at all?
2     A.   Zero.
3     Q.   And in 2015 you still lived on Nelson in
4  Moorpark; is that correct?
5     A.   At that time, yes, I lived on Nelson.  I
6  lived at Nelson.
7     Q.   Did anyone at the Sheriff's Department at
8  any time ever ask you to give them the videotape?
9     A.   No, never.
10    Q.   Did anyone at the Sheriff's Department
11 ever try to set up a meeting between you and your
12 attorney?
13    A.   No, never, not that I know of.
14    Q.   Have you ever spoken with anybody at the
15 Sheriff's Department by the last name Kimura,
16 K-i-m-u-r-a?
17    A.   Have I?
18    Q.   Yes.
19    A.   No, not that I recall.
20    Q.   Okay.  At any time after you filed your
21 claim, did you have further communications with the
22 FBI about their investigation?
23    A.   Yes.  I called.  I asked them what the
24 status of things were.  And they said, oh, you know
25 what, these things take time, phone records, X, Y,

Page 135

1  Z.
2         I didn't really know how to react to it.
3  I was just so -- (inaudible) -- in everything.  I
4  mean, life was just a dark place.  And I just didn't
5  know what to do anymore.
6     Q.   Did you ever have any communications with
7  your attorney about what your remedies were after
8  you filed the claim with the Sheriff's Department if
9  they ignored it, like you say they did?
10    A.   Well, to me -- I did, and I was under the
11 impression that I did not want to be ruling and the
12 government was doing.  Because I had told the FBI
13 agent, listen, I need to file a suit, I need some
14 way of remedying -- I need something for what's
15 happening.
16         And that's it.  That's all I can say.  I
17 mean, I don't have much more to say about that.
18    Q.   So did you ever ask your attorney, hey,
19 should we just go ahead and file a lawsuit against
20 the Sheriff's Department to get my money back?
21    A.   I don't remember.  I do not remember.
22    Q.   Did you ever consider filing a lawsuit
23 against the Sheriff's Department to try to get your
24 money back?
25    A.   Of course.

Page 136

1     Q.   Why didn't you?  Is the reason you didn't
2  because you didn't want to interfere with what the
3  FBI was doing?
4     A.   Yes.
5         MR. DEVEREUX:  Mr. Nersoyan would like a
6  break.
7         MS. INLOW:  Sure.  How long do you guys need?
8         MR. DEVEREUX:  Ten minutes?
9         MS. INLOW:  We are getting close.  So sure, ten
10 or 15.
11        MR. DEVEREUX:  Okay.
12        THE VIDEOGRAPHER:  We are now off the record.
13 The time is 2:33 p.m.
14        (A brief recess was taken.)
15        THE VIDEOGRAPHER:  We are now back on the
16 record.  The time is 2:47 p.m.
17 BY MS. INLOW:
18    Q.   Mr. Nersoyan, you appreciate you are still
19 under oath?
20    A.   I do.
21    Q.   Are you still feeling physically able to
22 give me your best testimony?
23    A.   Absolutely.
24    Q.   Okay.  Thank you.
25        So did you take any action with regard to

Page 137

1  the alleged theft by Kenneth Collins in 2015?
2     A.   Okay.  2015, the reason why I did not take
3  any action --
4         MR. DEVEREUX:  No, that's not the question.
5         THE WITNESS:  Oh.
6         No, I did not take any action.  No.
7  BY MS. INLOW:
8     Q.   Did you take any action with regard to the
9  alleged theft in 2016?
10    A.   No.
11    Q.   Did you take any action with regard to the
12 alleged theft in 2017?
13    A.   I was in custody.
14    Q.   So is that a no?
15    A.   No.
16    Q.   Did you take any action with regard to the
17 alleged theft in 2018?
18    A.   Yes.
19    Q.   What did you do in 2018?
20    A.   I found out that it was actually a
21 sheriff's deputy that stole from me.  I did not know
22 till then.
23    Q.   And is that when the FBI spoke with you
24 while you were at MDC?
25    A.   Yes, that's when they confirmed.  They

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
**Daniel Edward Nersoyan on 10/15/2020**                    **Pages 138..141**

**Page 138**

1  said, you know what, you're right, it was a sheriff
2  that X, Y, and Z.  And that's when I said, oh my
3  gosh, it was a sheriff's deputy.
4       Q.   Do you remember what month it was in
5  2018?
6       A.   No, I can't remember.  I can't remember.
7       Q.   Did you ever find out from -- strike
8  that.  Did the FBI tell you the name Kenneth Collins
9  at that time?
10      A.   Sounds correct.
11      Q.   Did you ever find out from the FBI when
12  they found out it was Kenneth Collins?
13      A.   They did not -- of course, there was no
14  reason why they would tell me that.  But they did
15  say you were right and there's actually zero doubt
16  and he's also confessed to it.  So, by then, it was
17  an open-and-shut case as far as they were concerned.
18      Q.   And is it correct that in 2015 you had no
19  contact whatsoever with the Sheriff's Department?
20      A.   That is correct.
21      Q.   Is it correct that you had no contact
22  whatsoever with the Sheriff's Department in 2016?
23      A.   That is correct.
24      Q.   Same for 2017?
25      A.   In custody.  No, I was not.

**Page 139**

1       Q.   No contact; correct?
2       A.   Correct.
3       Q.   Did you have any contact with the
4  L.A.S.D., the Sheriff's Department, in 2018?
5       A.   Contact, no.
6       Q.   How long was it before you were released
7  from custody that you found out from the FBI the
8  name of Kenneth Collins?
9       A.   I was in custody when I found out.
10      Q.   I understand that.  How long before you
11  were released was it.
12      A.   Oh, before?  About ten months, eight
13  months.
14      Q.   Okay.
15      MR. DEVEREUX:  Can you repeat your question?
16  Because I don't think he heard it correctly.
17  BY MS. INLOW:
18      Q.   Okay.  You were released from MDC in
19  approximately, I think you said, October of 2018;
20  correct?
21      A.   Yes.
22      Q.   How long before October of 2018 was it
23  that the FBI told you the name of Kenneth Collins.
24      A.   About six to ten months, I would say.
25  Yeah.

**Page 140**

1       Q.   Was Mr. Gourjian still your attorney in
2  2015?
3       A.   No.
4       Q.   When did he cease being your attorney?
5       A.   He ceased being my attorney the minute my
6  case was almost over.
7            I needed my attorney for a marijuana case
8  in San Fernando court, and that was it.
9            He wasn't my attorney for this matter.
10      Q.   So he was your criminal attorney in a
11  marijuana case in the San Fernando Courthouse;
12  correct?
13      A.   Correct.
14      Q.   But you think he was also the attorney
15  who submitted your government tort claim to the
16  county, correct, in 2014?
17      A.   Yes.
18      Q.   Okay.  Did you have a written agreement
19  with Mr. Gourjian with regard to your claim against
20  the county?
21      A.   No.
22      Q.   Did you at some point fire him or
23  terminate your relationship with him with regard to
24  the claim against the county?
25      A.   I did neither of those things.  Neither

**Page 141**

1  of those things I did.  When I was in custody, he
2  just went away.
3       Q.   Okay.  When is the last time you spoke
4  with Mr. Gourjian?
5       A.   A year and a half, two years.
6       Q.   When you spoke with him a year and a half
7  or two years ago, did it have anything to do with
8  Kenneth Collins?
9       A.   No.
10      Q.   What was the next thing you did after
11  learning from the FBI the identity of Kenneth
12  Collins and that he was a deputy sheriff with the
13  Sheriff's Department with regard to a lawsuit
14  against the county?
15      A.   I retained an attorney.
16      Q.   Mr. Devereux represented you in the
17  criminal case in the federal court; correct?
18      A.   No.  No.  Victor Sherman did.
19      Q.   Victor who?
20      A.   Sherman.
21      MR. DEVEREUX:  Sherman, S-h-e-r-m-a-n.
22  BY MS. INLOW:
23      Q.   When did you hire Mr. Devereux?
24      MR. DEVEREUX:  2018.
25      THE WITNESS:  Yeah, 2018.  End of 2018.

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
**Daniel Edward Nersoyan on 10/15/2020**      Pages 142..145

Page 142

1     I'll say sometime in 2018. It would have
2 been early 2018. Around that time, early 2018.
3 BY MS. INLOW:
4     Q.   Did you tell Mr. Devereux that you had
5 previously filed a claim against the county in 2014?
6     A.   Did I tell him that? I don't know.
7          Did I?
8          I can't remember if I did that.
9     Q.   You have to answer the questions, not him.
10    A.   I'm not asking for an answer. I'm just
11 looking at him.
12         I don't remember if I did.
13    Q.   So have you now told me about every
14 conversation or communication that you had with the
15 Sheriff's Department regarding the theft of your
16 money?
17    MR. DEVEREUX:   She is asking if you have told
18 her everything.
19    THE WITNESS:   I cannot tell you. I could have
20 forgotten something, so I cannot be definite in
21 saying I told you everything. I might remember
22 something.
23 BY MS. INLOW:
24    Q.   To the best of your recollection as you
25 sit here today, you have not left anything out?

Page 143

1     A.   To the best of my information.
2     Q.   So now in paragraph 79 of your First
3 Amended Complaint, it says "While waiting for trial
4 at MDC, the FBI visited Plaintiff on or about June
5 of 2018 showing the plaintiff a videotape of the
6 illegal seizure." Is that true? Did that happen?
7     A.   Yes.
8     Q.   So you had given them the videotape;
9 correct?
10    A.   Yes.
11    Q.   Did they show you the exact same tape?
12    A.   No. They -- no. What they did was they
13 showed me the pictures of the shots. They didn't
14 actually play the DVD. They showed the pictures,
15 the stills, of the video, the DVD.
16         They went over it and said is this the DVD
17 that you told me? And I said yes. And just went
18 over it with me.
19    Q.   Okay. So they did not actually show you a
20 videotape of the seizure; correct?
21    A.   No, they did not.
22    Q.   And in paragraph 79, it says "Mr. Nersoyan
23 believes the videotape shown to him from the FBI was
24 the videotape that he provided to the L.A.S.D." But
25 we know that can't be true because you never gave

Page 144

1 the videotape to the Sheriff's Department.  Correct?
2     A.   I never gave it to the Sheriff's
3 Department. I gave it to the FBI.
4     Q.   Okay. So what you are saying is this is
5 incorrect and what is accurate is that the pictures
6 the FBI showed you in June of 2018 you believe were
7 still photos taken from the same video that you had
8 provided to the FBI.
9     A.   Correct.
10    Q.   And the FBI confirmed to you that Collins
11 had never made a report or turned in the money;
12 correct?
13    A.   Correct.
14    Q.   Now, in paragraph 84, it says "In addition
15 to Collins' conduct, the L.A.S.D. was well aware of
16 the illegal seizure and never reached out to the
17 plaintiff to try to right the wrong." And you base
18 that on the fact that they never called you back;
19 correct?
20    A.   Yes.
21    Q.   Did you ever have any understanding of how
22 Kenneth Collins came to be arrested?
23    A.   Well, I heard it from Grant. So Grant
24 told me.
25    Q.   What did he tell you?

Page 145

1     A.   The FBI -- my attorney, Mr. Sherman, gave
2 me the rundown. I mean, he told me that they want
3 to see you, that that police officer has been
4 arrested, X, Y, Z, and gave me a little bit of brief
5 of what the case was, and that was it.
6          So when I went inside, that's when they --
7 that's when -- in my mind, I said, oh, well, the
8 guys must hear it. That's when Grant and I met.
9 That's who I met at jail, because I understood he
10 was the one I was knowing got arrested with the
11 sheriff. So that's how we met each other.
12    Q.   Did you come to learn from Grant Valencia
13 how he and Kenneth Collins came to be arrested?
14    A.   Yes.
15    Q.   What did you learn?
16    A.   I learned that he was involved in selling
17 narcotics and transporting narcotics and he asked
18 Grant to come along with him.
19    Q.   What agency or agencies did you understand
20 were responsible for the arrest of Grant Valencia
21 and Kenneth Collins?
22    A.   I did not even think along those lines.
23 To me, that was the job of the agencies, or agency.
24 It didn't make a difference to me.
25    Q.   Do you have any understanding of where

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
**Daniel Edward Nersoyan on 10/15/2020**                    **Pages 146..149**

Page 146

1  Kenneth Collins is today?
2      A.   He's in prison.
3      Q.   Did you ever come to learn that the
4  Sheriff's Department had cooperated with the FBI in
5  the sting that resulted in the arrest of Grant
6  Valencia and Kenneth Collins?
7      A.   Well, later that came out, yes.
8      Q.   So you did know that the Sheriff's
9  Department helped the FBI in their investigation
10 that resulted in those arrests.
11     A.   Helped in the arrest, I don't know.
12 That's not for me to know.  But I know they were
13 involved.
14     Q.   Did you ever have any conversation with
15 anyone in the FBI as to why they were not charging
16 Kenneth Collins with the theft of your money?
17     A.   I did have that talk with the feds, with
18 the federal agent.  I go why didn't you guys come in
19 beforehand?  Why didn't you guys get to talk to me?
20 While I'm in jail, my life is in shambles.  They
21 say, well, we just weren't sure, and they gave me
22 some cockamamie story.  What can I say.
23     Q.   All right.  In your Complaint you state,
24 in paragraph 88 of the First Amended Complaint, that
25 after Plaintiff was released in October of 2018,

Page 147

1  L.A.S.D. Internal Affairs contacted him at least
2  twice through counsel and that you declined to talk
3  to the Internal Affairs department.  Is that true?
4      A.   That never happened.  Never.  Not once.
5      Q.   So IA never called you?
6      A.   Never.
7      Q.   Okay.  In paragraph 89 of your First
8  Amended Complaint, it says "L.A.S.D. Internal
9  Affairs did ask to meet with Mr. Nersoyan.
10 Mr. Nersoyan respectfully declined both requests
11 because he believed that the purpose of the
12 interview was a fishing expedition to press charges
13 against him in retaliation for reporting harm."  Did
14 any of that happen?
15     A.   No, I never spoke to them.
16     Q.   So you never declined to meet with
17 Internal Affairs; correct?
18     A.   Never.
19     Q.   In page paragraph 71 of the First Amended
20 Complaint, it says "The policies and customs behind
21 the unlawful seizure and theft of personal property
22 are patently unconstitutional."
23          What policies and procedures of the
24 Sheriff's Department do you think were
25 unconstitutional and resulted in the theft of your

Page 148

1  cash by Kenneth Collins?
2      A.   I have no comment.
3      MR. DEVEREUX:  I am going to object to that as
4  calling for a legal conclusion.
5  BY MS. INLOW:
6      Q.   Do you have any understanding about the
7  policies and procedures of the Sheriff's Department?
8      A.   Do I?
9      Q.   Yes.
10     A.   No.
11     Q.   Do you have any understanding of the
12 policies and procedures with regard to the conduct
13 that is expected of deputy sheriffs?
14     A.   No.
15     Q.   Do you have any understanding of the
16 policies and procedures with regard to discipline of
17 deputy personnel?
18     A.   No.
19     Q.   In paragraph 132 of your complaint, First
20 Amended Complaint, you state "By reason of the
21 aforementioned policies and practices of Defendant,
22 Plaintiff incurred damages in the form of lost
23 profit, psychological and emotional injuries,
24 including, without limitation, sleep deprivation,
25 humiliation, depression, all of which are

Page 149

1  continuing, and damage to reputation."  So I want to
2  take those one at a time.
3          So how did you -- strike that.  What is
4  the amount that you claim you lost in lost profits?
5      A.   Conservatively --
6      Q.   I'm sorry, what did you say?
7      A.   Conservatively.  I will give you a
8  conservative number.
9          -- of the necklace by itself, of the
10 necklace which by itself I lost maybe 3- or 400,000
11 dollars off the necklace alone.  If I'm in
12 wholesale, diamonds are a price.  If I retailed it,
13 well over that, double, triple that amount.
14     Q.   So let me stop you there for a second.
15         So you were going to buy this necklace for
16 158,000; correct?
17     A.   Correct.
18     Q.   You had no contract to sell it with anyone
19 at the time it was stolen; correct?
20     A.   Well, there is no such thing as a contract
21 to sell in the jewelry business.  It doesn't exist.
22     MR. DEVEREUX:  Just answer.
23     THE WITNESS:  No.  No.
24 BY MS. INLOW:
25     Q.   You had no agreement with any

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
**Daniel Edward Nersoyan on 10/15/2020**          **Pages 150..153**

Page 150

1  particular --
2  A.  No.
3  Q.  -- individual or business to sell the
4  necklace; correct?
5  A.  No.  No.
6  Q.  Okay.  So you are telling me that it is
7  your belief and anticipation that you could have
8  sold it for 3- to 400,000 over the 158-; is that
9  correct?
10  A.  It is not my belief.  It is my
11  professional opinion.  As a gemologist, I can tell
12  you if I were to certify each diamond individually,
13  I would have earned more than five or six times
14  that.  I mean, hands down.  There's no question
15  about that.  That's not even debatable as far as I'm
16  concerned.
17  Q.  All right.  Do you have any other claim
18  for lost profits?
19  A.  Well, no.  I will leave it there.
20  Q.  Okay.  How did this affect you
21  psychologically?
22  A.  Well, I have a policeman now that's
23  accosted me, targeted me.  I had my home invaded.
24  Okay?  And I felt that that's all connected.  I
25  still to this day believe that's connected.  I

Page 151

1  believe that they have targeted me and had inside
2  people doing it.
3      I'm afraid.  I mean, when I see a black
4  and white sheriff's deputy car, I panic.  I panic.
5  Q.  Did anyone from the FBI ever tell you that
6  Kenneth Collins did anything else to you other than
7  this one theft of 158,000 dollars?
8  A.  What do you mean?  I don't understand the
9  question.
10  Q.  Did the FBI ever tell you that Kenneth
11  Collins had been involved in any other crime against
12  you.
13  A.  If the FBI would have told me about what
14  he did to me?  Why would the feds be telling me
15  that?
16  Q.  Based on their investigation, did the FBI
17  ever tell you -- yes or no -- that Kenneth Collins
18  had done anything else to you other than steal money
19  from you on May 28, 2014.
20  A.  No, there's nothing else.
21  Q.  Based on their investigation, did the FBI
22  ever tell you that anybody affiliated with the
23  Sheriff's Department ever committed any other crime
24  against you?
25  A.  No.  It was never brought up.

Page 152

1  Q.  So do you have any factual basis for your
2  statement that you think you were being targeted by
3  the Sheriff's Department.
4  A.  The mere fact that he targeted me?  Yeah,
5  the fact that it happened.  That's my factual basis
6  that the sheriff actually knew.  And not two or
7  three weeks later than that, I was home invaded.
8  That's pretty coincidental.
9  Q.  Were you home invaded more than once?
10  A.  No, one time.
11  Q.  Okay.  Well, that was in January of 2014,
12  and this robbery occurred in May of 2014.
13  A.  Okay.
14  Q.  And so you were never home-invaded after
15  this robbery; correct?
16  A.  I understand that, but I saw it as though
17  they know each other, because no one in all my life
18  has done anything like this to me, and now all of a
19  sudden in one year I get twice?
20  Q.  Okay.  So now are you telling me that the
21  gang guys that had the big nice Mercedes you think
22  are somehow connected with Collins?
23  A.  Yes, that's what I'm telling you.
24  Q.  What do you base that on?
25  A.  Because Collins is part of a gang -- he --

Page 153

1  Q.  What do you base that on?
2  A.  Let me finish my statement.
3      He is part of a gang counseling therapy.
4  That's what he does.  He recruits gang members and
5  counsels them.  So it would be very easy for me to
6  see how he's going to recruit one of these gang
7  members to perpetrate something like this.  It's a
8  no-brainer.
9  Q.  But this is all your speculation; right?
10  A.  Of course it's my speculation.  I'm not
11  doubting -- I'm not saying anything but that.
12  Q.  Anything else about how this has affected
13  you psychologically or emotionally?
14  A.  Actually, fear from any black and white
15  sheriff's car that I see.
16  Q.  Anything else?
17  MR. DEVEREUX:  Did you ask physically, too?
18  MS. INLOW:  No.  There was no claim in here
19  about physical.
20  MR. DEVEREUX:  Okay.  Thank you.
21  BY MS. INLOW:
22  Q.  All right.  How has this resulted in sleep
23  deprivation?
24  A.  Because I just have a hard time sleeping,
25  stress, a lot of stress.  Financial stress.  Now I

Page 158

1   calls were well before you had submitted your
2   government tort claim; correct?
3       A.   I believe so, yes.
4       Q.   To gather documents for this lawsuit, did
5   you ever make any attempt to contact the FBI to get
6   copies of what they had or what you had given them?
7       A.   No, I have not.  I was going to do that
8   through my attorney.
9       Q.   Did you keep a copy of the two videotapes?
10      A.   Yes, I do have them.
11      MS. INLOW:  Counsel, why are those not
12  produced?
13      MR. DEVEREUX:  I have to locate them.  I am in
14  the process of locating them.  I know I have some.
15  I was a little bit confused and lost them.  I know I
16  have to find them.
17  BY MS. INLOW:
18      Q.   Other than the videotapes, what do you
19  still have or what do you know your attorney has
20  relating to the theft by Kenneth Collins or your
21  contacts with the Sheriff's Department?
22      A.   All I have are the DVDs.  That's all.
23      Q.   Would you agree that if Kenneth Collins
24  had stolen your money without the knowledge of the
25  Sheriff's Department that he was acting outside the

Page 159

1   course and scope of his job as a deputy sheriff?
2       A.   It's hard for me to make that
3   determination.  I'm sorry.
4       MR. DEVEREUX:  And I will object that it's
5   calling for a legal conclusion.
6       MS. INLOW:  Mr. Devereux, do you have any
7   questions?
8       MR. DEVEREUX:  No, thank you.
9       MS. INLOW:  Just give me a second to go through
10  my notes.
11      Q.   What documents would you have from 2014,
12  '15, '16, prior to your arrest, showing the
13  financial health of The Nersoyan Group?
14      A.   I can go to my bank and produce documents
15  showing the money.  It wouldn't be a problem.
16      Q.   Do you also have tax returns and
17  tax documents?
18      A.   Absolutely, 100 percent.
19      Q.   Anything else?
20      A.   What else can I do?  What else can I show?
21  I'll give you my tax returns.
22      Q.   It's your business, not mine.  Do you know
23  of any other --
24      A.   My tax returns.  My tax returns.
25      Q.   Did you do tax returns for both yourself

Page 160

1   as an individual and the company?
2       A.   I did it with my wife, joint.
3       Q.   So you and your wife did a joint one, and
4   then there was a separate one for the company; is
5   that correct?
6       A.   Yes.  Yes.
7       Q.   Has your wife ever been arrested?
8       A.   No.  My wife is a doctor.  She is just
9   perfect.  So don't even mention her.
10      Q.   Do you have any independent knowledge
11  about what steps, if any, the Sheriff's Department
12  ever took to investigate your government tort claim
13  of 2014?
14      A.   I'm sorry, I don't have any.
15      Q.   Have you had any conversations with the
16  FBI since filing this lawsuit?
17      A.   No, I have not.
18      Q.   When is the last time you spoke with the
19  FBI regarding Kenneth Collins or the Sheriff's
20  Department?
21      A.   It was at MDC, when they came with you.
22      Q.   And as we have gone through today, have
23  you had any recollection of who exactly at the FBI
24  you spoke with?
25      A.   No.  I mean, I don't know.

Page 161

1       Q.   So the names of the FBI agents that I read
2   off earlier that were in your discovery responses,
3   do you know where those names came from?
4       A.   I don't.
5       Q.   Have you seen any documents that had the
6   names of those agents on them?
7       A.   Well, not that they have given me.  In my
8   old phone I have all the information, but my old
9   phone, I can't find it.  But I had their names and
10  everything, with their numbers and everything.  But
11  other than that, I'm sorry, I don't have anything
12  else I can offer.
13      Q.   So you made a second claim to the
14  Sheriff's Department in April of 2019; is that
15  correct?
16      A.   Correct, once it was determined and
17  evaluated that it was actually a sheriff deputy that
18  did that.
19      Q.   Did you ever get any response from the
20  Sheriff's Department after the second claim in April
21  of 2019?
22      A.   Ask him.
23           Have we?
24           No.
25      Q.   And the second claim was filed by

**Page 162**

1   Mr. Devereux; correct?

2        A.   Correct.

3        MS. INLOW:  All right, Mr. Nersoyan, the only

4   thing, I am going to just reserve my right on the

5   record, but it appears that documents and/or

6   videotapes were certainly within the ability of

7   Plaintiff and/or Counsel to obtain, which I think

8   would have been responsive to the request for

9   production that I had previously served.  So when

10  and if I get any of those things, I am going to

11  reserve my right to a second session of the

12  deposition to ask any questions for documents or

13  videos that were not produced in a timely fashion

14  that I didn't have an opportunity to question

15  Mr. Nersoyan about today.

16        But other than that, Mr. Devereux,

17  anything?

18        MR. DEVEREUX:  Nothing further.  Thank you.

19        MS. INLOW:  So that's it.  Thank you all very

20  much.

21        THE VIDEOGRAPHER:  We are now off the record.

22  The time is 3:25 p.m.

23        (At 3:25 p.m. the deposition was concluded.)

24

25

**Page 163**

1            CORRECTIONS TO DEPOSITION TRANSCRIPT

2

    PAGE    LINE(S)    CORRECTION           INITIALS

3

                     CHANGE TO:

4

                     REASON:

5

6

                     CHANGE TO:

7

                     REASON:

8

9

                     CHANGE TO:

10

                     REASON:

11

12

                     CHANGE TO:

13

                     REASON:

14

15

                     CHANGE TO:

16

                     REASON:

17

18

                     CHANGE TO:

19

                     REASON:

20

21

                     CHANGE TO:

22

                     REASON:

23

24                                    (Page ___ of ___)

25  (CONTINUE FORMAT ON BLANK SHEET IF NECESSARY)

**Page 164**

1   STATE OF _____)

                             ) ss.

2   COUNTY OF _____)

3

4        I declare under penalty of perjury that

5   I have read the foregoing transcript, I have made

6   any corrections, additions or deletions that I was

7   desirous of making in order to render the within

8   transcript true and correct, and

9            IN WITNESS WHEREOF, I have hereunto

10  subscribed my name this ____ day of _____,

11  20___.

12

13

14

15

16        _____

                 DANIEL EDWARD NERSOYAN

17

18

19

20

21

22

23

24

25

**Page 165**

1   STATE OF CALIFORNIA    )

                           ) ss.

2   COUNTY OF LOS ANGELES  )

3

4        I, LAURIE BETH KAY, C.S.R. No. 8427, do

5   hereby certify:

6        That the foregoing deposition was taken

7   before me at the time and place therein set forth,

8   at which time the witness was put under oath by me;

9        That the testimony of the witness and all

10  objections made at the time of the examination were

11  recorded stenographically by me, were thereafter

12  transcribed under my direction and supervision and

13  that the foregoing is a true record of same.

14        I further certify that I am neither

15  counsel for nor related to any party to said action,

16  nor in anywise interested in the outcome thereof.

17        IN WITNESS WHEREOF, I have hereunto

18  subscribed my name this 20th day of

19  October, 2020, at Pasadena, California.

20                    Lan B. Kay

21        _____

                 LAURIE BETH KAY, C.S.R. No. 8427

22

23

24

25