Exhibit B

GRANT VALENCIA vs LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, ET AL.
Kenneth Collins on 11/18/2019

```
 1              UNITED STATES DISTRICT COURT
        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION
 2
     GRANT VALENCIA                  )
 3       Plaintiff,                  )
                                     )
 4   VS.                             )  CASE NO. 19-cv-00471
                                     )
 5   LOS ANGELES COUNTY              )
     SHERIFF'S DEPARTMENT, a public)
 6   entity; COUNTY OF LOS ANGELES,)
     a public entity; KENNETH        )
 7   COLLINS, an individual; and     )
     DOES 1 through 50, inclusive    )
 8       Defendants.                 )
                                     )
 9   COUNTY OF LOS ANGELES,          )
         Cross-Complainant,          )
10                                   )
     VS.                             )
11                                   )
     KENNETH COLLINS, and MOES 1     )
12   Through 50,                     )
         Cross-Defendant             )
13

14

15

16      * * * * * * * * * * * * * * * * * * * * * * * * *

17                    ORAL DEPOSITION OF

18                    KENNETH COLLINS

19                    NOVEMBER 18, 2019

20                    Volume No. 1

21      * * * * * * * * * * * * * * * * * * * * * * * * *

22

23

24

25
```

**GRANT VALENCIA vs LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, ET AL.**
Kenneth Collins on 11/18/2019                                    Pages 2..5

**Page 2**

```
1      ORAL DEPOSITION of KENNETH COLLINS, produced as a witness
2  at the instance of the Defendant, and duly sworn, was taken in
3  the above-styled and numbered cause on the 18th of November,
4  2019, from 9:32 a.m. to 11:30 a.m., before Sherry Folchert,
5  CSR, in and for the State of Texas, reported by machine
6  shorthand, at the Federal Correctional Institution -
7  Seagoville, 2113 North Highway 175, Seagoville, Texas, pursuant
8  to the Federal Rules of Civil Procedure.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1                         INDEX
2                                              PAGE
3   Appearances . . . . . . . . . . . . . . . . .   3
4   Stipulations. . . . . . . . . . . . . . . . .   5
5   KENNETH COLLINS
       Examination by Ms. Inlow . . . . . . . . . .   5
6      Examination by Mr. Wong. . . . . . . . . . .  61
       Further Examination by Ms. Inlow . . . . . .  73
7
   Signature and Changes . . . . . . . . . . . .  77
8
   Reporter's Certificate. . . . . . . . . . . .  79
9
10                        EXHIBITS
11   NO.  DESCRIPTION                            PAGE
12    1   Photograph                              52
13
      2   Plea Agreement                          70
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1               A P P E A R A N C E S
2   FOR THE PLAINTIFF:
      Alister Wong
3   RICHIE LITIGATION
      US Bank Tower - 67th Floor
4   633 West 5th Street, Suite 6780
      Los Angeles, CA 90071
5   213-265-7888
      Alister@richielitigation.com
6
      FOR THE DEFENDANT:
7   Laura E. Inlow
      COLLINSON, DAEHNKE, INLOW & GRECO
8   21515 Hawthorne Boulevard, Suite 800
      Torrance, CA  90503
9   424-212-7777
      Laura.inlow@cdigaw.com
10
      ALSO PRESENT:
11  Lloyd Ingram
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
1                      AGREEMENTS
2       It is hereby agreed by and between the parties hereto,
3  through their attorneys appearing herein, that any and all
4  objections to any question or answer herein, except as to the
5  form of the question and responsiveness of the answer, may be
6  made upon the offering of this deposition in evidence upon the
7  trial of this cause with the same force and effect as though
8  the witness were present in person and testifying from the
9  witness stand.
10      It is further agreed by and between the parties hereto,
11 through their attorneys appearing herein, that this deposition
12 may be signed before any notary public in and for the State of
13 Texas, but if the original deposition has not been signed by
14 the witness and returned by the time of the trial or any
15 hearing in the case, the unsigned original or a copy thereof
16 may be returned into Court and used with the same force and
17 effect as though all requirements of the rules and statutes
18 with reference to signature and return had been fully complied
19 with.
20
21
22
23
24
25
```

**GRANT VALENCIA vs LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, ET AL.**
**Kenneth Collins on 11/18/2019**                                    **Pages 6..9**

---

Page 6

```
1                    P R O C E E D I N G S
2    (All parties present have hereby waived the necessity of the
3    reading of the statements by the court reporter as required by
4    Rule 30(b)(5).)
5                    KENNETH COLLINS,
6    having been first duly sworn, testified as follows:
7                    EXAMINATION
8    BY MS. INLOW:
9        Q.   Good morning.  Could you please state your full name
10   for the record?
11       A.   Kenneth Collins.
12       Q.   Mr. Collins, have you ever had your deposition taken
13   before?
14       A.   No.
15       Q.   Okay.  Let me just take a moment at the beginning
16   then to kind of explain a few guidelines that will make today
17   go more smoothly.
18       A.   Sure.
19       Q.   Initially the oath that you just took is the same
20   oath you would take in a court of law.
21       A.   Sure.
22       Q.   It carries the same penalty of perjury.  So it's very
23   important that you give your best testimony today.  Do you
24   understand that?
25       A.   Sure.
```

Page 7

```
1        Q.   As you can see the court reporter seated in between
2    us, takes down everything that we say.  It's really hard for
3    her if we're both talking at the same time.  So if you could
4    please wait and make sure whoever is asking you questions is
5    completely done with their questions before you give your
6    answer, we'll wait and make sure you're completely done with
7    your answer before we ask the next question.  Will you do that
8    for us?
9        A.   Yes.
10       Q.   Thank you.  Similarly, because everything we say is
11   being taken down, it's very important that you give your
12   responses in words.  Shrugs, nods, uh-huh, things we do in
13   everyday conversation just don't come out very well on paper.
14   So if we're here long enough, you will give us an uh-huh
15   because that's how we normally talk.
16       A.   I understand.
17       Q.   So we'll ask you is that a yes, is that a no, we just
18   need you to give your answer in words.  We are going to
19   discuss events that happened some time ago.  We are entitled to
20   your best estimates and your best recollections.  But if you do
21   not know or you do not remember, nobody here wants you to
22   guess.  Do you feel like you understand the difference?
23       A.   I do.
24       Q.   Okay.  If you answer our questions today, we're going
25   to assume that you both heard them and understood them.  So if
```

Page 8

```
1    there's anything confusing to you about a question or you
2    didn't feel like you heard it or understood it, please let us
3    know and we'll ask it again.  Okay?
4        A.   Yes.
5        Q.   Is there any reason why you feel we cannot get your
6    best testimony today?
7        A.   No.
8        Q.   You will be sent a copy of the transcript in a couple
9    of weeks when it's finally completed.
10       A.   Sure.
11       Q.   You have an opportunity to read it and make any final
12   revisions that you feel are necessary.  Again, I just want to
13   caution you that any significant changes that you make can be
14   commented on and could affect your credibility should the
15   matter go to trial.  So, again, very important to give your
16   best testimony today.  Do you understand?
17       A.   I do.
18       Q.   Any questions before we begin?
19       A.   No.
20       Q.   Okay.  If at any time today you have a question, you
21   need to take a break, please let us know and we'll -- we'll
22   certainly accommodate rest room or -- or whatever.  Okay?
23       A.   Sure.  Okay.
24       Q.   Thank you.  So you're currently here at Seagoville?
25       A.   Yes.
```

Page 9

```
1        Q.   Okay.  What is your estimated date of release?
2        A.   I'm not exactly sure.  I believe 2033.
3        Q.   Okay.  Do you have any reason to believe that you
4    will be transferred from Seagoville in the next six months?
5        A.   No.
6        Q.   Okay.  Does that kind of give your -- your data?
7        A.   Yeah.  Just give me a second.
8             MS. INLOW: Mr. Ingram is giving us some help.
9    Thank you.
10            THE WITNESS: Yeah.  2033 is my projected
11   release date.
12       Q.   (BY MS. INLOW)  If for any reason you do get
13   transferred, if you could just try to let one of the attorneys
14   know so we would know where to send your transcript.  I mean I
15   can track you on Inmate Locator, but we'd like to be able to
16   find you if you need you.  Okay?
17       A.   (Witness indicates.)
18       Q.   Are you currently married?
19       A.   Yes.
20       Q.   Who is your wife?
21       A.   Racell White.
22       Q.   Can you spell her first name?
23       A.   R-A-C-E-L-L W-H-I-T-E.
24       Q.   And her address?
25       A.   ████████████████████████ -- excuse
```

---

**Page 10**

1  me.  75033.

2      Q.   Okay.  And do you have a phone number for her?

3      A.   ▓▓▓▓▓▓▓▓▓

4      Q.   Thank you.

5           And what is your date of birth?

6      A.   ▓▓▓▓▓

7      Q.   Okay.  What is the highest level of education that

8  you've completed?

9      A.   Associate's degree.

10     Q.   And what was that in?

11     A.   Criminal justice.

12     Q.   And did you ever -- were you ever in the military?

13     A.   Yes.

14     Q.   What -- what branch?

15     A.   U.S. Army.

16     Q.   When to when were you in the Army?

17     A.   From 1985 to 1988.

18     Q.   And what was your rank?

19     A.   It was Specialist 4.

20     Q.   And what did you do for the Army?

21     A.   I was a combat medic.

22     Q.   Were you ever an EMT?

23     A.   Yes.

24     Q.   From -- when were you first certified as an EMT?

25     A.   I believe it was shortly after I got out of the

**Page 11**

1  military.  I -- I want to say in 1989.

2      Q.   Okay.  And did you work as an EMT for some period of

3  time?

4      A.   Yes.

5      Q.   From when to when did you work as an EMT?

6      A.   From 1989 until I transferred into the Sheriff's

7  Department, which was about 2001.

8      Q.   Did you transfer into the Sheriff's Department as

9  part of the consolidation or from where did you transfer?

10     A.   I was working at Paramedic Training Institute for Los

11  Angeles County.  And it wasn't a consolidation.  It was --

12     Q.   Okay.

13     A.   -- just an open application.

14     Q.   Got you.  Okay.  So what did -- when did you go to

15  the academy?

16     A.   2000... 2002, I believe.

17     Q.   Okay.  And did you pass on the first time?

18     A.   Yes.

19     Q.   And was your first assignment in custody?

20     A.   Yes.

21     Q.   And where did you do your custody assignment?

22     A.   The majority of my custody assignment was at Men's

23  Central Jail.

24     Q.   And from when to when were you assigned to custody?

25     A.   From 2003 until 2007.

**Page 12**

1      Q.   Other than MCJ, where else did you work?

2      A.   I worked a short stint at Wayside.

3      Q.   Anywhere else?

4      A.   No.

5      Q.   Okay.  Within MCJ, did you have any particular

6  assignments, other than just regular custody assignments?

7      A.   Just general custody.

8      Q.   All right.  And approximately 2007, did you begin

9  your patrol training?

10     A.   Yes.

11     Q.   Where did you go for your patrol training?

12     A.   It was Lennox Station at the time, but now it's

13  South Los Angeles.

14     Q.   And how long were you at Lennox?

15     A.   I believe three years.

16     Q.   So approximately 2010?

17     A.   Yeah.

18     Q.   After completing your patrol training, did you have

19  any particular assignments at Lennox, other than patrol duty?

20     A.   No. Just patrol deputy.

21     Q.   And in 2010 where did you go?

22     A.   I transferred to another unit, the COPS Unit.

23     Q.   All right.  And how long were you with COPS?

24     A.   I want to say approximately two years.

25     Q.   And very generally, what was your assignment at COPS

**Page 13**

1  Bureau?

2      A.   COPS was a -- was a community-oriented police team.

3  It was an impact team that focused on problem spots within Los

4  Angeles.

5      Q.   Did you guys at COPS take calls or were you

6  observations only?

7      A.   Observations only.

8      Q.   Okay.  So after COPS, where did you go?

9      A.   I started working for the Emergent Leaders Program.

10     Q.   Also known as ELA?

11     A.   Yes.

12     Q.   Okay.  Did you start with ELA in 2012?

13     A.   Yes.  I -- I want to say -- and, you know what, I --

14  when I worked with ELA, I believe I was still with the COPS

15  Unit and I was on loan to ELA.

16     Q.   When you started with ELA, physically where was that?

17     A.   We didn't really have a -- a physical, you know,

18  headquarters.

19     Q.   Okay.

20     A.   Place.

21     Q.   When you first started with ELA, was that already

22  under the auspices of the education-based EBI or not?

23     A.   I mean it was -- it was -- it was -- it -- it -- it

24  was one of those programs where I don't believe that we were

25  really with anybody.  It was kind of a -- a program that was

**GRANT VALENCIA vs LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, ET AL.**
Kenneth Collins on 11/18/2019                                    Pages 14..17

Page 14

1  kind of like a pilot program, but we -- we -- we wasn't -- we
2  weren't being financed by anybody. Wasn't in anybody's budget.
3       Q.   And was sergeant -- is it --
4       A.   Clyde Terry.
5       Q.   Yeah. Was he the -- so Clyde --
6            MS. INLOW: Clyde, C-L-Y-D-E. Terry, T-E-R-R-Y.
7       Q.   (BY MS. INLOW) He was already kind of the head of
8  ELA when you started?
9       A.   Yes.
10      Q.   Okay. And it's my understanding that in the
11 beginning he was kind of basically doing it out of his own
12 pocket to try to make this thing a go?
13      A.   Yes. Like I said, we wasn't receiving any fund at
14 all from the Department.
15      Q.   What, in your understanding, was the -- the stated of
16 goal or purpose of the ELA program?
17      A.   The ELA from -- from my understanding of the -- the
18 purpose was to -- to contact people who were trying to
19 re-acclimate into society from, you know, prison. Things of
20 that nature.
21      Q.   My understanding, so please correct me if I'm wrong,
22 is that inmates who either a deputy or a parole officer or a
23 probation officer thought maybe had the potential to kind of
24 maybe turn their life around --
25      A.   That's correct.

Page 15

1       Q.   -- would -- would be referred to ELA?
2       A.   Yes, I would say so.
3       Q.   Okay. You did have to be referred, not every inmate
4  got the opportunity, correct?
5       A.   No, it wasn't a referral only. We would go to
6  certain facilities and talk to inmates also. So it wasn't just
7  a specific referral.
8       Q.   Okay. But not every inmate funneled through ELA,
9  correct?
10      A.   No. No, not at all. And it was -- it was -- it was
11 more towards the post-release inmates.
12      Q.   So inmates who were already on parole, probation, or
13 had just been released?
14      A.   Yes.
15      Q.   Okay. So in approximately 2012 when you started,
16 when a former inmate started with ELA, what was the length of
17 the time that they would be affiliated with the program?
18      A.   You know, it -- it varied, and it was -- it was up to
19 the individual as far as, you know, how long they were actually
20 affiliated with it. We had courses that -- that -- you know,
21 the time of the course varied. I mean we had courses, you
22 know, in the beginning when we started that only lasted, you
23 know, maybe four weeks. And as we started to extend the
24 program, it would become a little longer.
25      Q.   Okay. Did the participating inmates -- ideally, did

Page 16

1  they kind of graduate from ELA?
2       A.   Yes.
3       Q.   And did they get like a certificate of completion or
4  something like that?
5       A.   Yes.
6       Q.   What types of courses was ELA offering?
7       A.   Well, we didn't have any -- what should I call it?
8       Q.   Curriculum kind of.
9       A.   Curriculum, yeah. There wasn't really any specific
10 curriculum. We were just kind of -- we would go ourselves to
11 different courses and we would take, you know, things from
12 different courses and -- and apply to the ELA program.
13      Q.   So, in general, what kinds of things were you trying
14 to help teach the former inmates?
15      A.   Life skills.
16      Q.   Anything else?
17      A.   Just life skills. You know, responsibility, I guess.
18 And, you know, generally just to be re-acclimated into the
19 program. And one of our main goals was just to connect them to
20 other sources, other resources.
21      Q.   In the community?
22      A.   Yes.
23      Q.   Was that to try to help them maybe find employment
24 versus going back to a life of crime?
25      A.   Exactly.

Page 17

1       Q.   How long were you personally affiliated with ELA?
2       A.   Let me see. I don't recall the exact amount of time.
3       Q.   Was it more than a year?
4       A.   Yes.
5       Q.   Were there other deputies who were also assigned or
6  working with ELA?
7       A.   Yes.
8       Q.   How many other deputies would also be working with
9  ELA?
10      A.   Three others.
11      Q.   Was Sergeant Terry in charge of ELA until you left?
12      A.   Yes.
13           MS. INLOW: I have something here with the names
14 on it. Oh, well.
15      Q.   (BY MS. INLOW) Do you know where Sergeant Terry is
16 now?
17      A.   No.
18      Q.   Can you tell me where you went after ELA?
19      A.   I went to -- I was assigned to -- to Altadena
20 Station.
21      Q.   Do you remember when you started at Altadena?
22      A.   I want to say -- I don't recall the exact.
23      Q.   Do you remember the year?
24      A.   I mean if I had to -- to -- to guess, around about, I
25 would say probably 2014, maybe.

**GRANT VALENCIA vs LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, ET AL.**
**Kenneth Collins on 11/18/2019**                    **Pages 30..33**

Page 30

1    Q.   And did you attend that event?
2    A.   Yes.
3    Q.   And what was that event?
4    A.   It was at a -- a club that I think he was promoting.
5  So myself, along with like six other people, went together to
6  support it.  Like I said, you know, supporting something like
7  that was kind of a follow-up thing for ELA.  You know, whenever
8  our graduates, you know, worked or they were involved in
9  something, we always wanted to kind of support that, you know,
10 kind of help out wherever we need -- where we could.
11   Q.   It's my understanding from Mr. Valencia's deposition
12 that you got married in late 2014 and you invited him to your
13 wedding?
14   A.   Him, along with other students, who wanted -- wanted
15 to attend.
16   Q.   Okay.  So he did attend your wedding in late 2014?
17   A.   Yes.
18   Q.   How many ELA participants do you think attended your
19 wedding?
20   A.   Probably five, maybe.
21   Q.   Now, Mr. Valencia has testified that pretty much
22 after attending your wedding that he had no contact with you
23 whatsoever in 2015.  Is that your recollection as well?
24   A.   That sounds -- sounds accurate.
25   Q.   And it was his testimony that he similarly had no

Page 31

1  contact with you whatsoever in 2016?
2    A.   That sounds about right.  I'm not exactly sure, but
3  that sounds about right.
4    Q.   Okay.
5    A.   Like I said, you know, we, you know, wasn't friends
6  to the point to where, you know, we stayed in constant contact
7  and things of that nature.
8    Q.   So -- and then 2015 and 2016 you also had no further
9  involvement with the ELA because it pretty much ceased to
10 exist?
11   A.   That sounds correct.
12   Q.   All right.  Now, according to Mr. Valencia, it was
13 sometime he thought in about the spring of 2017 that you
14 reached out to him.  Does that sound right to you?
15   A.   Yeah.  I don't recall if I reached out to him or if
16 he reached out to me.  But I do know from time to time he
17 would, you know, reach out, maybe through text or something
18 like that from time to time.  And I -- and I believe even
19 during the two years that he said that he didn't contact me,
20 I -- I believe that he reached out from time to time.
21   Q.   And if he reached out, would you respond?
22   A.   Yeah, generally I would.
23   Q.   Okay.  Was it just sort of hi, how are you kind of
24 stuff?
25   A.   Yes.

Page 32

1    Q.   Okay.  At any time in 2015 did you ever solicit
2  Mr. Valencia to participate in any illegal activities with you?
3    A.   No.
4    Q.   At any time in 2016 did you ever solicit Mr. Valencia
5  to participate in any illegal activities with you?
6    A.   No.
7    Q.   So I think you said that in approximately 2014 you
8  went to Altadena, correct?
9    A.   Yes.
10   Q.   How long did you stay in Altadena?
11   A.   I want to say approximately two years.
12   Q.   Okay.  Any particular assignments at Altadena?
13   A.   No.
14   Q.   Just patrol?
15   A.   Yes.
16   Q.   Okay.  And after Altadena, where did you go?
17   A.   I went to County Services.
18   Q.   So that was approximately 2016?
19   A.   Yes, I would say probably early 2016, maybe even late
20 2015.  I'm not exactly sure.
21   Q.   And how long did you remain at County Services?
22   A.   Until my arrest.
23   Q.   And what were your job duties at County Services?
24   A.   I was the -- the watch deputy.
25   Q.   At some point did you begin kind of your own program

Page 33

1  called Clarity Through Education?
2    A.   Yes.
3    Q.   Okay.  So if I call that CTE, we'll know what we're
4  talking about?
5    A.   Yes.
6    Q.   Okay.  When did you start Clarity Through Education?
7    A.   I believe I started that program, maybe 2015.  I
8  don't recall the exact date or time.
9    Q.   Is it correct that the Sheriff's Department had no
10 affiliation with Clarity Through Education?
11   A.   That's correct.
12   Q.   So this was completely on your own time, your own
13 dime?
14   A.   That's correct.
15   Q.   And what was your purpose in starting Clarity Through
16 Education?
17   A.   It was a personal development and transformational
18 company.
19   Q.   Basically were you trying to start a side company and
20 kind of like life coaching?
21   A.   Yes.  For -- not for parolees or anything that has to
22 do with incarceration or anything of the sort.  It was mainly
23 generally open to the public and I was, you know, moving
24 towards companies, businesses.
25   Q.   Were any other organizations supporting you or

Page 58

1    A.   Yes.
2    Q.   Was there ever any discussion with Mr. Valencia that
3  there was a potential for additional future operations?
4    A.   I think like me, we both understood there was a
5  potential for -- for potential transports.
6    Q.   And was it your understanding that Mr. Valencia fully
7  intended to participate and take the money for any future
8  transports?
9    A.   I don't understand that question.
10    Q.   Meaning if there had been a third and a fourth, was
11  it your understanding Mr. Valencia still wanted in?
12    A.   Yes.
13    Q.   He wanted the money?
14         MR. WONG:  Objection; speculation.
15    Q.   (BY MS. INLOW)  Did you ever come to know that the
16  Sheriff's Department had actually participated in the FBI sting
17  that resulted in all of you-all's arrest?
18    A.   No.  I don't know what the extent of that
19  participation was.
20    Q.   Did you ever come to understand how the FBI came to
21  do the undercover operation?
22    A.   No.
23    Q.   Is it correct that after your arrest the Sheriff's
24  Department terminated your employment with them?
25    A.   Not immediately.  I actually retired, so it wasn't a

Page 59

1  termination.
2    Q.   They sent you the letter of intent, correct, after
3  your arrest?
4    A.   I believe so.
5    Q.   But they allowed you to retire and keep your pension?
6    A.   I mean I don't know if they allowed it, but I put in
7  for retirement.
8    Q.   Is it safe to say that you are no longer affiliated
9  with the Sheriff's Department?
10    A.   That's correct.
11    Q.   And Sheriff's Department refused to provide you with
12  a defense in this case, correct?
13    A.   That's correct.
14    Q.   Have you had any contact with Mr. Valencia since your
15  arrest?
16    A.   No.
17         MS. INLOW:  I have no idea what time it is.  But
18  would -- would this be a good time, Mr. Ingram, to take a
19  little quick break?
20         MR. INGRAM:  Yes.
21         (Break taken)
22         MS. INLOW:  Back on the record.  Thank you.  We
23  had a quick break.  Did you need to use the restroom?
24         THE WITNESS:  No, I'm fine.
25    Q.   (BY MS. INLOW)  Do you appreciate you're still on the

Page 60

1  record?
2    A.   Yes.
3    Q.   All right.  Do you know a Daniel Nersoyan?  It's
4  N-E-R-S-O-Y-A-N.
5    A.   I'm assuming that it was one of the guys that
6  introduced me into this whole thing.  But they went, I believe,
7  by other names, so I'm -- I'm not exactly sure.  There was two.
8  So I'm not exactly sure which one you're speaking of.  And I'm
9  assuming that it was the guys that introduced me in to -- to
10  this.
11    Q.   Okay.  Do you understand Mr. Nersoyan to be Armenian?
12    A.   Yes.
13    Q.   How did you first meet him?
14    A.   Oh, I met him through a mutual friend.
15    Q.   And approximately when was that?
16    A.   I would say probably maybe the beginning of 2017.
17  Somewhere in 2017.
18    Q.   Okay.  Do you know a Mr. -- I'm going to spell it.
19  Hyrum, H-Y-R-U-M, last name D-U-B-O-N.
20    A.   I don't know who that is.
21         MS. INLOW:  All right, Counselor, you want to --
22  any questions?
23         MR. WONG:  Yeah.  All right.
24         (Intentionally left blank)
25

Page 61

1               EXAMINATION
2  BY MR. WONG:
3    Q.   All right.  Going back to November, the November
4  transport, the first one.
5    A.   Uh-huh.
6    Q.   Have you ever communicated to Grant Valencia saying
7  that everything's going to be fine, I'm a sheriff, I'll make
8  sure everything -- or along though lines, not word for word.
9    A.   I don't recall.
10    Q.   Do you recall ever showing your badge and firearm to
11  the undercover agent at -- at the time you didn't know they
12  were undercover agents?
13    A.   I remember showing my badge to him and I didn't
14  specifically, you know, pull my weapon out and show him.  I
15  think he kind of saw that secondary.  But, yeah, I do remember
16  showing him my badge.
17    Q.   Okay.  And during the first transport, I understand
18  that you testified earlier saying that you never personally saw
19  the cargo?
20    A.   Yes.
21    Q.   Is that right?
22    A.   Yes.
23    Q.   However, were you ever informed of the contents of
24  the cargo?
25    A.   Not fully, I would say.

**Page 74**

1  and the Department?
2      A.   Yes.
3      Q.   They're trying to deny your pension and you're trying
4  to get it?
5      A.   Yes.
6      Q.   So as to not make you talk about things that you
7  believe are pending in your appeal or other potential
8  litigation, let me ask it this way.
9           If there was a time that you had done anything
10  illegal while working for the Sheriff's Department prior to
11  your arrest, to your knowledge, did the Sheriff's Department
12  know about that?
13     A.   No.  I would say no.
14     Q.   Okay.  If there had been a time you had done anything
15  illegal prior to your arrest and you were asked about it by the
16  Sheriff's Department, would you have basically lied to them to
17  cover it up?
18     A.   I can't answer that.
19          MS. INLOW:  Counsel, want anything else?
20          MR. WONG:  No, that's it.
21          MS. INLOW:  All right, Mr. Collins.  Thank you
22  very much.  We really appreciate your time today.
23          THE WITNESS:  Sure.
24          MS. INLOW:  So I would propose a stipulation on
25  the record that the court reporter can be relieved of her

**Page 75**

1  duties.  With regard to the transcript, after transcribing the
2  transcript, we would ask that she forward the original here to
3  Mr. Collins.  I believe she got the arrest -- the address
4  during a break.  And includes with the original a
5  self-addressed stamp envelope back to my attention.
6           So, Mr. Collins, what we would ask is that when
7  you receive the original transcript, that you review carefully.
8           THE WITNESS:  Sure.
9           MS. INLOW:  To make any changes that you feel
10  are necessary.  There will be a page at the back for you to sign
11  and date it under penalty the perjury that you have agreed that
12  it's the best testimony that you can provide.
13          THE WITNESS:  Sure.
14          MS. INLOW:  I would then ask that you put the
15  original back in that self-addressed, stamped envelope, back to
16  my attention.  I will maintain possession of the original,
17  making it available throughout this matter and through trial.
18          If for any reason the signed original is lost,
19  destroyed or unavailable, a certified copy may be used in lieu
20  of the original until the conclusion of case.
21          And, Mr. Collins, per your request, I will send
22  you a copy of the -- the transcript for you to keep.
23          THE WITNESS:  Sure.
24          MR. WONG:  Stipulated.  So stipulated.
25          THE REPORTER:  This concludes the deposition of

**Page 76**

1  Kenneth Collins.
2           (Original exhibits marked during the.
3           deposition were attached to the original
4           deposition transcript)
5           (According to Federal Rule 30 (e) (1),
6           deponent or party must request to read and
7           sign before the deposition is concluded.
8           Signature was requested.
9           (Proceedings concluded at 11:30 a.m.)

**Page 77**

1                    CHANGES AND SIGNATURE
2   WITNESS:  KENNETH COLLINS          DATE:  NOVEMBER 18, 2019
3   PAGE    LINE      CHANGE           REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____