# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 19-471-GW(GJSx) | Date | February 24, 2020 |
|---|---|---|---|
| Title | *Grant Valencia v. Los Angeles County Sheriff's Department, et al.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE |
|---|---|

| Javier Gonzalez | Terri A. Hourigan | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Antonio Castillo, III<br>Alister Wong | Laura E. Inlow |

PROCEEDINGS:     **DEFENDANT COUNTY OF LOS ANGELES' MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR PARTIAL SUMMARY JUDGMENT [23]**


Court hears oral argument. The Tentative circulated and attached hereto, is adopted as the Court's Final Ruling. The Court would GRANT Defendant's Motion for Summary Judgment on Plaintiff's second and third claims.


| | : | 15 |
|---|---|---|
| Initials of Preparer | JG | |

***Valencia v. Los Angeles County Sheriff's Dep't, et al.***; Case No. 2:19-cv-00471-GW-(GJSx)
Tentative Ruling on Defendant's Motion for Summary Judgment

## I.    Introduction

Plaintiff Grant Valencia sues Defendants Los Angeles County Sheriff Department ("LASD"), County of Los Angeles (the "County"), Kenneth Collins, and Does 1-50 for: (1) violation of 42 U.S.C. § 1983 – action under color of state law, against Collins; (2) negligent supervision or retention, against the County; (3) violation of 42 U.S.C. § 1983 – *Monell*, against the County; (4) intentional infliction of emotional distress, against Collins; and (5) negligent infliction of emotional distress, against Collins.  *See generally* Complaint, Docket No. 1-1.  LASD was later dismissed as a defendant.  *See* Stipulation to Dismiss Defendant Los Angeles County Sheriff's Department, Docket No. 11.  In general, Plaintiff's claims stem from his allegation that Deputy Collins used his position of authority to manipulate Plaintiff into participating in a criminal drug trafficking scheme.  *See* Complaint at ¶ 7.  The County brings a cross-complaint for indemnity against Collins and Moes 1-50, inclusive.  *See* Defendant County of Los Angeles' Cross-Complaint for Indemnity ("Cross-Complaint"), Docket No. 14.

The County now moves for summary judgment on Plaintiff's second and third claims.  *See* Defendant's Motion for Summary Judgment ("Motion"), Docket No. 23.  Plaintiff opposes, *see* Opposition to Motion for Summary Judgment ("Opp'n"), Docket No. 26, and the County replies, *see* Reply to Opposition to Motion for Summary Judgment ("Reply"), Docket No. 29.

## II.    Legal Standard

Summary judgment shall be granted when a movant "shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Miranda v. City of Cornelius*, 429 F.3d 858, 860 n.1 (9th Cir. 2005).  As to materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

To satisfy its burden at summary judgment, a moving party without the burden of persuasion "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential

element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (*en banc*); *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

> If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment[, but instead] must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial.

*T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (internal citations and quotation marks omitted). In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence, and views all evidence and draws all inferences in the light most favorable to the non-moving party. *See id.* at 630-31 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *see also Hrdlicka v. Reniff*, 631 F.3d 1044 (9th Cir. 2011); *Motley v. Parks*, 432 F.3d 1072, 1075 n.1 (9th Cir. 2005) (*en banc*).

The initial burden is on the moving party to demonstrate an absence of a genuine issue of material fact or to demonstrate that the nonmoving party will be unable to make a sufficient showing on an essential element of its case for which it has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Only if the moving party meets its burden must the non-moving party produce evidence to rebut the moving party's claim and create a genuine issue of material fact. *Id.* at 322-23. If the non-moving party meets this burden, then the motion will be denied. *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1103.

## III.   Factual Background[1]

---

[1] Some of the underlying "undisputed" facts cited herein have been disputed by Plaintiff or Defendant. The Court has reviewed said disputes and has included in this summary only facts that are supported by the cited evidence, altering the proffered facts if necessary to accurately reflect the uncontroverted evidence. To the extent that the cited underlying "undisputed" facts have been disputed, the Court finds the stated disputes: (1) fail to controvert the proffered "undisputed" facts, (2) dispute the facts on grounds not germane to the below statements, and/or (3) fail to cite evidence in support of the disputing party's position. As such, the Court treats such facts as undisputed. Any proffered facts not included in this Tentative Ruling were found to be: (1) improper opinions or conclusions rather than facts, (2) were unsupported by admissible evidence, (3) were deemed irrelevant to the Court's present analysis, or (4) some combination thereof. To the extent the Court uses any facts in the Discussion section of this tentative ruling, and does not note that they are disputed, it has determined that they are undisputed. Plaintiff presented evidentiary objections, which the Court addresses in a separate document.

### A. Plaintiff and Collins

Plaintiff, who is 36 years old, has a criminal history, primarily related to the possession, sale, and transportation of controlled substances. *See* Defendant's Responses to Plaintiff's Opposition to Defendant's Separate Statement of Undisputed Material Facts ("SUF"), Docket No. 29-1, ¶ 3. In 2012, Plaintiff was arrested by the Coast Guard and ICE while transporting 1,000 kilos of marijuana by boat to Catalina Island. *Id.* ¶ 4. He was convicted in federal court of possession with the intent to distribute. *Id.* Shortly after his release from federal custody in 2013, Valencia met then Sheriff's deputy Kenneth Collins when Valencia was a voluntary participant in the Emerging Leaders Academy (ELA), a community-based organization which provided resources, guidance, training and mentoring for newly released criminal offenders. *Id.* ¶ 5. ELA partnered with various local agencies, including LASD. *Id.* ¶ 6. The program put deputies at the head of classrooms filled with convicted felons to teach a curriculum focused on keeping the students out of a cell. *Id.* ¶ O. Collins was assigned to ELA from 2012 to 2014. *Id.* ¶ 6. While he played no role in getting Plaintiff involved in ELA, Collins served as one of Plaintiff's ELA instructors/mentors. *Id.* ¶¶ 6-7. Plaintiff was grateful at the time to have his course instructor led by an almost two decade tenured Sheriff Deputy. *Id.* ¶¶ Q, R.

Collins and Plaintiff became friendly through the ELA program, and Plaintiff attended Collins' wedding in December of 2014. *Id.* ¶ 8. During his participation in ELA, Collins tried to provide inspiration, friendship, guidance and resources to the former inmates in the program. *Id.* ¶ 9. During ELA, Collins formed a tight-knit relationship with Plaintiff and gave him his phone number, so that the two could stay in touch following Plaintiff's graduation from the program. *Id.* ¶ L. Collins learned that Plaintiff had recently been released from federal custody for running marijuana for the Mexican cartels. *Id.* ¶ 12. Plaintiff confided in Collins that he wanted to get back into the work force and get back on his feet financially. *Id.* ¶ M. Plaintiff also opened up to Collins about his family problems, including a dysfunctional relationship with his mother. *Id.* Collins gave Plaintiff good advice and supported his efforts to get back on the right path in life. *Id.* ¶ 9. Collins never asked Plaintiff to participate in any illegal activity during ELA, and Plaintiff had no reason to believe that Collins was involved in any criminal activities in 2014. *Id.* ¶ 10. Plaintiff completed the ELA program in May of 2014; Collins' involvement with the program also ended in 2014. *Id.* ¶ 11. In 2015 and 2016, Plaintiff and Collins had no contact whatsoever. *Id.* ¶ 13. In 2015, Collins started his own life-coaching business, Clarity Through Education ("CTE"),

which was in no way associated with the LASD or Collins' employment with the County as a deputy sheriff. *Id.* ¶ 14.

Two and a half years after last speaking with Plaintiff, Collins reached out to him in April of 2017 and invited him to attend a CTE seminar. *Id.* ¶ 15. Between April and July of 2017, Collins and Valencia exchanged phone calls and emails and met socially a few times. *Id.* ¶ 16. Plaintiff confided in Collins about his personal life, including his unemployment, relationship difficulties, and that his girlfriend had threatened to kick him out. *Id.* ¶ N. Collins was aware that Plaintiff was having financial difficulties and needed money to move out. *Id.* They never met on LASD property, they never used Collins' County email, and Collins never involved any other LASD personnel. *Id.* Plaintiff knew that CTE was not associated with the Sheriff's Department. *Id.*

In August of 2017, Collins met with Plaintiff twice and invited him to be a driver for "a wealthy Asian investor" (the "Investor"). *Id.* ¶ 17. Collins told Plaintiff he would be paid $5,000; Plaintiff accepted the offer. *Id.* Plaintiff did not have to produce his driver's license, driving record, or proof of insurance. *Id.* ¶ 18. Plaintiff was never formally hired, and the job never materialized. *Id.*

Plaintiff saw Collins three times in September of 2017. *Id.* ¶ 23. The first meeting was just about CTE. *Id.* During the second meeting, Collins invited Plaintiff to attend a relationship seminar, and Plaintiff asked when the driving job was going to happen. *Id.* Plaintiff and his girlfriend also attended a birthday party for Collins in September of 2017. *Id.* At the second meeting, Collins informed Plaintiff that the Investors were interested in launching a marijuana business with Collins. *Id.* ¶ 20. Collins asked Plaintiff to provide him with two pounds of marijuana as proof to the Investors that he could establish the marijuana business, but Plaintiff declined. *Id.* Plaintiff was subject to release restrictions as part of his federal parole until November 21, 2017, including prohibitions on leaving the Central District of California without permission, being around convicted felons, firearms, marijuana, alcohol, or other controlled substances, and being involved in illegal activities. *Id.* ¶ 21. Plaintiff understood that it was illegal in California to possess certain quantities of marijuana without proper licensing, that possession of marijuana was a federal crime, and that it was illegal to transport cannabis across state lines. *Id.* ¶ 22. He also knew being involved in marijuana would violate his parole conditions. *Id.*

In October of 2017, Plaintiff saw Collins two times, including once at the relationship

seminar. *Id.* ¶ 24. At the next meeting, they discussed CTE, and Plaintiff again inquired about the driving job. *Id.* In November of 2017, Collins stated the Investor was coming to town, but that the driving job would not be as previously discussed. *Id.* ¶ 25. Collins stated that they would now be transporting cigarettes and pre-rolled marijuana from Los Angeles to Las Vegas. *Id.* Plaintiff knew these activities would violate his parole conditions. *Id.* ¶ 26. Nonetheless, he agreed to participate. *Id.* Plaintiff did not ask to back out of the November 14, 2017 drug transport. *Id.* ¶ 27.

Collins picked Plaintiff up at 5:30 a.m. on November 14, 2017 in a rented black Tahoe. *Id.* ¶ 28. Collins was wearing civilian clothes and said he would flash his badge if they got into trouble, causing Plaintiff to suspect this was not a legal activity. *Id.* They met a third man, David Easter, and the Investors at the Rosemont Pavilion in Pasadena. *Id.* ¶ 29. Unbeknownst to Plaintiff and Collins, the Investors were undercover FBI agents running a sting operation against Collins. *Id.* During the drive from Los Angeles to Las Vegas, Plaintiff rode in the same vehicle as one of the Investors. *Id.* ¶ 30. During the ride, Plaintiff spoke about his prior experience running drugs. *Id.* He stated that this was not his "first rodeo" and that he knew drug running was a risk, but that it was a risk he was willing to take. *Id.* Plaintiff knew that the drug transport operation had nothing to do with official LASD business and would violate his parole conditions. *Id.* ¶ 31. After the successful transport to Las Vegas, Plaintiff accepted $2,000 in cash from Collins. *Id.*

In December/January of 2017, Collins invited Plaintiff to participate in a second, larger cigarette and marijuana transport in January for more money. *Id.* ¶ 32. Plaintiff agreed. *Id.* Plaintiff never asked to back out from this trip. *Id.* ¶ 33. To facilitate the second operation, Plaintiff rented a U-Haul truck. *Id.* As soon as the cargo and all individuals were in place on January 16, 2018, the FBI arrested all participants, including Collins and Plaintiff. *Id.* ¶ 34. Plaintiff was charged with conspiracy to distribute methamphetamine, cocaine, and marijuana under 21 U.S.C. § 846 and possession of a firearm in furtherance of a drug trafficking crime. *Id.* He pled guilty to conspiracy to distribute marijuana. *Id.* Plaintiff was sentenced to time served of eight months and four years of supervised release. *Id.* Collins was sentenced to 24 years in federal custody. *Id.* At no time prior to his arrest did Plaintiff report Collins to the LASD, FBI, or any other law enforcement agency. *Id.* ¶ 35.

### B. Collins' Background

Collins served as a combat medic in the Army from 1985-1988 and has an AA degree in

criminal justice. *Id.* ¶ 38. He worked as an EMT from 1989-2001 and then attended the Sheriff's Academy, graduating in 2002. *Id.* Collins had various duty assignments until he was loaned from the Community Oriented Policing (COPS) Bureau to ELA for about two years starting in 2012. From 2014 to 2016, he was assigned to patrol out of the Alta Dena station. From 2016 until his arrest in January of 2018, he was assigned to County Services. *Id.* ¶ 39. After his arrest, Collins' employment with the LASD was terminated. *Id.*

At all times relevant to this matter, the County had written policies regarding the retention and discipline of deputies. *Id.* ¶ 37. All known civilian and personnel complaints were investigated and, if warranted, the deputy was subject to discipline ranging from re-training to termination for both on-duty and off-duty incidents. *Id.* In the fifteen years in which Collins was employed as a deputy Sheriff, he received eight public commendations and five Unit Commander commendations. *Id.* ¶ 40. Collins was also the subject of six civilian complaints, three of which alleged theft of money. *Id.* ¶ 41. Each complaint received a full investigation resulting in a Watch Commander's Service Report, with a 2014 investigation remaining open due to insufficient evidence. *Id.* In 2007, two suspects alleged that Deputy Collins and his partner had stolen money from them during their arrest. *Id.* ¶ 42. Following an investigation, the conduct of Deputy Collins and his partner was determined to be reasonable regarding that complaint. *Id.* In 2008, another suspect complained that Collins and a different partner had stolen money from a vehicle that had been sent to a tow yard. *Id.* ¶ 43. After a full investigation resulting in a Watch Commander's Service Comment Report, no determination was reached. *Id.*

Plaintiff bases his negligent retention claim on a 2014 complaint by Daniel Nersoyan, alleging it was not investigated by the County and that, if had been investigated, Collins would have been fired and could never have lured Plaintiff back into a life of crime. *Id.* ¶ 44. In November of 2014, Nersoyan filed a Government Tort Claim alleging that an unidentified deputy stole $158,000 from one of his employees during a traffic stop on May 28, 2014. *Id.* ¶ 45. No record of a seizure of $158,000 was located. *Id.* ¶ F. Then-Sgt., now Lt., Douglas Kimura was assigned to investigate the complaint. *Id.* ¶ 45. As Nersoyan's claim had provided only a partial vehicle identification number, Sgt. Kimura initially used department resources to determine which patrol cars could have been involved. *Id.* ¶ 46. He was able to determine that vehicle SH1137 was the involved vehicle, and that it was assigned to Collins at the time of the incident. *Id.* ¶ G. Collins was assigned to the ELA at that time. *Id.* ¶ H. Sgt. Kimura also tried to contact both Nersoyan

and the alleged employee on several occasions without success.  *Id.* ¶ 47.  As Nersoyan never called him back, Sgt. Kimura sent him a certified letter on December 16, 2014.  *Id.*  On December 17, 2014, Sgt. Kimura spoke with Nersoyan by telephone and learned the alleged May 28, 2014 incident was captured on videotape which was in the possession of Mr. Nersoyan's attorney.  *Id.* ¶ 48.  When Sgt. Kimura requested a copy of the videotape, Nersoyan terminated the call and referred Sgt. Kimura to his attorney.  *Id.*  Between December 17, 2014 and January 6, 2015, Sgt. Kimura left several messages for Nersoyan's attorney without reaching him.  *Id.* ¶ 49.  On January 6, 2015, Sgt. Kimura called Nersoyan again and advised him that he had not been able to contact his counsel.  *Id.*  On January 13, 2015, Sgt. Kimura interviewed Collins, who stated he had been assigned to ELA since 2012 and denied any involvement, asserting that he had never made a traffic stop while assigned to ELA.  *Id.* ¶ 50.  Having received no additional information or telephone calls from Nersoyan or his attorney, Sgt. Kimura mailed a second letter to Nersoyan on January 27, 2015.  *Id.* ¶ 51.  The letter advised Nersoyan that Sgt. Kimura's investigative efforts had been exhausted due to Nersoyan's lack of cooperation and instructed Nersoyan to contact the Los Angeles Police Department regarding the claim, as the location of the alleged incident was within the jurisdiction of the LAPD Newton Division.  *Id.*  It also stated that the identity of any Department personnel involved in the incident was not able to be identified based on the information provided.  *Id.* ¶ I.

On January 29, 2015, Nersoyan's attorney called Sgt. Kimura and stated he had the videotape.  *Id.* ¶ 52.  Sgt. Kimura arranged to go to the attorney's office on February 5, 2015 to view the tape.  *Id.*  However, on February 3, 2015, the attorney's office left a voice message cancelling the meeting.  *Id.*  Sgt. Kimura attempted to reschedule but was not provided a new date. *Id.*  As of February 10, 2015, Sgt. Kimura had not heard further from the attorney's office.  *Id.* ¶ 53.  Based on the available information and the lack of cooperation by Nersoyan, Sgt. Kimura determined there was insufficient evidence to substantiate Nersoyan's allegation or to identify the allegedly involved deputy.[2]  *Id.*  Nersoyan failed to take further action until September of 2019, when he filed a federal lawsuit.  *Id.* ¶ 54.

In 2017, LASD Detective Tim Berns, who is now retired, was assigned to Fraud and Cyber Crimes working on a joint ID Theft Task Force with the FBI, Secret Service, and Customs.  *Id.* ¶

---

[2] As part of his plea deal in 2018, Collins admitted to the illegal traffic stop and seizure of approximately $160,000 on May 28, 2014.

55. A Reliable Confidential Informant (RCI) told Det. Berns about a "dirty cop" initially believed to be with either the Riverside or San Bernardino Sheriffs. *Id.* Det. Berns shared this information with the FBI Agent in his joint taskforce. *Id.* A few weeks later, the RCI relayed that the name of the dirty officer was Kenneth Collins. *Id.* ¶ 56. Det. Berns ran the name through the LASD database and determined he was with the LASD. *Id.* Det. Berns shared this information with his sergeant, his captain, and the FBI. *Id.* While Det. Berns assisted the FBI as needed, the FBI conducted the investigation and ran the sting operation which resulted in the arrests of Collins and Valencia. *Id.* ¶ 57.

## IV. Discussion

### A. Claim for Negligent Supervision/Retention

#### 1. *Scope of Employment*

"In California, a governmental entity can only be sued in tort pursuant to an authorizing statute or enactment." *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 840 (9th Cir. 1996). Plaintiff bases his state law claim for negligent supervision/retention on Cal. Gov't Code § 815.2. This provision allows a plaintiff to hold a public entity liable for "injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." *Id.* Liability for negligent supervision or retention is based on facts indicating that "the employer knew or should have known that hiring the employee created a particular risk or hazard and that [the] particular harm materialize[d]." *John Doe v. Capital Cities*, 50 Cal. App. 4th 1038, 1054 (1996). Defendant argues that this claim fails, as Collins was not acting within the scope of his employment during the events at issue. *See, e.g.*, *Van Ort*, 92 F.3d at 840 (explaining that Cal. Gov't Code § 815.2(a) "cannot support negligent supervision claims for actions outside [the actor's] scope of employment"). While determining whether an act falls within the scope of employment is normally a question of fact, "where only one conclusion is possible 'and where there is no dispute over the operable, overt, observable facts, then the question logically becomes one of law.'" *White v. Cty. of Orange*, 166 Cal. App. 3d 566, 570 (1985) (quoting *Golden W. Broads., Inc. v. Superior Court*, 114 Cal. App. 3d 947, 956 (1981)).

Several courts have addressed similar questions as to when a public officer acts within the scope of her employment. For instance, in *Van Ort*, a police officer who had discovered a safe in the victim's house during execution of a warrant returned the next day to rob the safe. 92 F.3d at

8

833-34. The officer was off-duty when he committed the robbery, and he did not wear his uniform or display his badge. *Id.* The victim brought a state law negligent supervision and hiring claim against the county under Cal. Gov't Code § 815.2. *Id.* at 840-41. The Ninth Circuit affirmed the district court's judgment in favor of the county on this claim, finding that the county could not be liable under § 815.2 because the officer was not acting within the scope of his employment when he committed the robbery. *Id.* The Court explained that "[a]n employer will not be held vicariously liable for an employee's malicious or tortious conduct if the employee *substantially* deviates from the employment duties for personal purposes." *Id.* at 840 (quoting *Farmers Ins. Group v. County of Santa Clara*, 11 Cal. 4th 992, 1005 (Cal. 1995). Thus, the Court concluded that "[t]he free-lance criminal exploits of a law enforcement officer" are outside the scope of employment. *Id.*

In contrast, in *Blair v. City of Pomona*, 223 F.3d 1074, 1081 (9th Cir. 2000), the Ninth Circuit found that several officers arguably had acted within the scope of their authority. There, the plaintiff was a former police officer who alleged that he had been subject to a variety of retaliatory acts by his colleagues after he had reported his fellow officers' abuses of power. *Id.* at 1076-78. The Ninth Circuit reversed the district court's grant of summary judgment in favor of the city, explaining:

> Several of the acts of which Blair provided evidence – the transfer, the blocking of his mother's car, the interference with his radio communication, and the failure of backup and its official toleration – were arguably within the scope of employment of Pomona police officers. The other acts of harassment also were within the scope of their employment if it is found as a fact that there was a police code of silence in the Department, enforced by police officers. Such acts would be very different from "the free-lance criminal exploits" recognized as not giving issue to liability under the California statute. *Van Ort*, 92 F.3d at 840.

*Id.* at 1081.

The Court is inclined to find that this case is more like *Van Ort* than *Blair*. Here, Collins' drug-running activities were clearly not part of his official duties. Nor were they related to or stemming from the performance of his official duties, as in *Blair*. Instead, Collins' activity fits squarely within the "free-lance criminal exploits" described in *Van Ort*.[3] The fact that Collins had his gun and badge with him, without more, is insufficient to bring his criminal activities within the

---

[3] Like *Van Ort*, Collins in this case engaged in the criminal activity on his off-hours when he was not conducting any activities for the County.

scope of his employment. And the Court disagrees with Plaintiff's assertion that this case is similar to *White v. County of Orange*, 166 Cal. App. 3d 566 (1985). In that case, a deputy sheriff on patrol pulled over a driver, placed her in his vehicle, drove her to a secluded area, and threatened to rape and murder her. *Id.* at 568. The Court held that the County could be liable under § 815.2(a) because "the wrongful acts flowed from the very exercise of [the officer's] authority." *Id.* at 571. In *White*, the officer acted within the scope of his authority because he committed the torts while on official patrol, "in uniform, in a marked patrol vehicle using flashing red lights." *Id.* The undisputed facts in this case show that Plaintiff knew the drug transport operation had nothing to do with official LASD business. SUF ¶ 31. As such, it cannot be said that Collins acted within the scope of his employment when he recruited Plaintiff to his scheme and engaged in the illegal transport of controlled substances. Plaintiff's argument that Collins' clothing was not an adequate sign of whether he was on- or off-duty is unavailing in this context. *See* Opp'n at 13. The undisputed facts show that Collins' allegedly tortious actions occurred outside the scope of his employment.

Because the Court would find that the undisputed facts show that Collins acted outside the scope of his employment, the Court would conclude that the County cannot be held liable for Collins' acts under Cal. Gov't Code § 815.2(a).

### 2. *Negligent Supervision*

Even if a statutory basis did exist to hold the County liable under § 815.2(a), the Court would find that Plaintiff cannot establish the elements of a negligent supervision or retention claim against the County. "California case law recognizes the theory that an employer can be liable to a third person for negligently hiring, supervising, or retaining an unfit employee. Liability is based upon the facts that the employer knew or should have known that hiring the employee created a particular risk or hazard and that particular harm materializes." *Doe v. Capital Cities*, 50 Cal. App. 4th 1038, 1054 (1996) (internal citation omitted).

Plaintiff argues that the County should have known that Collins was likely to commit the bad acts because the County had knowledge of several civilian complaints against Collins. *See* Opp'n at 14-16. In particular, Plaintiff focuses on the May 2014 complaint by Nersoyan alleging that Collins and his partner stole $158,000 from Nersoyan's employee.

However, the Court would find that the undisputed facts are insufficient as a matter of law to establish a claim for negligent supervision or retention. This is because "the cornerstone of a

negligent hiring theory is the risk that the employee will act in a certain way and the employee does act in that way." *Capital Cities*, 50 Cal. App. 4th at 1055. Here, based on the complaints alleging that Collins had stolen money from civilians, Plaintiff argues that Defendants should have known that Collins had a propensity to take money from civilians. But none of the complaints were substantiated after investigations. Moreover, the acts alleged here − that Collins recruited Plaintiff into an illegal drug running operation − are not related to Collins' alleged propensity for theft. For example, in *Capital Cities*, a plaintiff sued ABC for negligent hiring after a casting director ("Marshall") drugged him, raped him, and attacked and harassed him. *Id.* at 1042-43. The plaintiff alleged that "ABC knew or should have known that Marshall engaged in the purchase and use of serious, mind-altering illegal drugs[ and] that defendant Marshall used his position at ABC to gain sexual favors." *Id.* at 1054 (internal quotations omitted). The court found that even these allegations were insufficient to establish a basis for negligent hiring, because:

> ABC's knowledge that Marshall personally used serious mind-altering drugs does not equate with knowledge that he would surreptitiously use drugs to place a prospective employee into a situation of helplessness before violently assaulting him. Nor does ABC's knowledge that Marshall used his position to gain sexual favors have material relevance to this matter. Use of the word "gain" is consistent with the quid pro quo form of sexual harassment but that is not the basis of plaintiff's claim.

*Id.* at 1054. In other words, while ABC knew of the casting director's propensity to do some bad acts, it did not know of his propensity to do the bad acts that actually occurred. And in this case, the hazard that Defendants are charged to have had reason to suspect their employment of Collins created − the risk of theft − is not similar to the harm that actually occurred − Collins' recruitment of Plaintiff into his illegal scheme to transport drugs to Nevada.

The undisputed facts provide no evidence showing that Defendants should have known Collins was likely to engage in such activity. Therefore, the Court would hold that Plaintiff's negligent supervision and retention claim fails as a matter of law.

### B. *Monell* Claim

Plaintiff's third claim alleges *Monell* liability for failure to adequately supervise, investigate, and discipline LASD deputies. *See* Complaint ¶¶ 100-110. Under *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978), a municipality may be held liable under 42 U.S.C. § 1983 if the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts

11

the injury." In this context, the municipality's policy must "amount[] to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). This may occur when the deficiency "is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390. "The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged" and that there is "a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). This is a relatively stringent standard:

> To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (opinion of Rehnquist, J.). Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities – a result we rejected in *Monell*, 436 U.S., at 693-694 . . . .

*City of Canton*, 489 U.S. at 391-92.

First, the Court addresses the question of whether there is a genuine dispute of fact regarding whether Defendant acted with deliberate indifference by failing to adequately supervise, investigate, and discipline its Sheriff's deputies. Plaintiff alleges that "each incident in the record reporting illegal behavior by Collins demonstrates a pattern of tortious conduct of which the Defendant was aware but failed to stop through adequate investigation, discipline, or supervision, establishing that it was the County's custom to turn a blind eye to 'dirty cops.'" Opp'n at 19. Plaintiff relies on the three complaints that Collins had stolen money from civilians. However, the undisputed evidence shows that each of the three complaints was investigated. *See* SUF ¶¶ 41-53. Plaintiff primarily focuses on the 2014 allegation that Collins had stolen money from Nersoyan's employee. Plaintiff argues that Defendant should have done more to follow up with Nersoyan regarding his allegation and his claim that he had a video tape of the traffic stop, especially in light of Sgt. Kimura's finding linking the theft to Collins' patrol car. However, the undisputed evidence shows that LASD did investigate each complaint and produce a Watch Commander's Service Report for each one. *Id.* ¶ 41. Moreover, it appears to the Court that Sgt. Kimura made a good faith effort in his investigation of the Nersoyan complaint: he made multiple calls to Nersoyan and

his attorney; sent Nersoyan two letters; interviewed Collins, who denied involvement; and arranged to meet with Nersoyan's attorney, who ultimately cancelled the meeting and did not respond to Sgt. Kimura's attempt to reschedule. *Id.* ¶¶ 46-53. The Court would therefore find that the undisputed facts show no genuine dispute as to whether Defendant acted with "deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388.

But even if the allegedly insufficient investigations did rise to the level of deliberate indifference, the Court is inclined to find that the nexus between Defendant's alleged insufficient supervision, investigation, and discipline and the ultimate injury that occurred is too attenuated to support a *Monell* claim for municipal liability. The Supreme Court has explained that "for liability to attach in this circumstance the identified deficiency . . . must be closely related to the ultimate injury." *City of Canton*, 489 U.S. at 391. As the Court explained in *Brown*:

> [A] finding of culpability simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury. Rather, it must depend on a finding that this officer was highly likely to inflict the particular injury suffered by the plaintiff. The connection between the background of the particular applicant and the specific constitutional violation alleged must be strong.

*Brown*, 520 U.S. at 412. Here, the Court would again conclude that there is not a "strong" connection between the alleged failure and the "particular injury suffered by [Plaintiff]." *Id*. As explained above, Collins' alleged propensity for stealing money from civilians has little relation to his ultimate act of recruiting Plaintiff for an illegal drug transportation operation. The civilian complaints simply provide no indication that Collins "was highly likely to inflict the particular injury" in this case. *Id*. Therefore, the Court would find that the undisputed facts do not support Plaintiff's claim for *Monell* liability.

## V.    Conclusion

Based on the foregoing discussion, the Court would **GRANT** Defendant's Motion for Summary Judgment on Plaintiff's second and third claims.

## VI.    Evidentiary Rulings

Plaintiff lodged objections to Defendant's proffered evidence. *See* Plaintiff's Request for Evidentiary Ruling, Docket No. 27. The Court would rule as follows:

Statement of Undisputed Facts:
- 1 – Overruled.
- 2 – Overruled.

- 3 – Overruled.
- 4 – Overruled.
- 5 – Overruled.
- 6 – Overruled.
- 7 – Sustained.

Declaration of Lt. Douglas Kimura, Docket No. 23-2:
- 1 – Overruled.
- 2 – Overruled.
- 3 – Overruled.
- 4 – Overruled.
- 5 – Overruled.
- 6 – Overruled.

Declaration of Captain Kelly Porowski, Docket No. 23-3:
- 1 – Overruled.
- 2 – Overruled.
- 3 – Overruled.
- 4 – Sustained.
- 5 – Overruled.
- 6 – Sustained in part.  The sentence "The suspect did not complaint at the time of booking[,] and Deputy Collins' partner had done the inventory of the car" is inadmissible hearsay.  The sentence "After a full investigation, no determination was reached" is admissible.