**Exhibit 1**

1   NICOLA T. HANNA
    United States Attorney
2   LAWRENCE S. MIDDLETON
    Assistant United States Attorney
3   Chief, Criminal Division
    LINDSEY GREER DOTSON (Cal. Bar No. 266973)
4   Assistant United States Attorney
    Public Corruption and Civil Rights Section
5        1500 United States Courthouse
         312 North Spring Street
6        Los Angeles, California 90012
         Telephone:  (213) 894-4443
7        Facsimile:  (213) 894-0141
         E-mail:     lindsey.dotson@usdoj.gov
8
    Attorneys for Plaintiff
9   UNITED STATES OF AMERICA

10              UNITED STATES DISTRICT COURT

11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12   UNITED STATES OF AMERICA,        No. CR 18-00038-ODW-1

13            Plaintiff,              GOVERNMENT'S SENTENCING POSITION
                                      FOR DEFENDANT KENNETH COLLINS AND
14            v.                      OBJECTIONS TO THE PRESENTENCE
                                      REPORT
15   KENNETH COLLINS,
      aka "Kenneth Randolph,"         Hearing Date: November 19, 2018
16                                    Hearing Time: 1:30 p.m.
              Defendant.             Location:     Courtroom of
17                                                 the Honorable
                                                   Otis D. Wright, II
18

19

20

21        Plaintiff United States of America, by and through its counsel

22   of record, the United States Attorney for the Central District of

23   California and Assistant United States Attorney Lindsey Greer Dotson,

24   hereby files its sentencing position for defendant KENNETH COLLINS

25   and objections to the United States Probation Office's presentence

26   report.

27   ///

28   ///

The government's sentencing position and objections are based upon the attached memorandum of points and authorities, the files and records in this case, the presentence report, and such further evidence and argument as the Court may permit.

Dated: October 29, 2018            Respectfully submitted,

                                   NICOLA T. HANNA
                                   United States Attorney

                                   LAWRENCE S. MIDDLETON
                                   Assistant United States Attorney
                                   Chief, Criminal Division


                                   ___/s/ Lindsey Greer Dotson___
                                   LINDSEY GREER DOTSON
                                   Assistant United States Attorney

                                   Attorneys for Plaintiff
                                   UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                                    PAGE

I.    INTRODUCTION ............................................... 1

II.   STATEMENT OF FACTS...........................................3

      A.   The Preliminary Negotiations: Defendant Offers to
           Provide Security Services for Illegal Marijuana Grow
           Houses and Drug Transports, in Exchange for Cash
           Payments..............................................3

      B.   The Marijuana Sale: Defendant Sells Two Pounds of
           Marijuana to UC-1 as a "Test Run" and Offers to Sell
           $4 Million of Marijuana to UC-1 Every Month Thereafter....5

      C.   The November 14, 2017 Transport: Defendant and His
           Co-Defendants Provide Security for a Drug Transport
           to Las Vegas, in Exchange for $25,000....................6

      D.   The January 16, 2018 Transport: Defendant and His
           Co-Defendants Plan to Provide Security for a Larger
           Drug Transport to Las Vegas, in Exchange for $250,000.....7

      E.   The "Fixer" Offer: Defendant Offers to "Fix Problems"
           for UC-1 and Details Past Crimes for His Other
           "Clients"...............................................10

      F.   The Emerging Leaders Academy: Defendant Abuses a
           Position of Trust as an Instructor to Recruit a Student
           (Co-Defendant VALENCIA) Back Into a Life of Crime.......11

      G.   Other Uncharged Conduct: Defendant Steals $160,000
           During a Sham Traffic Stop While on Duty and Carrying
           His Firearm.............................................12

III.  ARGUMENT....................................................12

      A.   The Presentence Report and Government's Objections.......13

           1.   Restitution.......................................13

           2.   "Minor Role" Adjustment...........................13

      B.   The Nature and Circumstances of the Offense,
           Seriousness of the Offense, and Just Punishment.........14

      C.   History and Characteristics of Defendant................16

      D.   Promoting Respect for the Law, Adequate Deterrence,
           and Protection for the Public from Defendant's Future
           Crimes..................................................17

IV.   CONCLUSION..................................................17

i

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

**I. INTRODUCTION**

For years, defendant KENNETH COLLINS ("defendant") "served" the people of Los Angeles as a corrupt deputy sheriff motivated by greed, utterly indifferent to his sworn duty to uphold the law. In public, he purported to be an upstanding deputy -- someone who gave back to the community, for instance by mentoring ex-offenders at the Emerging Leaders Academy run by the Los Angeles County Sheriff's Department ("LASD"). In private, he used his status as a deputy to commit crimes, thwart the detection of legitimate law enforcement, and demand high paydays from his criminal clientele. He even abused his position as an instructor at the Emerging Leaders Academy to recruit at least one ex-offender (his co-defendant GRANT VALENCIA) back into a life of crime.

As the Federal Bureau of Investigation's ("FBI") undercover operation evidenced, defendant was the leader of a drug security operation. He claimed to run "teams" providing security for illegal marijuana grow houses and drug transports. In this case, he and members of his "team" provided security for a drug transport to Las Vegas, Nevada in November 2017, in exchange for $25,000. He planned to do so again in January 2018 for an even larger drug transport, this time in exchange for $250,000. When he and his "team" arrived to provide security, however, they were arrested. At the time of his arrest, defendant possessed a loaded firearm and his LASD badge -- both of which he had brought that day to provide security for the drug transport.

Beyond protecting drug transports, defendant also facilitated the distribution of drugs himself. He sold two pounds of marijuana

for $6,000 to UC-1 as a "test run."  If the test run went well, he
offered to sell up to $4 million of marijuana every month to UC-1.

Drugs, though, was not defendant's only criminal side business.
Defendant also claimed to "fix" problems for his "clients," often by
assaulting people and committing other crimes on their behalf.  In
fact, defendant even extended this "service" to UC-1.  During
multiple recorded meetings, defendant offered to travel up North to
intimidate and assault a particular individual on UC-1's behalf, in
exchange for a cash payment.

Defendant's conduct in this case was, no doubt, brazen and
alarming.  But make no mistake, defendant's criminal deeds began long
before the FBI came into the picture.  As part of his plea agreement,
defendant admitted that, in 2014, he orchestrated a bogus traffic
stop while on duty to steal $160,000.  While driving his LASD patrol
car, wearing his LASD uniform, and possessing a firearm, defendant
conducted a sham traffic stop of a vehicle he knew would be carrying
a large sum of cash.  He illegally seized $160,000 that day from the
car and never once reported the stop or seizure to LASD.

Given defendant's egregious criminal conduct for years as a
deputy sheriff, justice demands a severe penalty to both punish and
deter.  Any sentence must convey to defendant, as well as the public,
that corrupt law enforcement officers who violate their sworn duty to
uphold the law and sell their badge for personal profit will be held
accountable and justly punished.  For this reason, the government
requests a United States Sentencing Guidelines ("Guidelines")
sentence of 18 years (216 months) in prison, five years of supervised
release, and $38,000 in restitution for the unrecovered payments to
defendant during the FBI's undercover operation.

**II. STATEMENT OF FACTS**[1]

In violation of his sworn duty as a deputy sheriff, defendant conspired with co-defendants DAVID EASTER ("EASTER") and GRANT VALENCIA ("VALENCIA"), among others, to accept cash payments in exchange for distributing controlled substances and actively thwarting the enforcement of state and local law. (Dkt. 78, ¶ 12.) Defendant agreed to use his position as an LASD deputy sheriff to further the conspiracy's objectives, all the while ensuring that his crimes went undetected. (Id.)

For his conduct, defendant pleaded guilty to count one -- Conspiracy to Distribute Methamphetamine, Cocaine, and Marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A)(viii), (b)(1)(A)(ii)(II), and (b)(1)(D). (Dkt. 78, ¶ 2(a); dkt. 80.) The government has agreed, at sentencing, to dismiss counts two and three -- Using and Carrying a Firearm During and in Relation to, and Possessing a Firearm in Furtherance of, a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). Nevertheless, both parties agree that the Court may consider these dismissed charges in determining the applicable Guidelines range and proper sentence. (Dkt. 78, ¶ 2(c).)

A. **The Preliminary Negotiations**: Defendant Offers to Provide Security Services for Illegal Marijuana Grow Houses and Drug Transports, in Exchange for Cash Payments

During a recorded meeting on August 2, 2017, defendant began negotiating with an undercover FBI Special Agent ("UC-1"), who was

---

[1] The statement of facts is based on the factual basis in defendant's plea agreement (dkt. 78) and, at times, the sworn complaint (dkt. 1).

posing as the partner of a wealthy Asian investor willing to finance the production, distribution, and sale of controlled substances. (Dkt. 78, ¶ 12.) During multiple recorded conversations, defendant claimed to run "teams" of co-conspirators, including other law enforcement officers, who provided security for illegal marijuana grow houses and drug transports. (Id.) Defendant offered to recruit and employ a team to assist UC-1 with transporting controlled substances. (Id.)

During a recorded meeting on August 25, 2017, defendant and co-defendant EASTER met UC-1 to discuss how they and others could provide security for an illegal marijuana grow house UC-1 was purportedly trying to establish. (Dkt. 78, ¶ 12.) Defendant and co-defendant EASTER also offered to assist UC-1 with transporting and distributing controlled substances. (Id.)

In front of co-defendant EASTER, defendant showed UC-1 his LASD badge and a firearm that he was carrying in his waistband. (Dkt. 78, ¶ 12.) Defendant displayed his badge and firearm to prove to UC-1 that he was, in fact, a law enforcement officer, thereby rendering his drug security and transportation services to UC-1 more valuable. (Id.) Toward the end of this meeting, defendant accepted $5,000 in cash hidden inside of a magazine from UC-1 as a good faith payment for future dealings together with co-defendant EASTER. (Id.)

During a recorded meeting on September 29, 2017, defendant and UC-1 met again to discuss the status of the illegal marijuana grow house UC-1 was purportedly trying to establish. (Dkt. 78, ¶ 12.) Defendant told UC-1 that instead of setting up a "major grow," UC-1 should just purchase marijuana for further distribution from defendant directly. (Id.) Defendant said that UC-1 should purchase

4

marijuana "in bulk," "package it up," and "send it."  Defendant said

that he could obtain marijuana for UC-1 from a "connection" defendant

had "up North."  (Id.)  Defendant also told UC-1 that he and his team

could assist UC-1 with transporting the marijuana.  (Id.)

   **B.**   **The Marijuana Sale: Defendant Sells Two Pounds of**
        **Marijuana to UC-1 as a "Test Run" and Offers to Sell**
        **$4 Million of Marijuana to UC-1 Every Month Thereafter**

On October 6, 2017, defendant and UC-1 met during a recorded

meeting to discuss a "test run" sale of marijuana, whereby UC-1 would

buy two pounds of marijuana from defendant.  (Dkt. 78, ¶ 12.)  If the

"test run" went well, defendant understood that UC-1 planned to

purchase greater quantities of marijuana from defendant in the

future.  (Id.)

The following week, during a recorded meeting on October 13,

2017, defendant agreed to sell two pounds of high-quality marijuana

to UC-1 for $6,000.  (Dkt. 78, ¶ 12.)  If this "test run" went well,

defendant offered to facilitate the sale of up to 2,000 pounds of

marijuana for $2,000 per pound -- that is, up to $4 million worth of

marijuana -- every month to UC-1.  (Id.)

On October 20, 2017, co-defendant EASTER delivered approximately

two pounds of marijuana to an undercover FBI Special Agent ("UC-2"),

who was posing as a drug trafficker working with UC-1.  (Dkt. 78,

¶ 12.)  This was the "test run" sale of marijuana that defendant has

previously negotiated with UC-1.  (Id.)  Defendant understood that

co-defendant EASTER was aware that he was delivering marijuana.

(Id.)  Shortly after the delivery, defendant accepted $6,000 in cash

from UC-1 as payment for the marijuana that co-defendant EASTER had

just delivered to UC-2.  (Id.)

C.   __The November 14, 2017 Transport__: Defendant and His

Co-Defendants Provide Security for a Drug Transport

to Las Vegas, in Exchange for $25,000

During a recorded meeting on October 6, 2017, defendant offered to provide UC-1 with security for an upcoming transport of controlled substances to Las Vegas. (Dkt. 78, ¶ 12.) Defendant demanded $25,000 for his services. He justified the $25,000 payment by saying that he and his team were "cops" and "all of our transports make it through." (Id.)

During a recorded meeting on November 3, 2017, UC-1 told defendant that the November transport would consist of methamphetamine, marijuana, and counterfeit cigarettes. (Dkt. 78, ¶ 12.) Defendant agreed that, in exchange for $25,000, he and members of his team would provide security for the transport. That transport was scheduled for November 14, 2017. (Id.)

On November 14, 2017, defendant and his co-defendants EASTER and VALENCIA met in a grocery store parking lot in Pasadena, California to provide security for what they understood to be a drug transport to Las Vegas. (Dkt. 78, ¶ 12.) The transport vehicle that day contained approximately two pounds of marijuana and counterfeit cigarettes, as well as fake methamphetamine disguised to resemble six kilograms of actual methamphetamine. (Id.) UC-1 told defendant and co-defendant EASTER that the "cargo look[ed] good" and contained "six of crystal," a reference to six kilograms of crystal methamphetamine. While in the parking lot, defendant accepted $12,500 in cash hidden inside of a brown paper bag from UC-1. (Id.) This was the first installment of the agreed-upon $25,000 payment for providing security for the drug transport. (Id.)

6

After meeting UC-1 and UC-2 in the Pasadena parking lot, defendant and co-defendants EASTER and VALENCIA escorted the drug transport vehicle to Las Vegas. (Dkt. 78, ¶ 12.) Defendant provided security for the transport by driving a car behind the transport vehicle, while scouting for law enforcement and other potential threats. (Id.) Co-defendant EASTER provided security by driving a car ahead of the transport vehicle, also while scouting for law enforcement and other potential threats. (Id.) Co-defendant VALENCIA provided security by riding in the transport vehicle with UC-2, who was driving, and scouting for law enforcement and other potential threats. If it appeared that a law enforcement officer might conduct a traffic stop of the transport vehicle, defendant and/or co-defendant EASTER planned, among other things, to drive erratically to capture the attention of the law enforcement officer, thereby causing the law enforcement officer to conduct a traffic stop of one of their cars instead of the transport vehicle. (Id.)

Once the transport vehicle made it safely to Las Vegas, co-defendant VALENCIA accepted an envelope with $12,500 in cash from UC-2 on behalf of defendant. (Dkt. 78, ¶ 12.) This was the second installment of the agreed-upon $25,000 payment. (Id.)

D.  **The January 16, 2018 Transport**: Defendant and His Co-Defendants Plan to Provide Security for a Larger Drug Transport to Las Vegas, in Exchange for $250,000

In the weeks following the November 14, 2017 transport, defendant began making plans with UC-1 to provide security for an even larger drug transport. (Dkt. 78, ¶ 12.) On December 11, 2017, defendant met UC-1 to discuss details for a second transport of controlled substances to Las Vegas. (Id.) During the recorded

7

meeting, UC-1 told defendant that the transport would consist of cocaine and methamphetamine. (Id.) Defendant said that, in exchange for $75,000, he and his team would provide security for the transport and make sure that the drugs arrived safely in Las Vegas "untouched, unscathed." (Id.)

On January 5, 2018, defendant and UC-1 met again to discuss details for the transport scheduled to take place on January 16, 2018. (Dkt. 78, ¶ 12.) During the recorded meeting, UC-1 told defendant that the cargo would contain 20 kilograms of cocaine, six kilograms of methamphetamine, and cash. (Id.) Defendant said that his "guys" were used to providing security for "bigger loads" and asked UC-1 about the possibility of doing even larger drug transports in the future. (Id.) Defendant and UC-1 then discussed increasing the size of the January 16, 2018 transport and filling a "moving truck." (Id.) Defendant told UC-1 that his price tag, in light of the greater drug quantity, would increase to as much as $250,000. (Id.) UC-1 ultimately agreed, saying that he (UC-1) could pay defendant $40,000 at the start of the transport, $35,000 once the transport made it safely to Las Vegas, and the remaining "charge for the bigger load" at a later date. (Id.) Defendant agreed and said that this new plan for a larger transport would be "better." (Id.)

The following day, January 6, 2018, defendant had a telephone call with UC-1 to finalize plans for the January 16, 2018 transport. (Dkt. 78, ¶ 12.) During the recorded call, UC-1 again told defendant that the cargo would consist of "meth and coke," a reference to methamphetamine and cocaine. (Id.) Defendant confirmed that the price for his team's services would be "two dollars and fifty cent[s]," meaning $250,000 as previously negotiated with UC-1. (Id.)

8

On January 16, 2018, defendant and his co-defendants EASTER and VALENCIA drove in separate cars and met at the agreed-upon location and time, the Rosemont Pavilion in Pasadena at 6:00 a.m., for the purpose of providing security for a transport of controlled substances to Las Vegas. (Dkt. 78, ¶ 12.) Both defendant and co-defendant EASTER were aware that the transport vehicle contained at least 20 kilograms of cocaine, six kilograms of methamphetamine, and cash. (Id.) Once the three arrived at the Rosemont Pavilion, defendant got out of his car and met with UC-1. (Id.) Defendant accepted $40,000 in cash from UC-1, as a first installment of the agreed-upon $250,000 payment. (Id.)

Similar to the November transport, defendant and co-defendant EASTER planned to provide security by driving near or around the transport vehicle to scout for law enforcement and other potential threats. (Dkt. 78, ¶ 12.) Instead of riding in the transport vehicle, this time co-defendant VALENCIA also planned to drive near or around the transport vehicle to scout for law enforcement and other potential threats. (Id.) If it appeared that a law enforcement officer might conduct a traffic stop of the transport vehicle, defendant, co-defendant EASTER, and/or co-defendant VALENCIA planned to, among other things, drive erratically to capture the attention of the law enforcement officer, thereby causing the law enforcement officer to conduct a traffic stop of one of their cars instead of the transport vehicle. (Id.)

For this transport, defendant possessed his LASD deputy badge and LASD identification card in the car he had driven to the Rosemont Pavilion. (Dkt. 78, ¶ 12.) Defendant further possessed, in that car, a firearm, namely, a loaded Smith and Wesson, Model MP 9 Shield,

nine millimeter semi-automatic handgun, serial number HNX5846.

Defendant admitted that he possessed the firearm that day to provide

security for the drug transport.  (Id.)

        **E.**    **The "Fixer" Offer**: Defendant Offers to "Fix Problems"

            **for UC-1 and Details Past Crimes for His Other "Clients"**

During the September 29, 2017 recorded meeting, defendant and

UC-1 discussed a variety of other criminal deeds that defendant and

his "team" could do for UC-1 in exchange for cash.  (Dkt. 1, ¶¶ 18-

22.)  "I fix problems," defendant said.  "I make a lot of things go

away."  (Id. at ¶ 18.)  Defendant talked about having a very

"professional" "team" comprised of "cops" who "travel...with guns."

(Id.)  He also detailed past things he had purportedly "fixed."

(Id.)  Defendant mentioned a "client" who recently "had something

that needed to be handled in Boston."  (Id.)  He said, "they flew me

and two of my guys to Boston."  (Id.)  According to defendant, he

and his two "guys" "handled" the situation by setting someone's

"$85,000 Cadillac truck on fire."  (Id.)  Defendant also told UC-1

that he and his team could "physically go and touch" someone, if

needed.  (Id.)

During the meeting, UC-1 mentioned that he was having an issue

with someone in Northern California.  (Dkt. 1, ¶ 19.)  Defendant

offered to do a "work-up" on the individual -- for instance, to

locate where the individual lived -- in exchange for $2,000.  (Id.)

Once defendant located the individual, UC-1 said that he (UC-1) would

go to Northern California to speak to that person.  (Id.)  If that

person did not do as UC-1 wanted, defendant offered to "make an

additional contact" for UC-1.  (Id.)  In essence, defendant was

offering to travel to Northern California to intimidate and, if

needed, physically assault the individual with whom UC-1 was purportedly having issues.  (Id.)  At the end of the meeting, UC-1 gave defendant $1,000 in cash hidden inside of a magazine.  (Id. at ¶ 20.)  This was the first installment of the $2,000 payment that UC-1 had agreed to give defendant for the "work-up."  (Id.)

When defendant and UC-1 met again on October 6, 2017, defendant gave UC-1 the agreed-upon "work-up" -- a home address and driver's license number for the individual in Northern California with whom UC-1 was purportedly having issues.  (Dkt. 1, ¶ 21.)  During the recorded meeting, defendant again offered to do more for UC-1.  (Id.)  "If you need anything else with that, definitely reach out to me," defendant said.  "We can definitely, you know, kind of impact him a little bit."  (Id.)  Defendant was, once again, offering to travel to Northern California to intimidate and, if necessary, physically assault the individual on behalf of UC-1.  (Id.)  At the end of this meeting, UC-1 gave defendant $1,000 in cash hidden inside of a magazine.  (Id. at ¶ 22.)   This was the second and final installment of the $2,000 payment that UC-1 agreed to give defendant for the "work-up."  (Id.)

**F.   The Emerging Leaders Academy: Defendant Abuses a Position of Trust as an Instructor to Recruit a Student (Co-Defendant VALENCIA) Back Into a Life of Crime**

In his plea agreement, defendant acknowledged that he met his co-defendant VALENCIA through a life-skills class called the Emerging Leaders Academy in or about 2014.  (Dkt. 78, ¶ 12.)  Defendant was an instructor, and co-defendant VALENCIA was a student.  (Id.)  The purpose of the Emerging Leaders Academy was for LASD deputies, like defendant, to teach and mentor adult ex-offenders, like co-defendant

11

VALENCIA, in order to help those ex-offenders successfully reintegrate into society. (Id.) Instead of providing mentorship, however, defendant provided an opportunity for co-defendant VALENCIA to return to a life of crime and narcotics trafficking.

### G. Other Uncharged Conduct: Defendant Steals $160,000 During a Sham Traffic Stop While on Duty and Carrying His Firearm

As part of his plea agreement, defendant admitted that he stole $160,000 during a sham traffic stop. On May 28, 2014, while driving his LASD patrol car, wearing his LASD uniform, and possessing a firearm, defendant conducted an unlawful traffic stop of a vehicle and illegally seized approximately $160,000 in cash from the vehicle. (Dkt. 78, ¶ 12.) Defendant was aware, in advance of the traffic stop, that there would be a large sum of cash in the vehicle and conducted the traffic stop for the purpose of illegally seizing the cash. (Id.) In violation of LASD policy, defendant failed to report to LASD that he had conducted the traffic stop or seized any cash that day. (Id.)

## III. ARGUMENT

Given the severity of defendant's conduct in this case, his admission that he committed at least one other serious crime while on duty in 2014 separate and apart from this case, and the need to send a message to both defendant and other public servants that corruption will not be tolerated, a Guidelines sentence of 18 years (216 months) in prison, five years of supervised release, and restitution in the amount of $38,000 for the unrecovered payments to defendant is justified.

///

///

**A. The Presentence Report and Government's Objections**

The PSR accurately describes defendant's conduct and the Guidelines application. The total offense level is 37, defendant falls in criminal history category I, and the corresponding Guidelines range is 210 to 262 months in prison. (Dkt. 110 at 3.) The government objects to the PSR as follows:

**1. Restitution**

The PSR states that restitution is not an issue in this case. (Dkt. 110, ¶¶ 111-12.) That is incorrect. As detailed above, defendant received a total of $38,000 from UC-1, which the federal government has not recovered:

| DATE | AMOUNT | PURPOSE |
|------|--------|---------|
| 08/25/2017 | $5,000 | Good faith payment for future deals |
| 09/29/2017 | $1,000 | First installment of the $2,000 payment for defendant's "work-up" on the individual up North |
| 10/06/2017 | $1,000 | Second installment of the $2,000 payment for defendant's "work-up" on the individual up North |
| 10/20/2017 | $6,000 | Payment for the "test run" sale of marijuana |
| 11/14/2017 | $25,000 | Payment for the first drug transport to Las Vegas |
| TOTAL | $38,000 | |

Accordingly, pursuant to 18 U.S.C. § 3663A, restitution in the total amount of $38,000 is due and owing to the United States Treasury as the victim in this case.

**2. "Minor Role" Adjustment**

The PSR states that the Probation Officer applied a "two-level decrease for minor role." (Dkt. 110, ¶ 102.) That decrease is not reflected in other parts of the PSR and not included in Guidelines calculation. (See, e.g., id. at ¶¶ 42-55.) The government presumes this is a typographical error but notes its objection for the record.

13

As is clear from the plea agreement and the remainder of the PSR itself, nothing about defendant's involvement in this conspiracy was "minor." He was the leader and mastermind of the drug security operation, which is why the PSR accurately applied a two-level <u>upward</u> adjustment for his role as a supervisor or manager pursuant to U.S.S.G. § 3B1.1(c). (<u>Id.</u> at ¶ 47.)

**B.    The Nature and Circumstances of the Offense, Seriousness of the Offense, and Just Punishment**

In determining a sufficient sentence, courts must consider the nature and circumstances of the offense. 18 U.S.C. § 3553(a)(1). Courts must also impose sentences that reflect the seriousness of the offense and provide just punishment. 18 U.S.C. § 3553(a)(2)(A). For these reasons, it is both appropriate and imperative for the Court to impose a Guidelines sentence of 18 years (216 months) in prison here.

It is difficult to understate the severity of defendant's criminal conduct, while a deputy sheriff no less. He orchestrated a drug security ring to protect narcotics transports. He bragged that he had been doing so for years undetected and already had teams in place protecting illegal marijuana grow houses. He and members of his team, in fact, provided security for what defendant understood to be a large-scale methamphetamine transport to Las Vegas in November 2017. He negotiated a second transport to Las Vegas in January 2018, this time in exchange for a whopping $250,000 payment. He justified his extraordinary fees by bragging that he and his team were "cops" and "all [their] transports make it through."[2] He even flaunted his

---

[2] Although co-defendants EASTER and VALENCIA were not, in fact, law enforcement officers, that does not mean that defendant did not employ other team members who potentially were law enforcement officers.

14

badge and firearm in order to prove to UC-1 that he was, in fact, a law enforcement officer, thereby rendering his security services to the a criminal enterprise more valuable. On the day of his arrest, defendant possessed his badge and a loaded firearm, both of which he had brought to provide security for the cocaine and methamphetamine transport to Las Vegas.

Beyond all this, defendant's offers to UC-1 during the undercover operation were abhorrent. Among other things, he offered to "fix" problems for UC-1 by assaulting people. He recounted how he had recently set a truck on fire for one of his "clients" in order to intimidate someone. In exchange for a $2,000 fee, defendant provided a "work-up" on an individual for UC-1 and even offered to travel to Northern California to assault that person on UC-1's behalf. Fortunately, and unbeknownst to defendant, UC-1 was an undercover agent and would never have taken defendant up on his violent offer. But that does not mitigate the egregiousness of defendant's offer here. Defendant -- a sworn law enforcement officer -- was offering to violently attack an innocent person in exchange for cash. And that offer cannot be reduced to mere "puffing" on defendant's part. For months, defendant had been fostering a relationship with UC-1 with hopes of significant paydays in the future. There can be little doubt that, had UC-1 asked defendant to actually go and assault someone, defendant would likely have obliged in order to maintain his lucrative relationship with UC-1. It was not in defendant's financial interest to make hollow offers to UC-1.

Furthermore, not only did defendant secure drug transports and offer to "fix" problems for his "clients," he also sold approximately two pounds of marijuana to UC-1 for $6,000. If this "test run" went

well and UC-1 liked the product, defendant offered to sell up to <u>$4</u> <u>million</u> of marijuana to UC-1 every month going forward.  The fact that a deputy sheriff would be selling drugs and brokering multi-million dollar marijuana deals is astounding, to say the least.

Defendant may argue that he was again "puffing" when he offered to broker these multi-million dollar marijuana deals.  But had UC-1 asked him to supply these much larger quantities of marijuana, it is likely that defendant would have obliged.  Again, in order to maintain this lucrative relationship with UC-1, it is unlikely that defendant would have offered to supply such large quantities of marijuana to UC-1 if he could not deliver on his promise. Defendant's offers to UC-1 are egregious in and of themselves, but the fact that he had the connections to possibly deliver is even more alarming.

### C.  History and Characteristics of Defendant

Adding to the egregiousness of defendant's current conduct is his criminal past, which the Court must also consider.  18 U.S.C. § 3553(a)(1).  Although defendant has no formal criminal history and falls in criminal history category I, he has admitted to other uncharged criminal conduct.  As part of his plea agreement, he admitted to illegally seizing $160,000 during a bogus traffic stop in 2014 while on duty and armed.  (Dkt. 78, ¶ 12.)  As such, it is clear that defendant's charged criminal conduct in this case was not aberrant.  His criminal ties and activities began long before the FBI began its undercover operation in this case.  Any sentence by this Court must reflect that.

///

///

16

**D.    Promoting Respect for the Law, Adequate Deterrence, and Protection for the Public from Defendant's Future Crimes**

Finally, any sentence must promote respect for the law, afford adequate deterrence, and protect the public from defendant's future crimes.  18 U.S.C. § 3553(a)(2).  These are additional compelling reasons warranting a Guidelines sentence of 18 years (216 months) in prison.  Corrupt law enforcement officers, like defendant, must appreciate the severity of their criminal conduct and face real consequences for violating their sworn oath to uphold the law.  Should defendant receive anything other than a Guidelines sentence here, it would signal to both him and the public that law enforcement officers who commit such crimes are above the law.  There is absolutely nothing in this record warranting a downward departure or variance.

**IV. CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to 18 years (216 months) in prison, followed by five years of supervised release, and order him to pay $38,000 in restitution to the United States Treasury for the unrecovered payments defendant received for his criminal conduct in this case.