**Exhibit 3**

1

2          IMPORTANT INFORMATION!   IMPORTANT INFORMATION!

3

4

           It is understood by all attorneys and/or
5    their staff using, saving onto a hard computer disk,
     or receiving a Livenote/Realtime ASCII or emailed
6    rough draft transcript that:

7        1.   The following is an unedited rough draft
     transcript.  Various corrections and/or changes may be
8    made before the final version is complete.  The use of
     this rough draft transcript is limited by C.C.P.
9    2025.540(b).  This reporter, as well as any affiliated
     court reporting agency, will not be responsible for
10   any variance of this draft from the final transcript.

11       2.   Because of the nature of stenographic
     outlines, differences WILL exist between the
12   Livenote/Realtime rough draft copy and the certified
     transcript prepared by the reporter.  Those
13   differences will include the following, among others:

14            A.   Words may change;
              B.   Page and line numbers may change;
15            C.   Quotes may change.

16

17       3.   Providing a Livenote/Realtime ASCII and/or
     email or saving Livenote/Realtime onto a computer
     hard drive will only be provided when a certified copy
18   is purchased and there will be a charege for the
     Livenote/Realtime rough transcript in addition to the
19   charge for the certified copy.

20

21   **Please include this disclaimer at the beginning of each
     Realtime feed and/or rough drafts provided at the conclusion
22   of the deposition.***

23

24                     UNITED STATES DISTRICT COURT

25               *****IN AND FOR THE COUNTY OF LOS ANGELES

                                                            1

1

2   DANIEL NERSOYAN,
                     Plaintiff,
3
        vs.                          Case No. CV1908109SVW
4
COUNTY OF LOS ANGELES,
5                    Defendants.
_____
6

7

8

9           DEPOSITION OF LIEUTENANT DOUGLAS KIMURA

10

                     APPEARING REMOTELY FROM
11
             LOS ANGELES COUNTY, CALIFORNIA
12

13                     February 17, 2020

14                        12:38 p.m.

15

16

17

```
18

19

20   REPORTED BY:

21   La Tasha Peters

22   CSR No. 12110

23   APPEARING REMOTELY FROM LOS ANGELES COUNTY, CALIFORNIA

24

25
```

2

♠

```
 1   REMOTE APPEARANCES:

 2

 3        For the Plaintiff:

 4           WEXFORD LAW
             MICHAEL DEVEREUX
 5           9171 Wilshire Boulevard, Suite 500
             Beverly Hills, California  90210
 6           424.444.0883
             .com
 7

 8        For the Defendant

 9

10

11
```

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    INDEX TO EXAMINATION

2          WITNESS:  LIEUTENANT DOUGLAS KIMURA

3                                                        PAGE

4    EXAMINATION BY MR. DEVEREUX

5

6

7

8

9          QUESTIONS INSTRUCTED NOT TO ANSWER

10                    PAGE          LINE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX TO EXHIBITS

 2               LIEUTENANT DOUGLAS KIMURA

 3            Nersoyan vs. County of Los Angeles

 4               Wednesday, February 17, 2020

 5               La Tasha Peters, CSR No. 12110

 6

 7   MARKED              DESCRIPTION              PAGE

 8   Exhibit 1

 9   Exhibit 2


10


11


12

13

14

15

16

17

18

19

20

21

22

23
```

24

25

5

REPORTED REMOTELY FROM LOS ANGELES COUNTY, CALIFORNIA

WEDNESDAY, FEBRUARY 17, 2021; 12:38 P.M.

THE VIDEOGRAPHER:  We are on the record the time is 12:38 p.m. Pacific Standard Time.  This is February 17th, 2021.  Audio and video recordings will continue to take place until all parties agree to go off record.  Please note that microphones are sensitive and may pick-up whispering and private conversations.  This is the video-recorded deposition of Douglas Kimura, taken by counsel for the plaintiff in the matter of Daniel Nersoyan versus County of Los Angeles, et al., United States district court central district of California Western Division Case number CV19-08109SVW.

This deposition is being held via Zoom conferencing. My name is Daniel Schloss, the videographer on behalf of US Legal Support located at 11845 West Olympic Boulevard, Suite 600W, Los Angeles, California.  The court reporter

18    today is La Tasha Peters on behalf of US Legal Support.  I am

19    not a relative or arrest party to the action, nor am I

20    financially interested in the outcome.

21          At this time if I could have counsel identify

22    yourselves starting with the noticing attorney first.

23          MR. DEVEREUX:  Thank you.  This is attorney

24    Michael Devereux on behalf of Mr. Nersoyan.

25          MS. INLOW:  Laura Inlow on behalf of defendant

                                                              6

1    County of Los Angeles and its employee witness,

2    lieutenant Kimura.

3          THE VIDEOGRAPHER:  Thank you.  And at this time

4    would the court reporter please swear in the witness.

5    THE REPORTER:   The attorneys participating in this

6    deposition acknowledge that I am not physically present in

7    the deposition room and that I will be reporting this

8    deposition remotely.  They further acknowledge that, in lieu

9    of an oath administered in person, the witness will verbally

10   declare his testimony in this matter is under penalty of

11   perjury.  The parties and their counsel consent to this

12   arrangement and waive any objections to this manner of

13    reporting.

14          Please indicate your agreement by stating your name

15    and your agreement on the record.

16          MS. INLOW:  Michael?

17          MR. DEVEREUX:  Yes, I agree.

18          MS. INLOW:  Laura Inlow.  And I agree.

19          THE REPORTER:  Thank you.  Good Afternoon, Officer.

20    If you could please raise your right hand to be sworn.

21          Do you solemnly state that the testimony you are

22    about to give in the cause now pending will be the truth, the

23    whole truth, and nothing but the truth?

24          THE WITNESS:  I do.

25    ///

7

⬆

1                    EXAMINATION

2

3    BY MR. DEVEREUX:

4         Q.   Good morning or afternoon now, Lieutenant.

5         A.   How are you.

6         Q.   Even though the deposition is being taken relatively

7    informal, I will tell you that you were sworn to tell the

8    truth and the fact of that, the effect of that oath is the

9    same as if you were in court.  Do you understand that?

10        A.   Can you hold on.  Let me turn this radio down.

11   Okay.  I'm back.

12        Q.   Okay.  Very good.  I was stating that even though

13   this deposition is being take in our offices and it's

14   relatively informal, I have to remind you that you have sworn

15   to tell the truth and the effect of that oath is the same as

16   if you were testifying in court.  Do you understand that?

17        A.   I do.

18        Q.   Okay.  Now, I'm going to be asking you questions

19   sometimes I get ahead of myself that are not clear, okay.  If

20   there's anything that I'm not clear about, you can ask me to

21   reword the question.  Is that understandable?

22        A.   Yes, sir.

23        Q.   Okay.  Don't guess.  If you're not certain, provide

24   estimates but tell us, Look, I'm not certain, this is

25   appropriate, this is an estimate, whatever or something,

8

⌃

1    okay, and if that's accurate.

2          Now the court reporter is recording all the

3      questions answers and objections and is going to reduce that

4      information to a paper form after the deposition ends at

5      which point you'll have the opportunity to read the

6      transcript and correct any inaccuracies.  If the questions

7      calls for a "yes" or "no" answer, just answer "yes" or "no,"

8      rather than don't shake your head.  That can't be -- the

9      court reporter can't take that down or nod.  So use your

10     words, please.  All right.  One person talks at a time.

11         The court reporter can't take both of us

12     simultaneously.  So if you're talking I will be quiet, I will

13     let you finish, okay.  If I'm talking, I'll ask you to do the

14     same.  Do you understand that?

15     A.    I do.  Let me ask you a quick question.  On the Zoom

16     thing, how do I -- how do I get it so I can see you instead

17     of a little, little square at the top?  Can I get you like in

18     front of me?

19         MS. INLOW:  Double click on his picture.

20         THE WITNESS:  It's not working.

21         MS. INLOW:  Or do you see on the top right cornER

22     there should be a think that says, "View."

23         THE WITNESS:  Right.

24         MS. INLOW:  If you go -- I'm in speaker view,

25     meaning you are big.  You can click on speaker view and I

9

think that will make Mr. Devereux big for you.

1

2          THE VIDEOGRAPHER:  Actually, I have him spotlighted

3     and that is for the purpose of recording.  So he will always

4     be so the screen if I put it a different way.

5          THE WITNESS:  That's cool.  I did.  You guys are --

6     I did a -- you guys are a little bigger now.

7     BY MR. DEVEREUX:

8          Q.   We're growing.

9          A.   Yeah.  All right.  Now we spoke about this.  If you

10    need a break, just say I need to take a break.  You can stop

11    and we'll stop for you.  Okay?

12         A.   Okay.

13         Q.   Also if you need a break for other than work, you're

14    allowed to take a break.  So if you need a break for others

15    than just a work break, just ask for it.  Okay.  The

16    attorneys may make objections to questions or answers.  The

17    objections are for the judge to consider later.  You are

18    required to answer unless as a party -- you're not a party,

19    you were told not to by counsel.  So that doesn't apply to

20    you.  Now, understanding the fact the effect of change, your

21    testimonies.  If you later make a change to your testimony

22    that's inconsistent with the answers given during this

23    deposition, the I'm entitled to comment on those

24    discrepancies at trial to question the -- your truthfulness.

25    All right?

                                                                    10

⌃

1        A.    All right.

2        Q.    Do you have any questions?

3        A.    No, I don't.

4        Q.    Okay.  Have you been deposed before?

5        A.    Yes.

6        Q.    How many times have you been depose do you recall

7    being deposed?

8        A.    A dozen maybe.

9        Q.    Okay.

10       A.    If that, I don't know.

11       Q.    Okay.  And your full name is?

12       A.    Douglas KIMURA.

13       Q.    Okay.  And is there a middle name there?

14       A.    Leslie.

15       Q.    Okay.  All right.  And your employer?

16      A.   Los Angeles County Sheriff's Department.

17      Q.   Okay.  And how long have you been with the

18 Los Angeles Sheriff's Department?

19      A.   A little over 30 years.

20      Q.   All right.  And what's your position or your title

21 today?

22      A.   Lieutenant.

23      Q.   Okay.  And are you a certain group?

24      A.   Lomita Sheriff.

25      Q.   Okay.  And your position or your title on

                                                          11

1 May 26, 2014?

2      A.   I believe I was a Sergeant over at the Cops

3 Bureau.

4      Q.   And what's a Cops Bureau?

5      A.   Community Oriented Policing Bureau.

6      Q.   Okay.  And what's the function of that bureau?

7      A.   It was to address community concerns with the

8 problems they have and solve them.

9      Q.   All right.  And when did you leave that position?

10    A.   *Sheesh, maybe 2015-ish.

11    Q.   In the begin beginning?  Middle?  End?

12    A.   Middle-ish.  Can you hear me?

13    Q.   Yes, okay.  All right.  And where did you go after,

14    after that?

15    A.   Internal criminal investigations bureau.

16    Q.   Okay.  Are you familiar with the sergeant, with the

17    sergeant Steve Kim?

18    A.   I am.

19    Q.   Okay.  All right.  Your education?

20         MS. INLOW:  Again, I'm going to allow you lieutenant

21    to state any degrees that you have, what they were and the

22    years you obtained them but do not state the name of the

23    institution.  That's an officer safety issue and a privacy

24    function.

25         Go ahead.

                                                            12

1     A.   Bachelor's ASU 2020.

2     Q.   Okay.

3     A.   Associates '88, maybe.

4     Q.   Okay.  Is that general education?

5       A.   For the bachelor's.

6       Q.   For the associates?

7       A.   Yes.  Liberal studies, I think that's what it was.

8       Q.   And the bachelor's was the degree in what?

9       A.   Liberal studies.

10      Q.   What kind of studies?

11      A.   Liberal.

12      Q.   Okay.  All right.  All right.  And your on-the-job

13  training?

14           MS. INLOW:  Objection.  Vague, ambiguous, hopelessly

15  overbroad, vague as to time what.  Do you mean by his

16  on-the-job training?  He's been on for 30 years.

17           MR. DEVEREUX:  Yeah, 30 years that's a long time.

18           MS. INLOW:  He'd be here until kingdom come.

19           MR. DEVEREUX:  Los Angeles Sheriff's Department --

20  what's that?

21           MS. INLOW:  He'll be here till kingdom come.  Please

22  ask another question.

23  BY MR. DEVEREUX:

24      Q.   Let's go from May 2014 till today?

25           MS. INLOW:  Same objections.  And irrelevant.  Much

13

1   of his training would be irrelevant.

2          MR. DEVEREUX:  All right.

3          MS. INLOW:  He may answer that as asked,

4   Lieutenant.

5          THE WITNESS:  What kind of training from 2014 to

6   today?

7   BY MR. DEVEREUX:

8      Q.   Yes.

9      A.   Leadership training, lieutenant training, tolerance

10  training, and that's it.

11     Q.   And your previous employment before you left the

12  Sheriff's Department?

13         MS. INLOW:  Lacks foundation.

14  BY MR. DEVEREUX:

15     Q.   You may answer.

16     A.   Previous employment?

17     Q.   Yes.

18     A.   I was a retail store, I guess, a clerk or manager.

19     Q.   Okay.  Do you recall when you first heard of

20  Mr. Nersoyan?

21     A.   Yes.

22     Q.   And when was that?

23     A.   I'm going to refer to my notes.  Is that okay?

24        Q.    That's fine.  Don't read from them, just look at

25    them.


                                                                    14


↑


1         A.    I would say on or about December 4th, 2014.

2         Q.    All right.  In what respect were you working at that

3     time?

4         A.    I was the operations sergeant over at the the

5     Community Oriented Policing Services Bureau.

6         Q.    Okay.  Now, when you say Operations Sergeant, that's

7     a Special Operations Bureau?

8              MS. INLOW:  That question is I -- don't understand

9     that question.  Are you asking?

10             MR. DEVEREUX:  I was kind of confused by the answer

11    and I was trying to clarify.

12             MS. INLOW:  Are you asking him what it means to be

13    the operations sergeant?

14             MR. DEVEREUX:  Yes.

15             MS. INLOW:  Go ahead.  Then brief, again it calls

16    calls for a narrative, hopelessly vague and ambiguous and

17    vague as to time.

18             But go ahead, Lieutenant.

19          THE WITNESS:  The operations sergeant, it was an

20    administrative position within that unit.  I was tasked to

21    oversee a lot of the risk management issues that came in,

22    review all the administrative packages that came in, work on

23    special projects, and do other things as needed.

24    BY MR. DEVEREUX:

25        Q.   All right.  Are you familiar with the term "Special

                                                              15

↟

 1    Operations Bureau"?

 2        A.   I am.

 3        Q.   Is that the same thing?

 4        A.   Well, that bureau consists of many subdivisions like

 5    Community Oriented Policing Bureau is one of them, parks

 6    bureau is under their command.  So there's a lot of different

 7    units that's -- that creates the Special Operations Bureau.

 8        Q.   Okay.  And at that time are you familiar with the

 9    name of Kenneth Collins?

10        A.   I am.

11          MS. INLOW:  Just to be clear, Michael, when you're

12    saying at that time, you're talking December of 2014?

13          MR. DEVEREUX:  Yes.

14          MS. INLOW:  Okay.

15   BY MR. DEVEREUX:

16     Q.   Was he a member of the Special Operations Bureau?

17     A.   I don't recall.  I don't think he was when I was

18   there.

19     Q.   All right.  Was he ever a member there, to the best

20   of your knowledge?

21          MS. INLOW:  Calls for speculation.

22   BY MR. DEVEREUX:

23     Q.   Was he ever a member of the Special Operations

24   Bureau to the best your knowledge?

25     A.   I believe he was.

                                                              16

↑

1     Q.   Okay.  Do you recall when he was?

2     A.   I don't.

3     Q.   Was it before you or after you?

4     A.   I believe it was before me.

5     Q.   Okay.  All right.  Now it says that Mr. Nersoyan

6   filed a complaint; is that correct?

7     A.   i'm Sorry.  Can you repeat that?

8       Q.    Mr. Nersoyan filed a complaint; is that correct

9             MS. INLOW:  I'm going to object to the term

10   complaint as lacking foundation, vague and ambiguous, may

11   misstate the evidence.

12            Go ahead.

13            THE WITNESS:  I don't believe it was a complaint; it

14   was a civil claim.

15   BY MR. DEVEREUX:

16       Q.    Okay.  So what initiated the process, if you can

17   recall?

18            MS. INLOW:  What process?  Vague and ambiguous.

19   BY MR. DEVEREUX:

20       Q.    He was involved in a process; is that correct?

21       A.    Did a what?

22       Q.    Are you involved in the process at this particular

23   time in December of 2014?

24            MS. INLOW:  Vague and ambiguous, lacks foundation,

25   calls for speculation.

17

1             What is the process to which you were referring?

2          MR. DEVEREUX:  I said, "a process."

3          MS. INLOW:  Same objections.  I don't understand the

4     question.

5      Q.   Well, at some point there's a process.  Every

6     company, every business you have has a process.  He's

7     involved in a process.  Am I wrong to say that you were

8     involved in the process in December 2014?  Correct me if I'm

9     wrong.  Somehow you got involved.

10          MS. INLOW:  Go ahead.

11          THE WITNESS:  Are you yelling at me or who are you

12     talking to?

13      Q.   I was yelling at YOU; I'M YELLING AT her.  I won't

14     say who, but...

15      A.   So a civil claim was filed, I believe, sometime in

16     November and then the claim -- I believe the claim gets filed

17     with the board of supervisors and somehow it ends up -- it

18     ended up with us.

19      Q.   Okay.  With you, as in the Operations?

20      A.   It goes to the captain first, operations lieutenant,

21     and then it got to me.

22      Q.   Okay.  Do you recall who the captain was at that

23     time?

24      A.   Jeff Perry.

25      Q.   Okay.  And do you recall who the lieutenant was?

18

1      A.   John Voza.

2           MS. INLOW:  Can you spell that last name

3      lieutenant.

4           THE WITNESS:  Which one, Perry or voza?

5           MS. INLOW:  Perry I know is P-e-r-r-y.

6           THE WITNESS:  Voza is V, as in victory; O as in

7      ocean; Z as in zebra; A as in apple.

8           MS. INLOW:  Thank you.

9      BY MR. DEVEREUX:

10     Q.   All right.  So at that point you received some

11     documents of some sort; is that correct?

12     A.   Yes, sir.

13     Q.   And a briefing likely; is that correct?

14     A.   Pardon me?

15     Q.   And a briefing of some sort?

16     A.   I don't believe it was a briefing; it was the claim

17     itself.

18     Q.   Okay.  So what was your first step?

19     A.   In investigating the claim?

20     Q.   Yes.

21     A.   I started doing some inquiries.

22      Q.   Okay.  And those inquiries, what did that consist

23   of?

24      A.   I gotta redeem my notes to be 100 percent accurate

25   with you.


                                                           19


1      Q.   Okay.

2      A.   So the claim -- can I talk about the claim what it

3   said real quick?

4      Q.   Certainly.  Absolutely.

5      A.   There's someone alleged that one of his employees I

6   believe it was, was stopped by a L.A. Deputy Sheriff, I

7   think, and some money was taken out of his car.  And the

8   complaint indicated that the only thing that was workable,

9   meaning investigatible was that there was a number associated

10   with the vehicle.  So in the process of my investigation, I

11   tried to figure out if that particular vehicle was in fact

12   assigned to the unit I was working.

13      Q.   Okay.  And, and and how did you do that?

14      A.   I requested all vehicles in the County that had --

15   that had a match to those three numbers.

16      Q.   Okay.  And is there a program or was it just a

17   request?  How does that work?

18      A.   I think I think it was done in an e-mail, and there

19   is a program that could make inquiries using those numbers

20   and I got a list of vehicles that contained those numbers.

21      Q.   Okay.  And those numbers that we're talking about,

22   were those license plate numbers or were they just etched on

23   the side of the car?

24        MS. INLOW:  Lacks foundation, complex, compound.

25        Go ahead.

                                                              20

1        THE WITNESS:  When I saw those numbers, I believe

2   they were the numbers on top of the actual car.

3   BY MR. DEVEREUX:

4      Q.   All right.  All right.  And what was your next step

5   then?  Did you send an e-mail out to?

6      A.   Once I received the list of vehicles, I -- I looked

7   for the car that contained those three numbers.

8      Q.   Okay.  And how many, how many cars came back with

9   those three numbers; do you recall?

10      A.   I don't.

11     Q.    Was it more than one?

12     A.    Yes.

13     Q.    Okay.  And so what happens next?

14     A.    So believing that the number that is provided by

15  Mr. Nersoyan was taken off the top of a car, I know from

16  working that the cars, the black and whites that the

17  Sheriff's Department uses has the last three numbers of their

18  vehicle number painted on top of the car.  So I was able to

19  eliminate the vehicles that had those numbers, which weren't

20  the last three of the actual vehicle identifier.  Do you

21  understand?

22     Q.    Yes.  Yes.  I think so.  Okay.  And was that vehicle

23  identifier on the Sheriff's cars, only on top of the

24  Sheriff's cars, or are they also on the side of the Sheriff's

25  cars or just in one spot?

                                                              21

⬆

1          MS. INLOW:  Again, I'm just going to object it's

2  vague as to time, may call for speculation, be overbroad.

3          Go ahead.

4  BY MR. DEVEREUX:

5      Q.   Was it marked in one spot or were they --

6      A.   Well, there's -- if you can imagine the roof of a

7   car, you know, the length and width, the last three numbers

8   are generally painted across the back portion of the roof.

9   So those three numbers are on top of that.  The full number

10  is at times stickered onto the trunk.  Sometimes they're

11  handwritten in the door, handwritten on the gas door, the gas

12  door thing.  So the numbers are most of the times in multiple

13  locations, but the biggest number is on top of the roof.

14     Q.   Okay.  Let me ask you this:  What's a FAST?  Have

15  you heard the terminology FAST programmers, F-A-S-T?

16     A.   yes.

17     Q.   What is FAST Program?

18     A.   That's a program where Sheriff's Department vehicles

19  are in.

20     Q.   So how does that program work?

21     A.   I don't know.

22     Q.   Is it -- is it contained if you want to look up a

23  vehicle, what kind of information would come back from that

24  program?

25          MS. INLOW:  Again I'm just going to object that it's

22

```
 1    overbroad, ambiguous, vague as to time, and may be outside

 2    the expertise of this witness.

 3              Go ahead, Lieutenant.

 4              THE WITNESS:  I don't know what, what -- what at all

 5    it contained but it told me vehicle numbers and I think you

 6    could get the last person that gassed up the car.

 7    BY MR. DEVEREUX:

 8         Q.   Okay.

 9         A.   I don't know what else it could do.

10         Q.   Okay.  Would you -- would you know what location

11    that person that gassed up the car was located at?  Could you

12    determine that?

13              MS. INLOW:  Objection.  Vague, ambiguous, lacks

14    foundation, calls for speculation, overbroad, may be outside

15    the expertise of this witness.

16              Go ahead, Lieutenant.

17              THE WITNESS:  Would it tell me where the last car,

18    last time the car was gassed at?

19    BY MR. DEVEREUX:

20         Q.   Yes.

21         A.   Yeah, I this ink so.

22         Q.   Okay.  Would it have maintenance records?

23         A.   I don't know.

24         Q.   Okay.  Let me ask you this:  If a car is missing, a
```

25   Los Angeles Sheriff's police car is missing in 2014, what

23

↥

1   would you do to track it down?

2          MS. INLOW:  Same objections.

3          THE WITNESS:  What do you mean missing, someone

4   stole it?

5      Q.   Someone stole it, somebody went out for a joy ride

6   or --

7          MS. INLOW:  Same objections.

8          THE WITNESS:  I believe it would probably be the

9   same as when a regular person gets his car stolen.  We either

10   write a stolen car report, but I'll probably put out a county

11   wide broadcast indicating L.A. County Sheriff's car was

12   stolen and start looking for it.

13   BY MR. DEVEREUX:

14      Q.   So in 2014, would it be fair to say there was no

15   tracking devices on the police cars -- on the squad cars?

16          MS. INLOW:  Same objections.  Vague and ambiguous as

17   to tracking --

18          THE WITNESS:  I believe so.

19          MS. INLOW:  -- devices.

20   BY MR. DEVEREUX:

21       Q.   Are there tracking devices today?

22          MS. INLOW:  Same objection.  And it's irrelevant.

23          THE WITNESS:  There's GPS.

24   BY MR. DEVEREUX:

25       Q.   Okay.  So you have GPS today, but in 2014 you did

                                                         24

🡑

1   not have GPS?

2       A.   I don't believe we did.

3       Q.   Okay.  How about dash cams.  Did you have dash cams

4   in 2014?

5       A.   Trash cans?

6       Q.   No.  Dash cams, dash cams.  You know, the dash

7   cameras, dashboard cameras?

8       A.   No, we didn't have those.

9       Q.   Okay.  Do you have them today?

10       A.   No.

11          MS. INLOW:  Same, yeah.

12   BY MR. DEVEREUX:

13       Q.   Why is that?

14          MS. INLOW:  Objection.  Vague, ambiguous, outside

15   the expertise of this witness, lacks foundation, and

16   irrelevant.

17          THE WITNESS:  Can I go outside my expertise and give

18   you a wild guess?

19   BY MR. DEVEREUX:

20      Q.   Certainly.

21          MS. INLOW:  No.  No guessing.

22          THE WITNESS:  My answer is, I don't know why we

23   don't have those.

24   BY MR. DEVEREUX:

25      Q.   Okay.  All right.  Body cameras, did you have body

                                                              25

↑

1   cameras in 2014?

2      A.   No.

3      Q.   And do you know why you did not have body cameras in

4   2014?

5          MS. INLOW:  Same objections.

6          THE WITNESS:  I don't know why.

7   BY MR. DEVEREUX:

8     Q.   Okay.  Do you have body cameras today?

9     A.   We do.

10        MS. INLOW:  Same objections.

11 BY MR. DEVEREUX:

12     Q.   Okay.  Does everybody have a body camera today?

13        MS. INLOW:  Same objections.

14        THE WITNESS:  Not everybody, but I think most of us

15 do.

16 BY MR. DEVEREUX:

17     Q.   Okay.  And when did body cameras become -- when did

18 you start acquiring body cameras?

19        MS. INLOW:  Same objections.  And when you're asking

20 him you, do you mean him personally because he is not here

21 designated as the Person Most Knowledgeable by the Department

22 on the deployment and roll out of body worn videos.

23        MR. DEVEREUX:  Okay.

24        MS. INLOW:  He's here to tell you what he has done,

25 not as a department spokesperson.

26

BY MR. DEVEREUX:

2     Q.   All right.

3       A.    When, when did that get my body camera are you

4    asking me?

5       Q.    Certainly.

6       A.    Three weeks ago, when did I get is the stack, take

7    out that in the last answer, when did I get my body camera.

8       Q.    Okay.  Are you familiar with the term, Education

9    Based Incarceration --

10      A.    Somewhat.

11      Q.    -- Group.  Are you familiar with that terminology?

12      A.    I'm somewhat familiar with it.

13      Q.    Okay.  What is it?

14            MS. INLOW:  Same objections.  Lacks foundation,

15    calls for speculation incomplete hypothetical, lacks

16    foundation as to time and may be outside the expertise of

17    this witness, and he is not designated by the Department as a

18    rule 30 (B) 6 on EBI.

19            But go ahead.  Anything on your personal knowledge,

20    Lieutenant.

21            THE WITNESS:  I think it was a program within the

22    jail system where they try to educate inmates so they are

23    more successful when they get released.

24    BY MR. DEVEREUX:

25      Q.    And that's a guess, you're not certain what that

1    is?

2         A.   Yes, sir.

3         Q.   Okay.  And Emerging Leaders Program.  Have you heard

4    of that before?

5         A.   I have.

6         Q.   And what is that, that you know about that

7    program?

8              MS. INLOW:  Same objections.

9              THE WITNESS:  Slowly nothing.

10   BY MR. DEVEREUX:

11        Q.   All right.  There's a mention in a declaration that

12   you wrote on September 4th, Deputy Collins transferred from

13   the Special Operations Bureau to the Education Based

14   Incarceration Program?

15             MS. INLOW:  Well, do you want to show him his

16   declaration since you're referring to it?  Are you going to

17   attach it?

18             MR. DEVEREUX:  I'll attach it.  I don't think I can

19   show it

20             MS. INLOW:  Do you have your declaration,

21   Lieutenant?

22      Q.   Well, you know what, this is a Grant Valencia's

23   case.  Hold on.

24      A.   Can you tell me what number it is.

25      Q.   You know what and let me mention this to you.  It's

28

↑

1   not this specific case.  This declaration was in the

2   Grant Valencia case.  I'm not certain if you recall a

3   Grant Valencia case.  You've probably done tons of these

4   things.

5           MS. INLOW:  You did a declaration in this case,

6   which I think is what he has reviewed to prepare for this

7   deposition.  So why don't you --

8      Q.   Let's look it up.  Hold on.

9           MS. INLOW:  Do you have your declaration,

10   Lieutenant.

11           THE WITNESS:  Yes, ma'am.

12           MS. INLOW:  I think he's referring to paragraph 8

13   just so you can find that while he's looking.

14   BY MR. DEVEREUX:

15      Q.   In this -- in this case, Laura, what document is

16   it?

17          MS. INLOW:  I don't have that open.  I'm home.  I

18   don't have that in front of me.  This is your --

19          MR. DEVEREUX:  Okay.  I'll look.  I'll hit and miss.

20          MS. INLOW:  It wasn't -- I don't think it was a

21   Bates stamp number because it was an attachment to the motion

22   for summary judgment.  It was not in that --

23          MR. DEVEREUX1:  I have it.

24          MS. INLOW:  -- discovery.

25   BY MR. DEVEREUX:


                                                        29

🌢

 1      Q.   My first guess.  3, document 3.  Okay.  Yeah.  So if

 2   you have your declaration, it's on page 3 the very top

 3   paragraph 8.

 4      A.   Right.

 5      Q.   Okay.  And you mentioned at that particular point

 6   Deputy Collins was transferred from Special Operations Bureau

 7   to the EBI program?

 8          MS. INLOW:  Misstates the statement in the

 9   declaration.

10          THE WITNESS:  Yes.

11    BY MR. DEVEREUX:

12        Q.    Where did you get that information from; do you

13    recall?

14        A.    Probably looked through the internal records.

15        Q.    Okay.  So you had access to Collins --

16    Deputy Collins' internal records; is that correct?

17        A.    I did.

18              MS. INLOW:  Vague and ambiguous as to internal

19    records.

20        Q.    Okay.  To the best of your knowledge, did

21    Deputy Collins have other prior issues prior to this?

22              MS. INLOW:  Objection.  Vague, ambiguous, hopelessly

23    overbroad, lacks foundation, incomplete hypothetical, outside

24    the expertise of this witness.  I don't know what you mean by

25    issues.

                                                              30

1    BY MR. DEVEREUX:

2        Q.    Let me ask you this:  You can answer that.  Then

3    I'll ask you a follow up.

4              Go ahead.

5              MS. INLOW:  Lacks foundation.

6          Only if you know, Lieutenant.

7          THE WITNESS:  And the question was, did I know if

8     Collins had issues?

9     BY MR. DEVEREUX:

10         Q.   Yes, within the department.

11         MS. INLOW:  Same objections.

12         THE WITNESS:  Like discipline issues or what kind of

13    issues are we talking?

14    BY MR. DEVEREUX:

15         Q.   Complaints about -- let's say specifically

16    complaints about stolen money?

17         A.   I don't -- I don't know.

18         Q.   You don't.  Okay.  Would that be something that you

19    would look into?

20         MS. INLOW:  Vague, ambiguous, lacks foundation.

21    BY BY MR. DEVEREUX:

22         Q.   In this investigation, would you look into his

23    background?

24         MS. INLOW:  Same objections.

25         Q.   -- within the Department?

31

1          MS. INLOW:  Vague and ambiguous as to background.

2    Lacks foundation, incomplete, hypothetical calls for

3    speculation.

4          Go ahead, Lieutenant

5          THE WITNESS:  Would I look into that?

6    BY MR. DEVEREUX:

7      Q.    Yes.

8      A.    Yes.

9      Q.    Okay.  All right.  If somebody has to take it, take

10   it.  Okay.  I heard a phone ring, so I was just --

11         MS. INLOW:  I'm just monitoring.  I'll let you know

12   if I need to get off.  Thank you.

13         MR. DEVEREUX:  Thank you.  I can't tell who's phone

14   is ringing.  I can just hear it.  And I'm lucky for that part

15   I guess at this time in my life.

16   BY MR. DEVEREUX:

17     Q.    So when you so when he went to special bureau to

18   EBI.  That's EB -- Education Based Incarceration.  Do you

19   believe he was working inside the or employed inside the jail

20   system at that point?

21         MS. INLOW:  Vague, ambiguous, lacks foundation,

22   calls for speculation, outside the knowledge of this

23   witness.

24         THE WITNESS:  To my knowledge, that's what he was

25    doing.

                                                                    32

🔺

1    BY MR. DEVEREUX:

2        Q.    Okay.  And the basis for your knowledge is what?

3        A.    That's where he was assigned.

4        Q.    Now, you mentioned at some point you tried to

5    contact Mr. Nersoyan; is that correct?

6        A.    Yes, sir.

7        Q.    Mr. Nersoyan was not a percipient witness, was he?

8        A.    Was what?

9        Q.    Not a percipient witness.  There was not a witness

10   to this, was it?

11       A.    Correct.

12       Q.    Okay.  So why would you try to contact

13   Mr. Nersoyan?

14       A.    As part of my investigation, he was the one that's

15   filing the complaint so I wanted to talk to him.

16       Q.    Okay.  Did you ever speak to Mr. Nersoyan?

17       A.    Yes, Sir.

18       Q.    Okay.  And what was that conversation like?

19            MS. INLOW:  Well, vague, ambiguous, lacks

20   foundation, complex, compound.

21   BY MR. DEVEREUX:

22      Q.   Well, let me ask you this:  How many times do you

23   recall speaking to Mr. Nersoyan?

24      A.   Maybe two.

25      Q.   Okay.  Do you recall the first conversation?

33

1      A.   Kind of.

2      Q.   Okay.  What do you recall from that first

3   conversation?

4      A.   You know, in the way I do investigations, I ask --

5   probably asked what happened or if you can get me

6   information.

7      Q.   Now this is a witness or a victim that was not a

8   witness; is that correct?  Is that how you viewed him?

9           MS. INLOW:  Asked and answered.

10          THE WITNESS:  Yes.

11   BY MR. DEVEREUX:

12      Q.   So what are you hoping for when you entered in

13   Mr. Nersoyan as a victim?

14      A.   More information.

15      Q.   Okay.  And did he supply you with names of witnesses

16 at that point?

17      A.   No.

18      Q.   Okay.

19      A.   I don't believe he did.

20      Q.   Okay.  When he told you the story, did he tell you

21 how many people were in the -- within the car, were in the

22 vehicle?

23           MS. INLOW:  Objection.  Lacks foundation as to he

24 told him a story.

25 BY MR. DEVEREUX:

                                                                34

↟

1       Q.   Okay.  Let's talk about this.  What did Mr. Nersoyan

2  tell you?

3            MS. INLOW:  And, Lieutenant, if you want to refer to

4  your declaration to refresh your recollection, just let

5  Mr. Devereux know.

6            Michael, you didn't attach it.  Are you attaching --

7            THE WITNESS:  I'll --

8            MS. INLOW:  Hold on, Lieutenant.  -- attaching the

 9    declaration, is that Exhibit 1 or A or what?

10         MR. DEVEREUX:  Let's make it Exhibit 1.

11         MS. INLOW:  I believe it starts with paragraph 14 of

12    your declaration, if that helps you, Lieutenant.

13         THE WITNESS:  What's your question again?

14

15         (Exhibit 1, introduced electronically to the

16          Reporter.)

17

18    BY MR. DEVEREUX:

19      Q.   My question to you is, what information did

20    Mr. Nersoyan provide to you in that first conversation?

21      A.   I believe he said that there was video of it and it

22    was with his attorney.

23      Q.   Okay.  Did he mention how many people were or did he

24    he mention where the car was coming or did he mention that

25    the money was in the car?

                                                          35

 1         MS. INLOW:  And that's complex, compound.  You asked

 2    him like three things.

3    BY MR. DEVEREUX:

4        Q.    I know.  I'm going to take -- I'm going to strike

5    everything but the last one.

6        A.    What was the last one?

7        Q.    Okay.  The last one was, did he mention that the

8    money was inside a car?

9        A.    I don't know if he mentioned that but it was

10   contained within the claim.

11       Q.    Okay.  And the claim, was it also mentioned how many

12   people were inside the car?

13       A.    I don't believe it did.

14       Q.    Okay.  What else was inside the claim to the best of

15   your knowledge?

16       A.    If you give me a chance to look at it, I could tell

17   you.

18       Q.    All right.  Fair enough.

19       A.    Can I just read it to you make it easier.

20       Q.    I prefer not.  If you can put it in your own words.

21       A.    **Well, it gives a date when one of these people

22   Mr. Dobum was pulled over.  Deputy ordered Mr. Dobum to open

23   the trunk, he took a duffle bag containing $158,000, and the

24   deputy left the premises without providing a receipt.

25            MS. INLOW:  Ms. Court Reporter, that's D-u-b-o-n.

36

1            THE REPORTER:  Thank you, Counsel.

2    BY MR. DEVEREUX:

3        Q.    Was there any mention at that time that there was a

4    third individual?

5        A.    I'm going to continue referring to this thing.  It

6    doesn't appear so.

7        Q.    Okay.  Now does it ever mention that anybody was

8    arrested?

9        A.    No.

10        Q.    At that time in 2014, what was the common practice

11    for vehicle stops if the deputy was going to stop a vehicle,

12    a traffic stop, what would they do?

13            MS. INLOW:  Vague, ambiguous, hopeless -- hopelessly

14    overbroad, incomplete hypothetical, calls for speculation.

15    And this is an expert question.  He has not been designated

16    as the person to comment on the propriety or policy and

17    procedure of traffic stops.  He's here as a percipient

18    witness to tell you what he did, what he saw, what he wrote,

19    et cetera.  So I think it's a highly inappropriate question.

20    BY MR. DEVEREUX:

21        Q.    You may answer.

22        A.    That was kind of a long question, and I forgot what

23   you asked.  So what --

24        Q.   You're the investigator at this point, right?

25        A.   Yeah.


                                                        37

⬆

1         Q.   ^Okay.  And if you're investigating a traffic stop,

2    what's your expectations?

3              MS. INLOW:  Same, same objections.  And he wasn't

4    investigating a traffic stop.  He was investigating a claim

5    of theft.  And personal expectations are irrelevant, and

6    again I think this is inappropriate.  And as phrased, I would

7    instruct him not to answer.

8    BY MR. DEVEREUX:

9         Q.   You may answer.

10             MS. INLOW:  Only if you can, Lieutenant.  You do not

11   have to speculate for him.

12             THE WITNESS:  So your question is, what does it take

13   to do a traffic stop?

14   BY MR. DEVEREUX:

15        Q.   My question to you is this:  You were an

16   investigator in 2014 on this specific complaint, correct?

17    A.   Yes.

18    Q.   Okay.  And in that complaint it said that there was

19  a traffic stop conducted; is that true?

20    A.   It looks like it, Yes, sir.

21    Q.   Okay.  Now you, as an investigator, are walking into

22  and taking a look at a traffic stop to the best of your

23  knowledge at this time; is that correct?

24    A.   Yes.

25    Q.   Okay.  What's the process or procedure in 2014 that

38

1  you thought would be taken at this point in the traffic

2  stop?

3        MS. INLOW:  Same objections.  It's hopelessly

4  overbroad, lacks foundation, incomplete hypothetical, calls

5  for speculation, outside the knowledge and expertise of this

6  witness, and he has not been designated by the Department as

7  a commentorIf you can answer, Lieutenant -- it's also

8  irrelevant

9        MR. DEVEREUX:  My understanding is he's the

10  investigator in this case.

11        MS. INLOW:  Why don't you ask him.

12          MR. DEVEREUX:  He doesn't even know what the

13     policies stuff, but he has to have some basic knowledge to go

14     in there and say I know how to investigate unless, unless

15     they don't do that in the Sheriff's Department.

16          MS. INLOW:  That --

17          MR. DEVEREUX:  I'm certain they do.

18          MS. INLOW:  Yeah, you you know they do.  But that's

19     not his role in this case.  Why don't you ask him what he

20     did.

21          MR. DEVEREUX:  His role in the case was as an

22     investigator.  I've asked him as an investigator what was his

23     expectations or what process or procedure did he believe

24     would be followed for a traffic stop?

25          MS. INLOW:  Same objection.

                                                              39

1          MR. DEVEREUX:  He's the investigator.

2          MS. INLOW:  Same objection.

3     BY MR. DEVEREUX:

4     Q.   What -- what.  Okay.  So you were on the bank and

5     you say I don't care, I'm not going to investigate the bank

6   robbery I don't know what should happen I don't know I'm just

7   doing he's not an idiot they didn't put him in there to be an

8   idiot he has some knowledge?

9        MS. INLOW:  Michael, you need to calm down because

10   if you get like this we're going to terminate because I'm not

11   allowing you to be abusive to my witness.

12        MR. DEVEREUX:  I'm not being abusive.

13        MS. INLOW:  I've made my objections you don't have

14   to comment on my objections they're made to preserve like you

15   said at the beginning for the judge to deal with later so I

16   don't need the commentary on the objections I'll do as I deem

17   appropriate lieutenant if you can answer and if you had such

18   an opinion at the time in 2014.  You may answer.

19        THE WITNESS:  I don't know what the reason for the

20   truck stop was.

21   BY MR. DEVEREUX:

22   Q.   My question to you is that you're investigating a

23   traffic stop what are you looking for?

24        MS. INLOW:  Same objections.

25        THE WITNESS:  Probable cause to stop the vehicle.

40

 1  BY MR. DEVEREUX:

 2      Q.   Okay.  And at that point did you determine there was

 3  any probable cause to stop the vehicle.

 4          MS. INLOW:  Objection.  Same objections also lacks

 5  foundation that he rendered any such opinion?

 6          THE WITNESS:  No.  Okay I'm going to write a little

 7  note someone is trying to get my attention and this he don't

 8  know I'm on a Zoom.

 9  BY MR. DEVEREUX:

10      Q.   Take your time.

11          MS. INLOW:  Do we need to go off for a minute,

12  Lieutenant.

13  BY MR. DEVEREUX:

14      Q.   You can turn your camera off too?

15      A.   I can even though you what I'm writing.

16      Q.   I don't know what you're writing Laura might be

17  interested for that matter?

18          MS. INLOW:  Please do not divulge any of your

19  unrelated police info, I don't need the next lawsuit from

20  this Zoom call.

21          THE WITNESS:  (Indicating.)

22          MS. INLOW:  Oh, perfect.

23  BY MR. DEVEREUX:

24      Q.   Thank you.  All right.  All right.  Did you ever try

25  to reach Hyrum Dobum or Dobum, whatever his name is.

41

1    H-y-r-u-m, D-o-b-u-m, he's in the complaint.

2          MS. INLOW:  It wasn't the complaint it was a civil

3    claim.

4    BY MR. DEVEREUX:

5      Q.   Oh, civil claim.

6      A.   Would it refresh my memory if I looked in the

7    declaration if you need to look at it to refresh your

8    recollection that's fine yes I have no objection to that

9    thank you.

10         MS. INLOW:  I think it's paragraph ten Lieutenant if

11   it speeds things up.

12         THE WITNESS:  I did try to contact him.

13   BY MR. DEVEREUX:

14     Q.   Okay.  How many times do you believe that you tried

15   to contact him?

16     A.   I don't remember.

17     Q.   Okay.  And and how did you try to contact him; do

18   you recall?

19     A.   I want to refer back be to this declaration I

20   believe I phoned.

21        Q.   Okay.  And where did you get the phone number do you

22   recall was that included in the claim?

23        A.   I believe it was contained within the complaint.

24        Q.   Okay.  All right.

25        A.   It was contained within the claim.


                                                                    42

⬆

 1        Q.   Okay.  Did you try to go outside the scope of the

 2   claim to find Mr. Dobum?

 3        A.   Not at that time.

 4        Q.   Okay.  And why not?

 5        A.   The investigation was.

 6        Q.   I'm sorry I didn't hear that?

 7        A.   It was still at the initial phase of the

 8   investigation, it was investigated preliminarily.

 9        Q.   Okay.  So at the initial phase of the investigation

10   what are you doing?

11        A.   What am I doing?

12        Q.   Yes.

13        A.   Trying to get more information from your client.

14        Q.   And and why is that important to you since he was

15    not a percipient witness?

16    A.   Because he would probably have more information

17    about Dobum what Dobum told him information about what, why

18    the traffic stop was conducted, why he believed money was

19    stolen, et cetera.

20    Q.   Okay.  And at that point when did you learn that

21    deputy Collins was assigned that vehicle?

22    A.   When I went through the I referenced the date the

23    vehicle time the vehicle was assigned to a individual, I

24    looked at the date and when, when, when that car was assigned

25    to Collins E.

43

1    Q.   So is there a process that from when you check out

2    vehicles?

3         MS. INLOW:  Same objections vague and ambiguous

4    hopelessly overbroad also lacks foundation he he said he made

5    a request for that to be made, that information is.

6         THE WITNESS:  One sec please.  All right I had to do

7    work stuff I had to look on the computer and could you repeat

8    your question please.

9   BY MR. DEVEREUX:

10      Q.   Sure.  At that time in 2014 if you were assigned a

11   vehicle is there a process within the Sheriff's Department

12   how to do that do you just jump in a car that has keys in it

13   and take off?

14         MS. INLOW:  Same objections.

15   BY MR. DEVEREUX:

16      Q.   In the --

17      A.   The from working that bureau, that bureau the

18   deputies get assigned vehicles.  So that vehicle is assigned

19   was assigned to Collins.

20      Q.   Now was that vehicle assigned to the deputy it 24/7,

21   or is it just a shift or how does that work?

22         MS. INLOW:  Same objections.

23         THE WITNESS:  Generally they are to take it to the

24   closest facility and park it and it's assigned to them but

25   when they're not using it I can't tell you who else might be

44

↑

1   be using it.

2   BY MR. DEVEREUX:

3      Q.   Okay.  Was there a log kept somewhere on who's

4    assigned the vehicle at specific times?

5         A.   Same objections vague and ambiguous lacks foundation

6    incomplete hypothetical calls for speculation vague and

7    ambiguous as to time and may be be outside the knowledge of

8    this witness.

9         A.   When you was working there we knew who had cars, who

10   had the cars assigned to them.

11        Q.   Okay.  And how did you know that?

12        A.   There was a log.

13        Q.   Okay.  So when you checked out a car it would be be

14   logged out and when you checked it in it would be logged in

15   is it that process is it that process?

16             MS. INLOW:  Same objections.

17             THE WITNESS:  During my tenure if a vehicle was

18   checked out until either the vehicle was brought in for

19   service or the employee left the unit.

20   BY MR. DEVEREUX:

21        Q.   Okay.  Is it the FAST program that keeps track of

22   that log or is it a paper?

23             MS. INLOW:  Same objections.

24             THE WITNESS:  When I was there when I was there it

25   was like a spreadsheet.

1   BY MR. DEVEREUX:

2       Q.   Okay.  Was it online or was it you fill it out with

3   a pen?

4            MS. INLOW:  Same objections.

5            THE WITNESS:  When I when I was there, it was it's

6   not online it was like an excel spreadsheet that we kept for

7   vehicle tracking.

8   BY MR. DEVEREUX:

9       Q.   And when I mentioned online what I meant is when you

10  fill it out are you on the computer typing it out or are you

11  just writing it down on the paper, was it electronic or was

12  it paper?

13      A.   I believe it was electronic.

14      Q.   Okay.  And and that is not part of the Fast program

15  or is it part of the electronic spreadsheet?

16           MS. INLOW:  Same objection it's also irrelevant in

17  that he said that he came to cops after Collins.  So it's

18  irrelevant as to time but go ahead lieutenant.

19           THE WITNESS:  It's not part of Fast.

20  BY MR. DEVEREUX:

21      Q.   Okay.  So Fast is something totally different?

22      A.   Correct.

23     Q.   Okay.  And okay.  How is it different what's the

24   difference between a spreadsheet and Fast?

25          MS. INLOW:  Same objections.


                                                                46


1          THE WITNESS:  The spreadsheet pretty much told me

2   who had the car.  Fast does a bunch of other stuff that I

3   don't know what it does other than gassing or fueling so

4   there is a big difference I just I don't know.  I'm not

5   familiar with the Fast program to be able to elaborate what

6   that actually does.

7   BY MR. DEVEREUX:

8     Q.   Okay.  Now at some point did you ever get a high, a

9   hold of Mr. Dobum?

10    A.   No.

11    Q.   How many times do you believe you tried to get ahold

12   of Mr. Dobum?

13          MS. INLOW:  Asked and answered.

14          THE WITNESS:  Several.

15   BY MR. DEVEREUX:

16    Q.   More than one I guess that would be several right,

17   more than five times would you believe?

18      A.   Probably.

19      Q.   More than ten?

20      A.   I don't know.

21      Q.   So you mentioned you probably tried to get ahold of

22 Mr. Dobum more than five times?

23      A.   Six.

24      Q.   Do you recall when you did that?

25           MS. INLOW:   Asked and answered.

                                                              47

♠

1 BY MR. DEVEREUX:

2       Q.   Do you recall how you told --

3            MS. INLOW:   He said on the phone.

4 BY MR. DEVEREUX:

5       Q.   On the phone.   And did you call the same number

6 every time?

7       A.   Yes, sir.

8       Q.   Okay.   And that was the number that Mr. Nersoyan

9 provided you; is that correct?

10      A.   It was provided as provided in the claim into in the

11 claim all right.   Did you ever try to go outside that claim

12    to try to reach Mr. Did you bottom.

13            MS. INLOW:  Asked and answered.

14            THE WITNESS:  What do you mean about I go try and go

15    to an address or something or physically go to an address.

16    BY MR. DEVEREUX:

17        Q.   Oh, physically go to an address or search phone

18    records or anything like that for this guy?

19        A.   I didn't physically go to an address and I don't

20    believe I searched phone records.

21            THE REPORTER:  Excuse me, Counsel, can we take a

22    five-minute break?

23            MR. DEVEREUX:  Absolutely.  I have no problem.

24            MS. INLOW:  So like mute and stop your video while

25    we're on the break.

                                                              48

⬆

1            THE WITNESS:  So mute and stop your video.

2            MR. DEVEREUX:  Something like that don't ask me

3    how?

4            MS. INLOW:  Just come back in about five minutes.

5            THE VIDEOGRAPHER:  The time is 1:36 p.m. and we're

6    off the record.

```
 7

 8              (A brief recess was taken.)

 9

10              THE VIDEOGRAPHER:  The time is 1:43 p.m. and we're

11      back on the record.  M he me just one moment of the question

12      read back.

13              MR. DEVEREUX:  Thank you.

14              THE REPORTER:  Sure certainly.

15      BY MR. DEVEREUX:

16         Q.   All right.  Lieutenant, so what else did you do to

17      try to procure the witness Hyrum Dobum?

18         A.   I believe I ran arrest records I don't know about

19      that or arrest history to try to track down where he lived.

20         Q.   Okay.  And were you able to find arrest records?

21         A.   Yes.

22         Q.   Okay.  All right.  And what did you do after you

23      found those arrest records?

24         A.   In what way.

25         Q.   What did you do with that information the new
```

49

1    information?

2        A.    I obtained an address I never made it out there.

3        Q.    Okay.  All right.  Do you recall what your next step

4    was?

5        A.    No.  Let me refer to this declaration.

6        Q.    All right.  At one time I was trying to set up a

7    meeting with the client's attorney?

8        Q.    Okay.

9        A.    I believe I did schedule a meeting with him.

10       Q.    Okay.

11       A.    However he cancelled on me.

12       Q.    All right.  Do you recall what the purpose of that

13   meeting was for?

14       A.    I believe to view the video that he said he had.

15       Q.    All right.  And --- and in 2014 or 2015 did you ever

16   see the video?

17       A.    No, Sir.

18       Q.    Have you seep the video since then?

19       A.    I've never seen the video.

20       Q.    Okay.  All right.

21       A.    Have you?

22       Q.    I'm going to get into who that is what video

23   somebody in the Department has it but we'll get into that.

24            MS. INLOW:  I'm going to object that that's not what

25   your client said.

50

&uarr;

     1   BY MR. DEVEREUX:

     2       Q.   That's not what he says but.  All right.  At at some

     3   point did you ever meet with deputy Collins?

     4       A.   No.

     5       Q.   No.  Okay did you ever speak to Deputy Collins?

     6       A.   Yes.

     7       Q.   Okay.  And how did you do that?

     8       A.   Over the phone.

     9       Q.   Over a phone.  How long was that conversation do you

    10   think?

    11       A.   A couple of minutes.

    12       Q.   Okay.  And you recall what the dread this of that

    13   conversation include?

    14       A.   Did I let me refer to the declaration.

    15       Q.   Okay.

    16       A.   I asked him about if he had contact with the hiring

    17   Hyrum Dobum answered told me he has never made traffic stops

    18   since being assigned to the emerging leaders program.

    19       Q.   Okay.  And and for you there was no, there was no

    20   tools to determine whether that was true or not; is that

21    correct?

22        A.    Correct.

23        Q.    Okay.  Let me ask you this:  If you had known

24    hypothetically that there were two previous accusations of

25    Kenneth Collins stealing money, would you approached it

51

1    differently?

2            MS. INLOW:  Objection.  It's vague and ambiguous

3    lacks foundation it is an incomplete hypothetical it is an

4    inappropriate hypothetical to this witness and calls for

5    speculation you may answer Lieutenant.

6            THE WITNESS:  If I had known that he has two prior

7    allegations of theft would I have handled it differently.

8    BY MR. DEVEREUX:

9        Q.    Correct.

10        A.    I don't believe I would have.

11        Q.    Okay.  At that point in time after you spoke to

12    Mr. Collins on the phone, what was your conclusion?

13            MS. INLOW:  Objection.  Vague and ambiguous lacks

14    foundation incomplete hypothetical.

15          THE WITNESS:  What was my conclusion?

16   BY MR. DEVEREUX:

17      Q.   Yes.

18      A.   I hadn't made a conclusion at that time.

19      Q.   Did you believe that Mr. Collins was being honest

20   with you?

21          MS. INLOW:  Same objections.

22          THE WITNESS:  Again I didn't have any conclusions at

23   that time.

24   BY MR. DEVEREUX:

25      Q.   I'm sorry.  I didn't hear that I'm sorry I'm getting

                                                          52

↑

1   kind of old?

2       A.   I said I didn't have any conclusions kind of

3   conclusions at that time.

4       Q.   Okay.  So what was your plan from there?

5       A.   One of is reasons I called him was to lock him into

6   a statement.

7       Q.   Okay.

8       A.   And my plan still this case is in the preliminary

9   stage.

10     Q.   Yes.

11     A.   And there was a lot of things I could have done.

12  But one was to talk to Dobum, one was to meet with

13  Nersoyan -- Nersoyan's attorney.

14     Q.   Okay.  Did Collins ever make a statement?

15         MS. INLOW:  Asked and answered.  Vague and ambiguous

16  as to statement.

17  BY MR. DEVEREUX:

18     Q.   In your investigation, did Collins ever provide a

19  statement to you?

20     A.   He did.

21     Q.   And did that statement say?

22     A.   He didn't --

23         MS. INLOW:  Objection.

24         THE WITNESS:  He didn't recall Dobum didn't make any

25  traffic stops while working at Emerging Leaders.

                                                          53

↑

1  BY MR. DEVEREUX:

2     Q.   Okay and at some point did you close out that

3  investigation?

4       A.   Yes.

5       Q.   Okay.  When do you think you closed that out?

6       A.   Let me refer to my notes on or about January 27th

7   February 3rd ish, on or about February 3rd, 2015.

8       Q.   Okay.  All right.  Now let me ask you this:  After

9   that had you heard of Kenneth Collins being picked up by the

10   Feds?

11          MS. INLOW:  I'm going to object that it's irrelevant

12   also anything that you may have learned exclusively through

13   counsel you are not obligated to share so if you have any

14   other independent information about Kenneth Collins.

15          You may answer although it's irrelevant.

16          THE WITNESS:  The question was, did I know he was

17   arrested?

18   BY MR. DEVEREUX:

19       Q.   Yes.

20       A.   I saw it on the news.

21       Q.   You saw it on the news.  Were you working in the

22   same capacity at that time when you saw it on the news?

23       A.   No.

24       Q.   When you saw it on the news, where were you

25   working?

1     A.    Internal criminal investigations bureau.

2     Q.    Well, let's talk about that of the how long were you

3     there?

4           MS. INLOW:  I'm going to object that it's

5     irrelevant.  Anything he did after he came to this

6     investigator what he did in this case and left that unit is

7     wholly irrelevant but go ahead lieutenant.

8           THE WITNESS:  How long was I at, let's refer to that

9     bureau as ICIB because that's a lot of words.

10    BY MR. DEVEREUX:

11    Q.    Okay.

12    A.    How long was I at ICIB?

13    Q.    Yes, sir.

14    A.    From probably 2015 to 2018, middle of 2018.

15    Q.    Is that was the address for that 13001 *Delia

16    Avenue?

17    A.    Sounds right.  I don't remember.

18    Q.    And that's in Downey?

19    A.    Right.

20    Q.    So internal criminal investigations what's that?

21    A.    What do the investigators do there?

22    Q.    Yes.

23    A.    They investigate allegations of criminal conduct

24    committed by members of the Sheriff's Department or other law

25    enforcement agencies.

                                                                                55

↟

1       Q.    Okay.  While you were there to the best of your

2    knowledge did they ever open a case on Kenneth Collins?

3            MS. INLOW:  Well I'm going to object that it lacks

4    foundation incomplete hypothetical calls for speculation may

5    be outside the knowledge of this witness as you haven't

6    established that he he would know of every open investigation

7    at ICIb even if he was assigned there.

8            THE WITNESS:  I'm not aware of that.

9    BY MR. DEVEREUX:

10       Q.    Okay.  As counsel has tried to indicate, was there a

11    substantial amount of cases going through ICIB that you

12    wouldn't -- is there like hundreds or thousands of them going

13    through that unit that you would recall?

14            MS. INLOW:  Vague ambiguous as to time argumentative

15    as phrased, lacks foundation, calls for speculation.

16            THE WITNESS:  You're asking how many cases?

17    BY MR. DEVEREUX:

18      Q.    No.  I'm asking specifically is there a tremendous

19   amount of cases going through there that you would not recall

20   whether or not Collins is based on the volume of cases going

21   through that Bureau?

22          MS. INLOW:  Same objections and vague and ambiguous

23   as to substantial and volume.  If you can answer.

24          THE WITNESS:  The cases there are compartmentalized.

25   We didn't talk to other investigators about what kind of

                                                              56

1    cases they had.  Also it was frowned upon so we really got

2    cases and weapon went out and investigated, it was, there is

3    there was some volume but it wasn't thousands.

4    BY MR. DEVEREUX:

5      Q.    Okay.  Let me ask you this.  To the best of your

6    knowledge at any given point, what would be the highest

7    amount of cases that you worked on in that, in ICIB?

8          MS. INLOW:  Same objections.  And it's wholly

9    irrelevant.

10          Go ahead.

11          THE WITNESS:  How many cases did I work there?

12   BY MR. DEVEREUX:

13        Q.    How many, what was the highest number of cases that

14   you had in ICIB from 2015 to 2018?

15             MS. INLOW:   Same objections.

16             THE WITNESS:   So you mean open at one time?

17   BY MR. DEVEREUX:

18        Q.    Open.

19             MS. INLOW:   After he completed his investigation in

20   this case or his involvement in this case

21   BY MR. DEVEREUX:

22        Q.    Sergeant Steve Kim's ever worked for ICIB?

23             MS. INLOW:   Same objections.   Wholly irrelevant.

24             THE WITNESS:   Yes.

25   BY MR. DEVEREUX:

57

1        Q.    Okay.   Did he work in your unit?

2             MS. INLOW:   Same objections.

3   BY MR. DEVEREUX:

4        Q.    On your team?

5        A.    Yes.   **Zoom messed up for my own notes****.

6        Q.    Do you know of any work that sergeant Kim had done

7      on the Collins case are you familiar with any of that?

8            MS. INLOW:  Same objections also vague and ambiguous

9      as to time calls for speculation outside the knowledge of

10     this witness.

11           THE WITNESS:  I'm not aware.

12     BY MR. DEVEREUX:

13     Q.   Okay.  All right.  Did anyone from ICIB ever

14     interview you regarding Kenneth Collins after after you left?

15     A.   No.

16     Q.   When was the last time that you think you contacted

17     Mr. Nersoyan's attorney?

18     A.   I'm going to make reference to the declaration.

19     Q.   And what year would that be?

20     A.   2015.

21     Q.   2015.  Okay.  And while you were at you worked at

22     ICIB until 2015 to 2018, correct?

23     A.   Yes.

24           MS. INLOW:  Asked and answered.

25     BY MR. DEVEREUX:

                                                              58

↟

1      Q.   And you were now assigned the Collins case; is that

2      correct?

3          A.   Correct.

4          Q.   And no one spoke to you regarding the Collins case;

5      is that correct?

6          A.   Correct.

7          Q.   Were you ever assigned any other case involving

8      Deputy Collins, Kenneth Collins?

9          A.   No.

10         Q.   Outside the Sheriff's Department who oversaw your

11     investigation?

12              MS. INLOW:  Objection what?  Outside the Sheriff's

13     Department?

14              MR. DEVEREUX:  Yes, outside the Sheriff's

15     Department.

16              MS. INLOW:  I don't understand that.  Number one

17     it's vague ambiguous as to time, your investigation into

18     what?  Lacks foundation, incomplete hypothetical, calls for

19     speculation, may be outside the knowledge of this witness.

20     What investigation are you talking about.

21              THE WITNESS:  Outside the Sheriff's Department.

22     BY MR. DEVEREUX:

23         Q.   Outside the Sheriff's Department who oversaw your

24     investigation regarding Kenneth Collins and the

25     disappearance -- Mr. Nersoyan's complaints, who oversaw

59

1    that?

2          MS. INLOW:  Lacks foundation that anyone outside the

3    Sheriff's Department would be overseeing.

4    BY MR. DEVEREUX:

5      Q.   I'm only asking --

6      A.   Who saw my preliminary investigation after?

7      Q.   Outside the Sheriff's Department.

8          MS. INLOW:  I believe.

9          THE WITNESS:  I'm sorry.

10         MS. INLOW:  I think what he's asking is to your

11   knowledge did anyone outside of the Sheriff's Department not

12   related to the Sheriff's Department see your preliminary

13   investigation into Kenneth Collins that you conducted while

14   the off sergeant at Cops Bureau.

15         THE WITNESS:  Is that what you're asking me?

16         MS. INLOW:  Michael?

17   BY MR. DEVEREUX:

18     Q.   Yes.

19     A.   I believe the Feds saw it.

20     Q.   Okay.  How about anybody from the County?

21              MS. INLOW:  Same objections.

22    BY MR. DEVEREUX:

23        Q.    Anyone from the County, County of Los Angeles?

24              MS. INLOW:  The County of Los Angeles would include

25    the Sheriff's Department.


                                                              60

↟



 1              THE WITNESS:  I don't know.

 2    BY MR. DEVEREUX:

 3        Q.    The civilian complaint board?

 4        A.    I don't know.

 5        Q.    So other than the Feds, okay.  The Collins or the

 6    Nersoyan matter was not presented to anyone else?

 7              MS. INLOW:  Same objections.

 8    BY MR. DEVEREUX:

 9        Q.    To the best of your knowledge?

10        A.    To the best of my knowledge was the Collins case

11    presented to other than the Feds.

12        Q.    Yes.

13        A.    I don't know.

14        Q.    Okay.  All right.  To the best of your knowledge did

15    you present it to anybody other than the -- did you present

16    it to anybody else outside the Sheriff's Department?

17        A.    No.

18            MR. DEVEREUX:  Okay.  I have nothing further.

19

20                CROSS-EXAMINATION

21

22    BY MS. INLOW:

23        Q.    Lieutenant, I have a questions you have multiple

24    times referred to your investigation as a preliminary

25    investigation where why did you refer to it as a preliminary

                                                            61

↑

1    investigation?

2        A.    I referred it to as a prelim far re investigation

3    because I was unable to conduct further investigation.

4        Q.    Why were you unable?

5        A.    I was told to stop the investigation because the FBI

6    is going to take over the case.

7        Q.    Who told you that?

8        A.    I believe it was my captain or my operations

9    lieutenant.

10    Q.   Were you ever given a reason as to why the case is

11   being pulled from you and given to the Feds?

12    A.   I was not given a reason.

13    Q.   Once you received that information did you do

14   anything else regarding Kenneth Collins?

15    A.   No.

16         MS. INLOW:  Thank you.

17         MR. DEVEREUX:  Nothing further from me.

18         THE WITNESS:  Are you sure?  Can I leave?

19         MR. DEVEREUX:  You can leave.

20         THE VIDEOGRAPHER:  I'll end by saying the time is

21   2:04 p.m. and we are off the record.

22

23         (Deposition concluded at 2:04 p.m.)

24

25         IMPORTANT INFORMATION!   IMPORTANT INFORMATION!


                                                             62

♠

1

2

            It is understood by all attorneys and/or
3   their staff using, saving onto a hard computer disk,
    or receiving a Livenote/Realtime ASCII or emailed
4   rough draft transcript that:

5        1.    The following is an unedited rough draft
         transcript.  Various corrections and/or changes may be
6        made before the final version is complete.  The use of
         this rough draft transcript is limited by C.C.P.
7        2025.540(b).  This reporter, as well as any affiliated
         court reporting agency, will not be responsible for
8        any variance of this draft from the final transcript.

9        2.    Because of the nature of stenographic
         outlines, differences WILL exist between the
10       Livenote/Realtime rough draft copy and the certified
         transcript prepared by the reporter.  Those
11       differences will include the following, among others:

12               A.    Words may change;
                 B.    Page and line numbers may change;
13               C.    Quotes may change.

14

15       3.    Providing a Livenote/Realtime ASCII and/or
         email or saving Livenote/Realtime onto a computer
16       hard drive will only be provided when a certified copy
         is purchased and there will be a charege for the
17       Livenote/Realtime rough transcript in addition to the
         charge for the certified copy.

18

19       **Please include this disclaimer at the beginning of each
         Realtime feed and/or rough drafts provided at the conclusion
20       of the deposition.***

21

22

23

24

25

63