**Exhibit 7**

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2017 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>KENNETH COLLINS,<br>　　aka "Kenneth Randolph,"<br>DAVID EASTER, and<br>GRANT VALENCIA,<br><br>　　　　Defendants. | CR No. CR 18 00038-ODW<br><br>I N D I C T M E N T<br><br>[21 U.S.C. § 846: Conspiracy to Distribute Methamphetamine, Cocaine, and Marijuana; 18 U.S.C. § 924(c)(1)(A)(i): Using and Carrying a Firearm During and in Relation to, and Possessing a Firearm in Furtherance of, a Drug Trafficking Crime; 18 U.S.C. § 2(a): Aiding and Abetting] |

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

1.　At all times relevant to this Indictment, defendant KENNETH COLLINS, also known as "Kenneth Randolph" ("COLLINS"), was an agent of, and public official employed by, the County of Los Angeles and the Los Angeles County Sheriff's Department ("LASD") as a deputy sheriff.

2. Defendant COLLINS conspired with defendants DAVID EASTER ("EASTER") and GRANT VALENCIA ("VALENCIA"), and others known and unknown to the Grand Jury, to accept cash payments in exchange for, among other things, distributing controlled substances and actively thwarting the enforcement of state and local law in violation of his sworn duty as a deputy sheriff.

3. In or about 2014, defendant COLLINS was an instructor and defendant VALENCIA was a student at the Emerging Leaders Academy, a life-skills class funded at least in part by LASD in which LASD deputies taught adult ex-offenders in order to help them successfully reintegrate into society.

4. These Introductory Allegations are hereby incorporated by reference into each count of this Indictment as though set forth fully therein.

COUNT ONE

[21 U.S.C. § 846]

A. OBJECTS OF THE CONSPIRACY

Beginning on a date unknown to the Grand Jury, and continuing until on or about January 16, 2018, in Los Angeles County, within the Central District of California, and elsewhere, defendants KENNETH COLLINS, also known as "Kenneth Randolph" ("COLLINS"), DAVID EASTER ("EASTER"), and GRANT VALENCIA ("VALENCIA"), and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally distribute the following:

1. at least 50 grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(viii);

2. at least five kilograms of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(ii)(II); and

3. marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(D).

B. MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

The objects of the conspiracy were to be accomplished, in substance, as follows:

1. Defendant COLLINS would negotiate the transport of controlled substances with an undercover Federal Bureau of Investigation ("FBI") Special Agent ("UC-1"), who was posing as a co-conspirator of a wealthy investor willing to finance the production, distribution, and sale of controlled substances.

3

2. Defendant COLLINS would recruit and employ a team, including defendants EASTER and VALENCIA, and others known and unknown to the Grand Jury, to assist with the transport and security of the transport of controlled substances.

3. Defendants COLLINS, EASTER, and VALENCIA would assist with the transport of controlled substances by, among other things, providing security for the transport to prevent (i) a law enforcement stop of the vehicle transporting the controlled substances (the "Transport Vehicle") and (ii) a robbery of the Transport Vehicle.

4. Defendants EASTER and VALENCIA would provide security for the pre-transport meeting where defendant COLLINS would secure the initial payment for the transport.

5. Defendant EASTER would provide security for the transport by driving a car ahead of, or otherwise near, the Transport Vehicle and scouting for law enforcement or other potential threats.

6. Defendant VALENCIA would provide security for the transport by either riding in the Transport Vehicle or driving a car ahead of, or otherwise near, the Transport Vehicle. He too would scout for law enforcement or other potential threats.

7. Defendant COLLINS would provide security for the transport by driving a car behind, or otherwise near, the Transport Vehicle and scouting for law enforcement or other potential threats.

8. Defendant COLLINS also would provide security for the transport by possessing a loaded firearm during the pre-transport meeting and transport.

9. If it appeared that a law enforcement officer might conduct a traffic stop of the Transport Vehicle, defendants COLLINS, EASTER, and/or VALENCIA would, among other things, drive erratically to

4

capture the attention of the law enforcement officer, thereby causing the law enforcement officer to conduct a traffic stop of one of their cars instead of the Transport Vehicle.

10. Defendants COLLINS and VALENCIA would collect payment from either UC-1 or UC-2 for their transport security services.

C. OVERT ACTS

In furtherance of the conspiracy, and to accomplish the objects of the conspiracy, on or about the following dates, defendants COLLINS, EASTER, and VALENCIA, and others known and unknown to the Grand Jury, committed various overt acts in Los Angeles County, within the Central District of California, and elsewhere, including, but not limited to, the following:

1. On August 2, 2017, defendant COLLINS met UC-1 at a restaurant in Los Angeles County. Defendant COLLINS told UC-1 that he and "[his] team" were willing to provide security for an illegal marijuana grow house UC-1 was purportedly trying to establish. According to defendant COLLINS, he and his team also were willing to assist UC-1 with transporting and distributing controlled substances.

2. On August 25, 2017, defendants COLLINS and EASTER met UC-1 to discuss how defendants COLLINS and EASTER could provide security for an illegal marijuana grow house UC-1 was purportedly trying to establish. Defendants COLLINS and EASTER also offered to assist UC-1 with transporting and distributing controlled substances.

3. During the August 25, 2017 meeting, defendant COLLINS, in defendant EASTER's presence, showed UC-1 his LASD badge and a firearm defendant COLLINS was carrying in his waistband to confirm to UC-1 that defendant COLLINS was a law enforcement officer, thereby rendering his services to UC-1 more valuable.

5

    4.    During the August 25, 2017 meeting, defendant COLLINS accepted $5,000 in cash hidden inside of a magazine from UC-1 as a good faith payment for future dealings together with defendant EASTER.

    5.    On September 29, 2017, defendant COLLINS and UC-1 met to discuss the status of the illegal marijuana grow house UC-1 was purportedly trying to establish. Defendant COLLINS told UC-1 that instead of setting up a "major grow," UC-1 should just purchase marijuana for further distribution from defendant COLLINS directly. Defendant COLLINS said that UC-1 should just purchase marijuana "in bulk," "package it up," and "send it." Defendant COLLINS said that he could obtain marijuana for UC-1 from a "connection" defendant COLLINS had "up North." Defendant COLLINS also told UC-1 that he and his team could assist UC-1 with transporting the marijuana.

    6.    On October 6, 2017, defendant COLLINS and UC-1 met to discuss a "test run" sale of marijuana, whereby UC-1 would buy two pounds of marijuana from defendant COLLINS. They also discussed defendant COLLINS and his team providing security for an upcoming transport of controlled substances to Las Vegas, Nevada. Defendant COLLINS demanded $25,000 in exchange for providing security for that transport. Defendant COLLINS justified the $25,000 price tag by saying that he and his team were "cops" and "all of our transports make it through."

    7.    On October 13, 2017, defendant COLLINS and UC-1 met again to discuss both the "test run" sale of marijuana and upcoming drug transport. With regard to the marijuana sale, defendant COLLINS agreed to sell two pounds of high-quality marijuana to UC-1 for $6,000. If this "test run" went well, defendant COLLINS offered to

6

1  facilitate the sale of up to 2,000 pounds of marijuana for $2,000 per
2  pound -- that is, up to $4 million worth of marijuana -- every month
3  to UC-1. With regard to the upcoming drug transport, defendant
4  COLLINS confirmed that he and members of his team would provide
5  security for the transport to Las Vegas.
6      8.  On October 20, 2017, defendant EASTER delivered
7  approximately two pounds of marijuana to an undercover FBI Special
8  Agent ("UC-2"), who was posing as a drug trafficker working with
9  UC-1.
10     9.  On October 20, 2017, defendant COLLINS accepted $6,000 in
11 cash from UC-1 as payment for the marijuana that defendant EASTER had
12 just delivered to UC-2.
13     10. On November 3, 2017, defendant COLLINS met UC-1 to discuss
14 details for the upcoming transport of what defendant COLLINS
15 understood to be methamphetamine, marijuana, and counterfeit
16 cigarettes to Las Vegas. Defendant COLLINS agreed that, in exchange
17 for $25,000, he and members of his team would provide security for
18 the transport scheduled to take place on November 14, 2017 and ensure
19 its successful delivery.
20     11. On November 14, 2017, defendants COLLINS, EASTER, and
21 VALENCIA met UC-1 and UC-2 in a grocery store parking lot in
22 Pasadena, California for the purpose of providing security for a
23 transport of what they understood to be six kilograms of
24 methamphetamine, as well as marijuana and counterfeit cigarettes.
25     12. On November 14, 2017, during the meeting in the grocery
26 store parking lot, defendant COLLINS accepted $12,500 in cash hidden
27 inside of a brown paper bag from UC-1. This was the first
28

7

installment of the agreed-upon $25,000 payment for providing security for the drug transport.

13. On November 14, 2017, defendant EASTER provided security for the Transport Vehicle by driving a car ahead of the Transport Vehicle and scouting for law enforcement and other potential threats.

14. On November 14, 2017, defendant VALENCIA provided security for the Transport Vehicle by riding in the Transport Vehicle with UC-2, who was driving, and scouting for law enforcement and other potential threats.

15. During the November 14, 2017 transport, defendant VALENCIA told UC-2, among other things, that he has transported significant distribution quantities of controlled substances in the past. For instance, he said that the November 14, 2017 transport was not his "first time around" and not his "first rodeo." Defendant VALENCIA said, "it's second nature" to him. "For me," he bragged, "this is, like, not even a big deal." According to defendant VALENCIA, he has worked with other "heavy dudes" in the past and "been on boats and all that shit." He said, "the guys I worked with, they worked with the cartels down South."

16. On November 14, 2017, defendant COLLINS provided security for the Transport Vehicle by driving a car behind the Transport Vehicle and scouting for law enforcement and other potential threats.

17. On November 14, 2017, once the Transport Vehicle made it to Las Vegas safely, for instance, without any law enforcement intervention, defendant VALENCIA accepted $12,500 in cash from UC-2. This was the second installment of the agreed-upon $25,000 payment.

18. On December 11, 2017, defendant COLLINS met UC-1 to discuss details for a second transport of controlled substances to Las Vegas.

1  This time, UC-1 told COLLINS that the transport would consist of
2  cocaine and methamphetamine. Defendant COLLINS said that, in
3  exchange for $75,000, he and his team would provide security for the
4  transport and make sure that the drugs made it safely to Las Vegas
5  "untouched, unscathed."
6      19. On January 5, 2018, defendant COLLINS and UC-1 met again to
7  discuss details for the transport scheduled to take place on January
8  16, 2018. UC-1 told defendant COLLINS that the cargo would contain
9  20 kilograms of cocaine, six kilograms of methamphetamine, and cash.
10 Defendant COLLINS said that his "guys" are used to providing security
11 for "bigger loads" and asked UC-1 about the possibility of doing even
12 larger drug transports in the future. Defendant COLLINS and UC-1
13 then discussed increasing the size of the January 16, 2018 transport
14 and filling a "moving truck." Defendant COLLINS told UC-1 that his
15 price tag, in light of the greater drug quantity, would increase to
16 as much as $250,000. UC-1 ultimately agreed, saying that he (UC-1)
17 could pay defendant COLLINS $40,000 at the start of the transport,
18 $35,000 once the transport made it safely to Las Vegas, and the
19 remaining "charge for the bigger load" at a later date. Defendant
20 COLLINS agreed and said that this new plan for a larger transport
21 would be "better."
22     20. The following day, on January 6, 2018, defendant COLLINS
23 had a telephone call with UC-1 to finalize plans for the January 16,
24 2018 transport. UC-1 again told defendant COLLINS that the cargo
25 would consist of "meth and coke," a reference to methamphetamine and
26 cocaine. Defendant COLLINS confirmed that the price for his team's
27 services would be "two dollars and fifty cent[s]," meaning $250,000
28 as previously negotiated with UC-1.

21. On January 16, 2018, defendants COLLINS, EASTER, and VALENCIA drove in separate cars and met at the agreed-upon location and time, the Rosemont Pavilion in Pasadena at 6:00 a.m., for the purpose of providing security for a transport of what defendants COLLINS, EASTER, and VALENCIA understood to be at least 20 kilograms of cocaine, six kilograms of methamphetamine, and cash.

22. On January 16, 2018, defendants EASTER and VALENCIA, while in their separate cars, created a perimeter around defendant COLLINS and UC-1 in order to provide security for defendant COLLINS and UC-1's pre-transport meeting.

23. On January 16, 2018, defendant COLLINS accepted $40,000 in cash from UC-1, as a first installment of the agreed-upon $250,000 payment for the January 16, 2018 transport.

24. On January 16, 2018, defendant COLLINS possessed a firearm, namely, a loaded Smith and Wesson, Model MP 9 Shield, nine millimeter semi-automatic handgun, serial number HNX5846, in the car he drove to the Rosemont Pavilion and intended to use the firearm as security for the January 16, 2018 transport.

COUNT TWO

[18 U.S.C. § 924(c)(1)(A)(i); 18 U.S.C. § 2(a)]

On or about August 25, 2017, in Los Angeles County, within the Central District of California, defendants KENNETH COLLINS, also known as "Kenneth Randolph," and DAVID EASTER, each aiding and abetting the other, knowingly used and carried a firearm during and in relation to, and possessed that firearm in furtherance of, a drug trafficking crime, namely, Conspiracy to Distribute Methamphetamine, Cocaine, and Marijuana, in violation of Title 21, United States Code, Section 846, as charged in Count One of this Indictment.

COUNT THREE

[18 U.S.C. § 924(c)(1)(A)(i); 18 U.S.C. § 2(a)]

On or about January 16, 2018, in Los Angeles County, within the Central District of California, defendants KENNETH COLLINS, also known as "Kenneth Randolph," DAVID EASTER, and GRANT VALENCIA, each aiding and abetting the others, knowingly possessed a firearm, namely, a loaded Smith and Wesson, Model MP 9 Shield, nine millimeter semi-automatic handgun, bearing serial number HNX5846, in furtherance of a drug trafficking crime, namely, Conspiracy to Distribute Methamphetamine, Cocaine, and Marijuana, in violation of Title 21, United States Code, Section 846, as charged in Count One of this Indictment.

A TRUE BILL

/S/
_____
Foreperson

NICOLA T. HANNA
United States Attorney

[signature]

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

MACK E. JENKINS
Assistant United States Attorney
Chief, Public Corruption and
 Civil Rights Section

DANIEL J. O'BRIEN
Assistant United States Attorney
Deputy Chief, Public Corruption
 and Civil Rights Section

LINDSEY GREER DOTSON
Assistant United States Attorney
Public Corruption and Civil
 Rights Section