# Exhibit N

Kenneth Collins
January 28, 2021

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

DANIEL NERSOYAN,

        Plaintiff,

    vs.                  Case No. CV19-08109
                            SVW (MAAx)

COUNTY OF LOS ANGELES, a county corporation; COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT, a public entity; SHERIFF JAMES MCDONNELL, in his official capacity and as an individual; DEPUTY KENNETH COLLINS, individually and in his official capacity as a Deputy, and DOES 1 through 10, inclusive,

        Defendants.
_____

DEPOSITION OF KENNETH COLLINS

APPEARING TELEPHONICALLY FROM

DALLAS, TEXAS

January 28, 2021

11:02 a.m.

REPORTED BY:

Lori Renee Budwig

CSR No. 9320

U.S. Legal Support | www.uslegalsupport.com

Page 18

1  A  Re-entry programs and Re-entry classes.
2  Q  Re-entry for deputies or re-entry for --
3  A  Re-entry for the public.  Primarily it was
4  people who were on probation, but the classes could be
5  taken by anyone in the community.
6  Q  Were you a part of E.L.A. then in 2014?
7  A  Yeah, I'm not exactly sure if I was still in
8  E.L.A. or if I had left by that time.
9  Q  If you had left, where would you have gone?
10 A  To Altadena Sheriff's Station.
11 Q  Altadena is near where?
12 A  Pasadena.
13 Q  Okay.
14 A  Excuse me.  The dates and days are like really,
15 really, it's really hard to remember that.
16 Q  Okay.  Fair enough.
17    Now, do you recall an incident on May 28,
18 2014, where you stopped a car carrying approximately
19 150 -- between 150- and $160,000 in cash?
20 A  No, I don't recall that.
21 Q  Do you recall in your plea deal that you took,
22 that you admitted to such?
23 A  That I'm not exactly sure if I can comment on
24 that because I actually have a motion at the Appellate
25 Court about my representation when it comes to that plea

Page 19

1  deal.
2  Q  Okay.  What's your argument in that motion, if
3  I may ask?
4  A  That a lot of the information that was inside
5  of that plea deal was, you know, wasn't accurate.  It
6  wasn't true, and at the direction of my lawyer, you
7  know, I was told to go along with the plea deal, even
8  though, you know, I adamantly objected to a lot of
9  things that were inside the plea deal, with my lawyer.
10 Q  What were you adamantly objecting to inside
11 that plea deal?
12 A  Well, No. 1, taking $165,000 from someone.
13 Q  That wasn't you?
14 A  That wasn't true.  And that's t-r-u-e.
15 Q  Why are you saying that's not true?
16 A  Because I've never taken any money from anyone
17 during any traffic stops in my entire career.
18 Q  Did you ever see the videotape of that event?
19 A  No, I haven't.
20 Q  Did the FBI ever show you the videotape?
21 A  No, sir.
22 Q  Okay.  Did the Sheriff's Department ever show
23 you the videotape?
24 A  No, sir.
25 Q  So you're claiming the person in that car that

Page 20

1  was assigned to you on that specific day was not you?
2     MS. INLOW:  I'm going to object that that lacks
3  foundation.
4  BY MR. DEVEREUX:
5  Q  You may answer.
6  A  I don't even recall that particular traffic
7  stop.
8  Q  You don't recall that traffic stop.
9     Were you under medication at that time?
10 A  No, sir.
11 Q  Were you being treated for any illness at that
12 time?
13 A  Not that I can recall.
14 Q  So when you said in the plea agreement that you
15 were wearing a gun at that time, that's not true; is
16 that correct?
17    MS. INLOW:  I'm going to object again.  At what
18 time?  It's vague, ambiguous, lacks foundation.
19 BY MR. DEVEREUX:
20 Q  Do you recall being in court accepting the plea
21 agreement?
22 A  Yes.
23 Q  Do you recall -- hold on one moment.
24    Do you recall agreeing to a factual basis in
25 that plea agreement?

Page 21

1  A  I don't understand what you're asking me.
2  Q  Well, there were certain facts that you went
3  over with your attorney at that time; is that correct?
4  Before signing that plea agreement, did you sit down
5  with your attorney and discuss the plea agreement?
6  A  Yes.
7  Q  And then you went into the courtroom, and they
8  asked you if that was the plea agreement that you agreed
9  to; is that correct?
10 A  Yes.
11 Q  So do you recall agreeing that while driving a
12 Los Angeles Sheriffs patrol car and wearing your Los
13 Angeles Sheriffs uniform and possessing a firearm,
14 Defendant Collins conducted an unlawful traffic stop of
15 a vehicle and illegally seized approximately $160,000 in
16 cash from the vehicle.
17    Do you recall going over that fact with your
18 attorney?
19 A  You're saying going over that with my attorney?
20 Q  Yes.  Reviewing these facts with your attorney.
21    Do you recall that?
22 A  I recall reviewing those with my attorney.
23 Q  Do you recall reviewing those facts with the
24 judge?
25 A  Yes.  I recall reviewing what you just said

Page 22

1 with the judge.
2     Q   It says "Defendant Collins was aware in advance
3 of the traffic stop, that there would be a large sum of
4 cash in the vehicle and conducted the traffic stop for
5 the purpose of illegally seizing the cash."
6         Do you recall going over those facts with your
7 attorney?
8     A   Vaguely.
9     Q   All right. Do you recall going over those
10 facts from the judge?
11    A   Vaguely.
12    Q   In violation of the Los Angeles Sheriff's
13 Department policy, Defendant Collins failed to report to
14 the Los Angeles Sheriff's Department that he had
15 conducted the traffic stop or seized any cash that day.
16 Let me ask you this.
17        Do you recall going over with your attorney,
18 reviewing this -- these facts with your attorney?
19    A   You know, being that I have an appeal or I've
20 filed a motion, I have an appeal in the Appellate Court
21 right now, in regards to what you're asking me, I'm not
22 exactly sure if I could, you know, if I could answer
23 that.
24        What I do know is that a lot of the
25 information that was in that plea agreement, I was

Page 23

1 instructed by my attorney against what I wanted to do to
2 sign on that particular plea agreement. Mainly because
3 from what he told me is I was -- the District Attorney
4 or the U.S. Attorney told him that I would basically get
5 30 years to life if I didn't sign that plea agreement.
6        Once he brought the plea agreement to me, I
7 read it over and told him that the information in that
8 plea agreement was not true and to have it taken back to
9 the U.S. Attorney and have her to take out that
10 information, particularly about the traffic stop,
11 because that wasn't true.
12       He came back to me the next day or a few days
13 after that, saying that the District Attorney would not
14 take that information out, and if I didn't sign the plea
15 agreement, which was originally 11 years, that she would
16 give me 30 years to life.
17       So under that duress, I signed on the plea
18 agreement, even though I knew the information inside the
19 -- some of that information inside the plea agreement
20 was not true.
21    Q   Why did you not bring that up to the Court?
22    A   Because I was basically under duress. My
23 attorney gave me the impression that if I tried to
24 resist, that, he told me that the U.S. Attorney would
25 then just take me to trial and give me 30 years to life.

Page 24

1        If you review the transcripts from that plea
2 agreement, I don't -- I mean, I was very distraught in
3 there, and I paused a lot inside of that -- inside of
4 the courtroom when he was asking me about the traffic
5 stop because I knew it wasn't true.
6        He knew that I was visibly -- something was
7 visibly wrong with me, and he asked me about me pausing
8 during that. And the whole deal was that there was a
9 lot of stuff inside that plea agreement that was not
10 true, but I was told that if I didn't take that deal,
11 that there wouldn't be another deal on the table, and
12 that I would get 30 years to life. And that's the
13 reason why I signed that plea agreement.
14    Q   All right. Fair enough. Now, let me ask you
15 this. At sentencing time, do you recall the judge
16 asking you if you were under any duress?
17    A   No, I don't recall that.
18    Q   At the plea agreement, do you recall the fact
19 that the judge asked you if you were under any duress?
20    A   No, I don't recall.
21    Q   Do you recall saying that you freely accept
22 these facts at the plea hearing?
23    A   Yeah. I remember that, but again, I was scared
24 out of my mind, and I mean, yeah, I remember that.
25    Q   Okay. Now, as we go through this, okay, and

Page 25

1 you say this did not happen, that's what you're claiming
2 right now; is that correct?
3     A   That's correct.
4     Q   Do you recall a Lieutenant Kimura ever meeting
5 with you in early 2015 and asking you about the
6 incident?
7         MS. INLOW: I'm just going to object that at
8 the time he would have been Sergeant Kimura.
9         And, Madam Court Reporter, it's K-i-m-u-r-a.
10        THE WITNESS: No. I don't recall having a
11 meeting with -- are you talking about actually a face-
12 to-face sit-down meeting with Sergeant Kimura?
13 BY MR. DEVEREUX:
14    Q   If Sergeant Kimura said he met with you in
15 early 2015 to discuss this incident --
16    A   I believe having a conversation with Sergeant
17 Kimura over the telephone.
18    Q   What was that conversation about?
19    A   I don't recall, you know, all the details of
20 the conversation.
21    Q   Was it about this incident on May 28, 2014?
22    A   Yes. He asked me about a traffic stop.
23    Q   Okay. What did you -- what was your response?
24    A   I believe that at that time I denied having --
25 making a traffic stop. I didn't recall making that

Page 26

1 traffic stop and, you know, I denied that.
2    Q   Okay.  Did he mention that the traffic stop was
3 near Slauson?
4    A   Yes.
5    Q   Were you stationed near Slauson at that time,
6 May 28, 2014?
7    A   I don't recall.  Again, if that was during the
8 Emergent Leaders, Emergent Leaders time, I wasn't
9 particularly stationed at any location.
10   Q   Okay.  Did you have a squad car?  Were you
11 assigned a squad car?
12   A   I don't recall if I was assigned a car or not.
13   Q   Okay.  Let me ask you this:  If you were
14 assigned a squad car in 2014, would that squad car have
15 a dash cam?
16   A   No, it would not have a dash cam.
17   Q   Why would it not have a dash cam?
18       MS. INLOW:  I'm just going to object that it's
19 argumentative.  I will tell you, Michael, to this day we
20 do not have dash cams.  So, they certainly didn't have
21 them in 2014.
22       MR. DEVEREUX:  Why do I believe that, Laura?
23       MS. INLOW:  LAPD has them.  We're just starting
24 to roll them out.
25       MR. DEVEREUX:  Okay.  Maybe tires will be next,

Page 27

1 or wheels or something, huh?
2    Q   My apologies, Mr. Collins.  Did you have a dash
3 cam on your car at that time?
4    A   No.
5    Q   Did Sergeant Kimura know at that time that you
6 were involved in COPS?
7        MS. INLOW:  I'm going to object it lacks
8 foundation.
9        MR. DEVEREUX:  I'm sorry.  What's that?
10       THE WITNESS:  I'm not sure.
11 BY MR. DEVEREUX:
12   Q   Okay.  You're not -- and who was Sergeant
13 Kimura at that time?  What unit was he working with, do
14 you know?
15   A   No.  I have no idea.
16   Q   Okay.  So the sergeant comes up to you, you
17 have no idea what unit he's working at, and he asked you
18 about the traffic stop?
19   A   Well, he didn't come up to me.  He actually
20 called me over the telephone.
21   Q   Okay.  What did you think that conversation was
22 about?  Why would a sergeant from a unit you don't know
23 contact you about a traffic stop?
24       MS. INLOW:  Calls for speculation.
25       THE WITNESS:  Yeah, I mean, based on what I

Page 28

1 know now, I would assume that someone made a complaint
2 against me.
3 BY MR. DEVEREUX:
4    Q   I'm asking you what you were thinking at that
5 time.
6    A   I don't recall what I was thinking at that
7 time.
8    Q   So you didn't find it particularly strange, a
9 sergeant from an unknown unit would contact you and ask
10 you about a traffic stop?
11   A   I don't think that he was from an unknown unit.
12 He identified what unit he was from.  I just don't
13 recall exactly what unit that was.  In my business we
14 get complaints all the time, so that's not something
15 that's new to any deputy or any police officer in the
16 country, for that matter.
17   Q   What complaints did you have previously?
18       MS. INLOW:  Again, I'm going to object that
19 that's vague and ambiguous as to complaints.  It's also
20 probably irrelevant.  But go ahead.
21       MR. DEVEREUX:  Okay.
22   Q   Go ahead.  You can answer, sir.
23   A   Yeah.  I don't recall what complaints that I
24 had.
25   Q   So you don't recall any complaints against you,

Page 29

1 ever?
2    A   I mean, a complaint can be anything from, I
3 mean, like I said, it's very vague what a complaint -- a
4 complaint can be anything.  A complaint can be, you
5 know, I waved at him and he didn't wave back at me.  I'm
6 not exactly sure what it is that you're looking for,
7 specifically, or you're asking me for, specifically.
8    Q   How many complaints did you have that somebody
9 waved to you and you didn't wave back to them?  How many
10 complaints of those do you have?
11   A   No complaints of that.  I was just giving you
12 an example of how small a complaint could be.
13       MS. INLOW:  I actually do have an objection to
14 the term "complaints," Michael.  Do you mean an actual
15 civil claim?  Are you talking about like a written
16 inmate grievance?  Are you talking about a personnel
17 complaint?  I mean, you're being very overbroad.
18       MR. DEVEREUX:  I am.  Absolutely.  I am being
19 overbroad.  It's a discovery process.  I'm asking
20 complaints.
21       As an officer in uniform, how many complaints
22 were there against you?
23       THE WITNESS:  I don't recall.  I don't recall.
24 BY MR. DEVEREUX:
25   Q   More than one?