# Exhibit O

DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.
Nareg Gourjian on 11/16/2020

```
 1              UNITED STATES DISTRICT COURT

 2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3                        --o0o--

 4   DANIEL NERSOYAN,                )
                                     )
 5            Plaintiff,             )
                                     )
 6    vs.                            ) Case No. 19-CV-08109
                                     )
 7   COUNTY OF LOS ANGELES, a        )
     County corporation; COUNTY OF   )
 8   LOS ANGELES SHERIFF'S           )
     DEPARTMENT, a public entity;    )
 9   SHERIFF JAMES MCDONNELL, in     )
     His official capacity and as an )
10   individual; DEPUTY KENNETH      )
     COLLINS, individually and in    )
11   his official capacity as a      )
     Deputy, and DOES 1 through 10,  )
12   inclusive,                      )
                                     )
13            Defendants.            )
     _____)

14

15                        --o0o--

16                   Deposition of

17                   NAREG GOURJIAN

18          Monday, November 16, 2020

19                        --o0o--

20        Reported by:  MIRANDA RUMSEY
              CSR License No. 14199
21

22

23

24

25
```

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
**Nareg Gourjian on 11/16/2020**                              **Pages 6..9**

Page 6

1   Q.       When's the last time you spoke with Mr.
2   Nersoyan?
3   A.       I would say it's been maybe about three years
4   since I last spoke with him.
5   Q.       Okay.  And were you retained by Mr. Nersoyan
6   specifically to address his belief that he had been the
7   victim of a theft in 2014?
8   A.       I was retained only for purposes of the initial
9   investigation, as to trying to identify who the officer
10  in question was.
11  Q.       Okay.  And at the time that you -- well, let me
12  back up.  When did you cease representing Mr. Nersoyan
13  on that issue?
14  A.       What happened was we were able to get in
15  contact with some agents from the FBI.  There was, I
16  believe, two interviews that were conducted at my office
17  with those agents and Mr. Nersoyan, and I believe one of
18  his employees by the name of Hyrum.
19           Soon, thereafter, once it was in the hands of
20  the FBI, there was really not much more I could do
21  except, you know, simply following up with the agents to
22  see whether or not they were successful in apprehending
23  the police officers in question.
24           And then, I, you know, let Daniel know that
25  that was pretty much the extent of my role in helping

Page 7

1   them with that and anything further, he would have to
2   retain other counsel in terms of pursuing any other type
3   of relief against the sheriff's department.
4           MS. INLOW:  Okay.  And, Madam Court Reporter,
5   just for the record I believe Hyrum is H-Y-R-U-M.
6   Q.       Is that correct, Mr. Gourjian?
7   A.       Yes, I believe so.
8   Q.       When was it that you told Mr. Nersoyan that any
9   further relief against the sheriff's department or the
10  individual officer, would need to be made with a
11  different attorney?
12  A.       I believe that was understood from the very
13  beginning that I would not represent him in terms of
14  filing any type of claim and/or civil lawsuits against
15  the sheriff's department.  That I was not able to --
16          (Poor videoconference connection; inaudible.)
17          MS. INLOW:
18  Q.       Not your area of expertise?
19          (Court reporter clarification.)
20          MS. INLOW:  I think he just sort of tapered it
21  off, but go ahead, Mr. Gourjian.
22          THE WITNESS:  Yeah, I made sure that he
23  understood that I did not practice that kind of law and
24  that he would have to retain other counsel to pursue
25  that --

Page 8

1           (Poor videoconference connection; inaudible.)
2           (Court reporter clarification.)
3           THE WITNESS:  To pursue his claims against the
4   sheriff's department.
5           THE COURT REPORTER:  Is it just me that this is
6   happening with?
7           MS. INLOW:  Yeah, I'm hearing him fine.
8           Michael, are you having any trouble?
9           MR. DEVEREUX:  I'm experiencing the same thing.
10  It's going in and out, and there are times that I don't
11  hear him.
12          MS. INLOW:  Well, we're gonna be quick, but
13  anybody at any time if you don't hear or you don't
14  understand, yeah, please speak up and we'll repeat it
15  and, Mr. Gourjian, I'm sorry.  It's just sort of the
16  world we live in these days.
17          THE WITNESS:  I understand.
18          MS. INLOW:  Especially you, Ms. Court Reporter.
19  If you ever don't hear him, obviously, you're the most
20  important person, so please speak up.
21          Okay.  So, for example, Mr. Gourjian, in your
22  file -- let me just go ahead -- let me go ahead and
23  attach that so we'll have it.  Okay.  Does everybody see
24  that?
25          THE WITNESS:  I don't see anything.

Page 9

1           MR. DEVEREUX:  I just have a Windows screen.
2           MS. INLOW:  I'm saying share.  Okay.  Now?  No?
3   I have to hit the "share all," which I always forget how
4   to do that.
5           HUSEBY HOST:  This is Reese Hamilton, the
6   Huseby host.  You want to make sure that the document is
7   open first, and then go back to Zoom.  Hit the share
8   content button.  Is that at the top or bottom of your
9   screen?
10          MS. INLOW:  I did.
11          HUSEBY HOST:  So you hit "share content" and
12  then there are going to be a couple of boxes that open
13  up, and you have to choose the one where you're bringing
14  it -- there you go.
15          MS. INLOW:  Okay.  Now does everybody see that?
16          THE WITNESS:  Yes.
17          MR. DEVEREUX:  Yes.
18          MS. INLOW:  Okay.  So we will go ahead and
19  attach this full record as Exhibit A to the deposition.
20          (Whereupon, Exhibit A, 25-Paged Document, was
21           marked for identification.)
22          MS. INLOW:
23  Q.       Mr. Gourjian, for example, here on what has
24  been Bates-stamped 0002 at the bottom, is a copy of the
25  claim for damages that Mr. Nersoyan submitted to the

**DANIEL NERSOYAN vs COUNTY OF LOS ANGELES, ET AL.**
**Nareg Gourjian on 11/16/2020**                    **Pages 10..13**

Page 10

1  county in November of 2014.  Do you see that?
2  A.      I do.
3  Q.      Did you assist Mr. Nersoyan in completing that
4  claim?
5  A.      I believe, yes, I did.
6  Q.      Okay.  But you did not put your contact --
7  excuse me -- information anywhere on that.  It was
8  submitted in his name under his contact information,
9  correct?
10 A.      That is correct.
11 Q.      Was there any discussion with Mr. Nersoyan at
12 or about the time that this claim for damages was
13 submitted to the county in 2014, that he would have six
14 months from whenever the county denied this claim to
15 file any lawsuit?
16 A.      Whether he was aware of it or whether or not I
17 advised him of that?
18 Q.      Did you ever advise him of that?
19 A.      Oh, I don't remember if I did or did not.
20 Q.      Okay.  All right.  So between May of 2014 when
21 the alleged theft happened and November of 2014 when the
22 government tort claim was submitted to the county, what
23 were you able to find in your investigation about the
24 alleged theft?
25 A.      If I remember correctly, I believe Daniel

Page 11

1  Nersoyan had hired the services of a private
2  investigator who was able to retrieve some recordings
3  from a warehouse that captured the incident at issue
4  and, I believe, maybe some other recordings as well from
5  a gas station, and with those recordings we were at
6  least able to identify the number of the patrol vehicle.
7  If I remember correctly on the top of the roof of the
8  car, there was a number associated with that patrol car
9  and provided that to the FBI.
10 Q.      Did you, yourself, ever contact anybody in the
11 sheriff's department about the alleged theft in May of
12 2014?
13 A.      I may have contacted by telephone the sheriff's
14 department to see if they would be willing to provide us
15 any information or if they were willing to meet with us
16 to discuss what occurred here, and I don't believe I was
17 able to get anywhere with them.  I don't believe anyone
18 was willing to provide me any information voluntarily,
19 nor were they willing to meet with Daniel or I.
20 Q.      Okay.  Do you ever remember speaking with a
21 Sergent Kimura, K-I-M-U-R-A?
22 A.      I don't remember as I sit here today whether or
23 not I did.
24 Q.      Did you ever have any discussion with
25 Mr. Nersoyan where he told you about any communications

Page 12

1  he had had with Sergeant Kimura?
2  A.      I don't recall.  Sergeant Kimura, is that --
3  which agency?  I'm sorry.
4  Q.      The sheriff's department.
5  A.      Oh, okay.  Got it.  I don't remember if he did.
6  Q.      Okay.  Did Mr. Nersoyan ever share with you any
7  written communication that he had with the sheriff's
8  department?
9  A.      I don't remember.
10 Q.      Hang on one sec.
11         Did Mr. Nersoyan ever share with you that he
12 got a written denial letter regarding his claim for
13 damages from the county?
14 A.      Yes.
15 Q.      And you made that part of your file, correct?
16 A.      Correct.
17 Q.      Okay.  Did you ever have a meeting scheduled
18 with Sergeant Kimura?
19 A.      I don't recall.
20         MS. INLOW:  Okay.  I'm going to share -- are
21 you guys seeing that one?
22         THE WITNESS:  Yes.
23         MS. INLOW:  Okay.  We'll attach this as Exhibit
24 B, and this is a transcription of an e-mail to Sergeant
25 Kimura that is dated February 3, 2015.

Page 13

1         (Whereupon, Exhibit B, One-Paged Transcription
2         of Voicemail Made to Sergeant Kimura by Nareg
3         Gourjian, was marked for identification.)
4         MS. INLOW:
5  Q.      And, obviously, the voice recognition software
6  has a little work to do on the spelling, but I'll
7  represent to you that it says:
8         "Hi, this message is for Sergeant Douglas
9  Kimura.  I'm calling from" -- and I believe that's
10 supposed to be Gourjian Group -- "in regards to the
11 meeting that he had with the attorney at 2:00 o'clock
12 p.m. he actually has to cancel.  He was called back
13 into court this afternoon.  If you have any questions or
14 if you can just call me back to confirm that you have
15 received this voicemail, my phone number is" -- and then
16 it's listed here.
17         "Again, calling to cancel the 2:00 o'clock
18 appointment.  Thank you.  Bye-bye."  So was this a phone
19 number that was in your office?  I know it's garbled.
20 A.      The 956-0100 is our main office number, yes.
21 Q.      Okay.  So does this help refresh your
22 recollection that you had an apartment with Sergeant
23 Kimura at 2:00 o'clock on February 3, 2015?
24 A.      It does not.
25 Q.      And then, showing you another, which we will

**Page 14**

1  mark as Exhibit C.  Do you guys see this one?
2        THE COURT REPORTER:  Yes.
3        MS. INLOW:  Okay.  So this will be Exhibit C.
4        (Whereupon, Exhibit C, One-Paged Transcription
5        of Voicemail Made to Sergeant Kimura by Nareg
6        Gourjian, was marked for identification.)
7        MS. INLOW:
8  Q.     And this is January 29 of 2015, again, a
9  voicemail transcription.  And this says that:
10       "It is Attorney Gourjian calling on the Daniel
11 Nersoyan.  If you can please call me back my name is" --
12 again, I think it has massacred your name -- "Nareg
13 Gourjian.  I'm Daniel's attorney.  Phone number" --
14 again, there listed -- "concerning the claim that Daniel
15 filed.  I believe you sent a letter as well asking that
16 we give you a call."
17       So does this help refresh your recollection
18 that the sheriff's department, A, gave Daniel some
19 written correspondence?  And, B, that there was
20 attempted communication between you and the sheriff's
21 department?
22 A.     Unfortunately, it does not.
23 Q.     So from the e-mail it looks like the sheriff's
24 department was attempting to get in touch with you and
25 meet with you.  Do you remember ever rescheduling a

**Page 15**

1  meeting with the sheriff's department?
2  A.     I do not.
3  Q.     To your knowledge was the videotape, the two
4  videotapes that were obtained, one from the warehouse
5  and I think you said one from a gas station, ever
6  provided by you or your office to anyone at the
7  sheriff's department?
8  A.     Can I have a moment?
9  Q.     Sure.
10 A.     I don't have any recollection as to whether or
11 not I personally did.
12 Q.     Okay.  If you had sent it by mail or whatever,
13 would it have been your custom and practice in your
14 office at that time to put a cover letter on it, which
15 would've become part of your office file?
16 A.     Yes.
17 Q.     And there is no such cover letter in the file
18 you have produced, correct?
19 A.     There is not.
20 Q.     Were you present during the two interviews that
21 Mr. Nersoyan had with the FBI agents?
22 A.     Yes.
23 Q.     At any time during those two interviews, did
24 the FBI ever encourage Mr. Nersoyan to do nothing in
25 terms of bringing a lawsuit against the sheriff's

**Page 16**

1  department?
2  A.     No, they never discouraged him.  I don't
3  remember, however, if they had asked us not to have any
4  contact with the sheriff's department, and the
5  investigation was now in their hands.
6  Q.     So by the time that you said you last spoke to
7  him about three years ago, so that'd be some time around
8  2017; is that correct?
9  A.     Yes.
10 Q.     Okay.  When you last spoke with Mr. Nersoyan
11 approximately three years ago, had he been advised by
12 anyone that they had identified the officer involved in
13 the alleged theft?
14 A.     I don't recall my last conversation with
15 Daniel, and I don't remember if we specifically
16 discussed the fact that they were able to identify and
17 arrest the subject officer.
18 Q.     But in 2014 it was Mr. Nersoyan and your
19 belief, am I correct, that the alleged theft had been
20 perpetrated by a member of the Los Angeles County
21 Sheriff's Department?
22 A.     Yes.  Or at least someone purporting to be an
23 officer with the LA Sheriff's Department.
24 Q.     Why did you assist Mr. Nersoyan in preparing
25 the government tort claim in November of 2014?

**Page 17**

1  A.     I was already representing Mr. Nersoyan on
2  other unrelated criminal matters at the time this
3  occurred.  So when he advised me about what had happened
4  and what he can do, I think I had at the time told him
5  that:  One, we could get the federal agents involved,
6  and I believe I advised him that he would have to file a
7  claim within the time, six-month period.
8        And like I said before, I did advise Mr.
9  Nersoyan that it wasn't anything that I would take on as
10 far as representing him, but I do remember helping him
11 fill out the form.
12 Q.     Were you also present when Hyrum spoke with the
13 FBI agents?
14 A.     Yes.
15 Q.     Was Hyrum also your client?
16 A.     No.
17 Q.     What did Hyrum tell the FBI?
18       MR. DEVEREUX:  I'm sorry.  I didn't hear his
19 answer if Hyrum was also his client.
20       MS. INLOW:  I believe he said no.  Is that
21 correct?
22       THE WITNESS:  No, he was not my client.
23       MS. INLOW:
24 Q.     So what did Hyrum tell the FBI agents?
25 A.     From what I remember, Hyrum told the FBI agents