# Exhibit P

Lt. Ronald Kopperud
December 16, 2020

```
                   UNITED STATES DISTRICT COURT

          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION



  DANIEL NERSOYAN,                  )
                                    )
                                    )
          Plaintiff,                )
                                    )
  v.                                )   Case No. CV19-08109 SVW
                                    )   (MAAx)
  COUNTY OF LOS ANGELES, a          )
  county corporation; COUNTY        )
  OF LOS ANGELES SHERIFF'S          )
  DEPARTMENT, a public entity;      )
  SHERIFF JAMES MCDONNELL, in       )
  his official capacity and as      )
  an individual; DEPUTY             )
  KENNETH COLLINS,                  )
  individually and in his           )
  official capacity as a            )
  Deputy, and DOES 1 through        )
  10, inclusive,                    )
                                    )
          Defendants.                )
  _____ )
```

DEPOSITION OF LT. RONALD KOPPERUD

APPEARING REMOTELY FROM SOUTHERN CALIFORNIA

DECEMBER 16, 2020

REPORTED BY:
Deborah M. Chatfield, CSR No. 6254, RPR

APPEARING REMOTELY FROM SAN LUIS OBISPO, CALIFORNIA

Page 6

1  you probably don't recall other things, if you're like
2  me. So basically, everything that you say is going to
3  be taken down by this court reporter here. If you're
4  asked a question, make sure it's a verbal response, not
5  a nod or a gesture. We also have today, we have video
6  camera taking down your image and what you say as well.
7  Okay.
8         Don't guess at anything. If you don't know the
9  answer, say I don't know. Okay. If you're going to
10 guess, at least tell us you're guessing. But if you
11 don't, there's nothing wrong with saying I don't know.
12        You have a right to break. If you need a
13 break, just ask for one. We'll stop and then we can
14 pick up and continue. Especially if you start getting
15 tired or you need, if you have any conditions or you
16 need something special, you can just ask for a break.
17        If there's anything affecting your ability to
18 focus on what I'm saying to comfortably answer, whether
19 it's physical, mental or whatever, bring that to our
20 attention because our goal here is to ask clear
21 questions and get accurate answers.
22        Is that all understood?
23    A.  Yes.
24    Q.  All right. What is your full name?
25    A.  My full name is Ron Kopperud, first name is

Page 7

1  R-o-n, last name is spelled K-o-p-p-e-r-u-d.
2     Q.  All right. Is Ron short for Ronald or is your
3  legal name Ron?
4     A.  My legal name is Ronald, you're right.
5     Q.  Okay. What is your current position?
6     A.  My current position is the operations
7  lieutenant at the sheriff's department, internal affairs
8  bureau.
9     Q.  What does that mean, operations lieutenant?
10    A.  Basically I run the office below the unit
11 commander, who is Captain Jaeger, Captain Bill Jaeger,
12 and I have the several functions in that job.
13        MS. INLOW: Would you just spell Jaeger,
14 please, for the court reporter.
15        THE WITNESS: The captain is, William is his
16 first name, his last name is Jaeger, J-a-e-g-e-r.
17 BY MR. DEVEREUX:
18    Q.  All right. When did you become a member of
19 internal affairs?
20    A.  I joined the internal affairs bureau in -- the
21 official date I believe was April 30th of 2018.
22 Basically the first of May 2018.
23    Q.  What did you do prior to that?
24    A.  Prior to that I was the watch commander on
25 early mornings at Walnut sheriff's station.

Page 8

1     Q.  Okay. Let me ask you this question: What were
2  you doing in 2014? May 28, 2014, where were you
3  assigned?
4     A.  2014 I was a sergeant at East Los Angeles
5  sheriff's station.
6     Q.  So you were not in internal affairs at that
7  moment?
8     A.  No, I was not.
9     Q.  Okay. Do you know who was in your current
10 position on May 28, 2014?
11    A.  I do not.
12    Q.  Now, are you familiar with a former Deputy
13 Collins?
14        MS. INLOW: Well I'm going to object that
15 familiar is vague and ambiguous. Calls for speculation.
16 BY MR. DEVEREUX:
17    Q.  Okay. When did you first hear of Deputy
18 Kenneth Collins?
19    A.  In I believe it was October, I don't know the
20 specific date, of this year, when Attorney Inlow
21 contacted me regarding this case.
22    Q.  All right. And you'd never heard of Deputy
23 Collins beforehand; is that correct?
24    A.  No, that's correct.
25    Q.  Somewhere you mentioned that you have written

Page 9

1  policies and procedures regarding the retention and
2  discipline of deputies. Is that correct?
3     A.  Yes.
4     Q.  How many written policies and procedures do you
5  believe you have --
6     A.  I don't know the answer to that.
7         MS. INLOW: When you say you, do you mean the
8  sheriff's department?
9         MR. DEVEREUX: Yes, the sheriff's department.
10        THE WITNESS: I don't know the exact number.
11 It's in the hundreds.
12 BY MR. DEVEREUX:
13    Q.  I'm being cut off. I don't know if you guys
14 can hear me.
15        MS. INLOW: You shared your screen. So we're
16 all now seeing your home screen.
17        MR. DEVEREUX: Oh, jeez. There you go. The fun
18 of all this stuff. How's that?
19        MS. INLOW: That's better.
20        MR. DEVEREUX: My apologies to all of you.
21 BY MR. DEVEREUX:
22    Q.  All right. In the declaration, you mentioned
23 that the department has written policies regarding
24 retention and discipline of deputies. Is that correct?
25    A.  Yes, that's correct.

Page 10

1  Q. When you were talking about those written
2  policies, was it anything specific or was it a series of
3  policies?
4       MS. INLOW: Objection. Vague, ambiguous, calls
5  for speculation and overbroad. If you can answer, go
6  ahead.
7       THE WITNESS: Well, what I mean is that the
8  sheriff's department has a manual of policies and
9  procedures which is many policies. I don't know the
10 exact number. And then there's also the guidelines for
11 discipline, which refers to those policies.
12 BY MR. DEVEREUX:
13 Q. Okay. And there's a manual policy and
14 procedure. MPP, are you familiar with that terminology?
15 A. Yes.
16 Q. How is that different than the guidelines for
17 discipline?
18 A. The guidelines for discipline is a tool for the
19 executives to use that then refers to the policy.
20 Q. All right. Today in the policies and
21 procedures, how would the policies and procedures
22 classified affect a deputy who stole over $150,000?
23      MS. INLOW: I'm going to object that any of the
24 policies and the procedures as they are today are
25 immaterial. But you may answer.

Page 11

1       THE WITNESS: Can you repeat that question,
2  sir.
3  BY MR. DEVEREUX:
4  Q. Sure. The policies and procedures today, how
5  do they classify a theft by a deputy of over $150,000?
6       MS. INLOW: Same objections. Vague, ambiguous,
7  and lacks foundation.
8       THE WITNESS: I don't know of a policy that
9  would be specific to that dollar amount. But there
10 is --
11      MR. DEVEREUX: Go ahead.
12      THE WITNESS: There is a policy related to
13 theft, but I believe that would be under obedience laws
14 and regulations, and then that is also referenced in the
15 guidelines for discipline.
16 BY MR. DEVEREUX:
17 Q. All right. Are thefts classified, is there a
18 certain amount that gets escalated up the chain of
19 command?
20 A. Not that I know of.
21 Q. So a theft of this large, to the best of your
22 knowledge, would not be reported directly to the
23 sheriff?
24      MS. INLOW: Again, vague, ambiguous, lacks
25 foundation. This large, it calls for speculation and

Page 12

1  anything that you're asking about that would happen
2  today is irrelevant.
3       THE WITNESS: I don't know the answer to that.
4  BY MR. DEVEREUX:
5  Q. Do you know any answers to the policy of theft
6  within your department?
7       MS. INLOW: Well what do you mean any answers
8  to the policy of theft? I don't understand that
9  question at all.
10      MR. DEVEREUX: Well it appears that he does not
11 know anything about the policies and procedures of theft
12 by a deputy sheriff.
13      MS. INLOW: No, I think you're asking poor
14 questions. I think you are confusing a policy and
15 discipline.
16      MR. DEVEREUX: Okay.
17 BY MR. DEVEREUX:
18 Q. I don't think I'm confusing. The discipline
19 would come later. The policy or the procedure of theft
20 and then there's an investigation. Explain to me what
21 the procedure is if somebody were to call in for a theft
22 of, say, under $10,000.
23      MS. INLOW: Same objections, but answer if you
24 can.
25      THE WITNESS: Sir, just to clarify, are you

Page 13

1  asking if someone outside the department alleged that a
2  theft occurred?
3       MR. DEVEREUX: Yes, sir.
4       THE WITNESS: So depending upon how that came
5  in, if somebody made a complaint to, say, a unit, then
6  that unit would take that information down likely on a
7  watch commander service comment report or what we
8  commonly term a complaint, and then they would have a
9  discussion presumably through their chain of command
10 directly to the unit commander at that unit, and that
11 unit commander then would take that information up their
12 chain of command to potentially their division chief.
13 BY MR. DEVEREUX:
14 Q. Define unit to me.
15 A. I'm sorry?
16 Q. Define unit. You're using the term unit.
17 Define that to me.
18 A. A unit like a station, a unit like a unit. I'm
19 working at internal affairs bureau. Any specified unit
20 of assignment of the sheriff's department.
21 Q. If I were to call in and say somebody, a
22 deputy, has stolen money from me, what unit would that
23 go to?
24      MS. INLOW: Vague, ambiguous, lacks foundation,
25 calls for speculation.

Page 22

1  upon how that complaint came in.
2  BY MR. DEVEREUX:
3     Q.  Okay.  Give me different scenarios then.
4         MS. INLOW:  Same objections.  Do you want to do
5  it as in this case, where a government tort claim was
6  the only thing filed?
7         MR. DEVEREUX:  I'd like to do it in this case.
8  I'd prefer to do it in this case.
9  BY MR. DEVEREUX:
10    Q.  If a complaint for a theft came in, of a theft
11 over $100 from a deputy came in in 2014, what would be
12 the policy and procedures?
13        MS. INLOW:  Same objection.
14        THE WITNESS:  Again, I'm not familiar with how
15 this case was initiated.  So if that's what you're
16 alluding to, if you could tell me how the complaint came
17 in, I could discuss that.
18 BY MR. DEVEREUX:
19    Q.  Initially my understanding was that there was a
20 phone call that there wasn't much response to and then
21 it eventually came down in November to a written
22 complaint to the County.
23        MS. INLOW:  Well, I'm going to object.  That
24 misstates the evidence.  Lacks foundation.  I will
25 stipulate that there was a government claim to the

Page 23

1  County.
2         MR. DEVEREUX:  Yes.
3         THE WITNESS:  So to answer your question
4  regarding if it came in by phone call, should I start
5  there?
6         MS. INLOW:  Yeah, but that's a hypothetical.
7  But go ahead.
8         THE WITNESS:  I understand if a complaint came
9  in to a unit via phone call complaint, then as I talked
10 to you all about, I would expect that to go on a watch
11 commander service report and inquiry of that complaint
12 be conducted.  If it came in via civil claim, then we
13 have a process for that.  Again, it's not part of this
14 internal affairs bureau.  However, based on my
15 experience, there's a several claim process in which you
16 would do -- there's different steps for that.  Would you
17 like me to discuss my experience with civil claims?
18        MR. DEVEREUX:  Yes.
19        THE WITNESS:  Again, internal affairs bureau
20 does not have a civil claims per se or inquiries into
21 civil claims; however, at one point in my career I was
22 operations sergeant at a station and my collateral duty
23 of that assignment was to handle civil claims.  When a
24 civil claim was assigned to us by the civil litigation
25 bureau, it would be assigned to me.  I would review the

Page 24

1  claim.  If it was related to something, I would research
2  what it was related to, to see if we had any documents
3  like a police report, traffic collision report or any
4  other document that was related to the civil claim and
5  package that together and provide it back to civil
6  litigation through my chain of command.  It would go to
7  my captain, then it would go through my division to the
8  division chief, and then it would be forwarded to civil
9  litigation.
10 BY MR. DEVEREUX:
11    Q.  All right.  I believe later on you wrote
12 something that, so if stolen money was determined to be
13 reasonable, and I guess the allegation is there's stolen
14 money.  There's been no determination if it was stolen
15 or not.  But what would the term reasonable mean to you?
16    A.  The reason I wrote reasonable?
17    Q.  Yes.
18    A.  What are you referring to?
19    Q.  In paragraph 17.
20    A.  Thank you.
21        MS. INLOW:  Well I'm going to object that your
22 question is vague, ambiguous, lacks foundation.  If you
23 can answer.  Is your question what does the phrase
24 reasonable mean?
25        MR. DEVEREUX:  I said -- it's his terminology.  I

Page 25

1  was asking him what that meant to him.  And my apologies.
2  It was paragraph 19, not 17.
3         MS. INLOW:  It's in 17 as well.
4         MR. DEVEREUX:  Is it?  Okay.
5         MS. INLOW:  If you can, answer Lieutenant.
6         THE WITNESS:  So prior to preparing the
7  declaration, I reviewed the watch commander service
8  comment reports, five of which were related to Collins.
9  And the term reasonable was not by me, it was by those
10 who completed the watch commander service comment report
11 inquiry.
12 BY MR. DEVEREUX:
13    Q.  So it was not your determination, it was
14 your --
15    A.  Yeah.  It wasn't my determination, correct.
16    Q.  Okay.  All right.
17        Now what is a watch commander service comment
18 report?
19    A.  A watch commander service comment report, like
20 I said, is commonly known as a complaint when somebody,
21 an external person from a member of the public, for
22 instance, contacts a unit, likely the watch commander,
23 and lodges a complaint against the department or one of
24 the personnel at the unit.
25    Q.  All right.

Page 26

1   A.   Or accommodation, for that matter.
2   Q.   In your experience, what are the factors to
3   determine whether or not to open an investigation?
4        MS. INLOW:  Same objections.
5        THE WITNESS:  Well, sir, it's not my role to
6   open investigations on the department.  That comes from
7   a unit commander, generally a captain.
8        MS. INLOW:  Hold on.  Let me stop you there.
9   Are you asking an IA investigation, a unit level
10  inquiry?  What are you asking about?  It's vague and
11  ambiguous.
12       MR. DEVEREUX:  Hold on.  Let me find --
13  paragraph 8 in the declaration.  It looks like a unit
14  commander's level or higher.
15       MS. INLOW:  Okay.  So paragraph 8 is discussing
16  exclusively internal affairs bureau investigations.  So
17  is that your question?
18       MR. DEVEREUX:  Yes.
19       MS. INLOW:  Okay.  So can you ask the question
20  again, please, limiting it to an IA investigation.
21  BY MR. DEVEREUX:
22  Q.   Okay.  In an IA investigation, how is it
23  determined, what are the factors to determine to open an
24  investigation?
25  A.   We aren't consulted on that, sir.

Page 27

1   Q.   And what is your role in the consultation?
2   A.   We're not consulted on whether or not -- in my
3   role, I am not consulted on whether an investigation
4   should be opened or not opened.  That's not my position.
5   Q.   Okay.  Does the internal affairs bureau open
6   investigations?
7   A.   No.
8   Q.   Who opens investigations?
9   A.   Investigations, a unit level investigation can
10  be opened by a unit commander or above.  Generally a
11  captain or above.  And then an internal affairs bureau
12  investigation is opened by a division chief.  We receive
13  requests from division chiefs to currently Captain
14  Jaeger, who is the unit commander internal affairs
15  bureau.
16  Q.   Okay.  Now when you were speaking in paragraph
17  8, in the second sentence, the determination to open an
18  investigation remains at the unit commander's level or
19  higher, were you speaking for other units or were you
20  speaking in terms of internal affairs?
21  A.   Other units.  Internal affairs unit commander
22  would only -- the internal affairs bureau commander, the
23  unit commander, the captain, Captain Jaeger, would only
24  open administrative investigation pertaining to his own
25  employees, his own personnel assigned to internal

Page 28

1   affairs bureau.
2   Q.   So if somebody was going to open an
3   investigation, it would be for people that are
4   specifically under that unit commander; is that correct?
5        MS. INLOW:  Vague, ambiguous, lacks foundation,
6   incomplete hypothetical.
7        THE WITNESS:  Again, what I would expect is
8   that if we're speaking about Collins, for instance, that
9   generally speaking his unit commander or his division
10  chief would be the one who would open an administrative
11  investigation.
12  BY MR. DEVEREUX:
13  Q.   And at the time, do you know which unit Collins
14  worked for?
15  A.   No.
16  Q.   Okay.  Was there ever an investigation by
17  internal affairs on Collins after his arrest in 2017?
18       MS. INLOW:  Again, I'm going to object that
19  it's irrelevant.  If you know.
20       THE WITNESS:  I don't know.
21  BY MR. DEVEREUX:
22  Q.   Okay.  Would it be common to open an internal
23  affairs investigation on any deputy that had been
24  arrested?
25       MS. INLOW:  I'm going to object again.  That

Page 29

1   comment is vague and ambiguous, calls for speculation.
2   If you can, answer that.
3        THE WITNESS:  Generally the process is an
4   employee -- if an employee is arrested, we do what is
5   called a criminal monitor, which is also requested
6   through the unit commander of the employee through their
7   division chief, we get the same request form, which is a
8   request for IAB investigation and -- or, criminal
9   monitor is what it's called, and we would get that to
10  monitor the criminal investigation.  Once the criminal
11  investigation concludes, we package all the documents
12  related to the criminal investigation itself and present
13  that back to the unit for review and they disposition
14  that as they choose.  It's not our decision to open an
15  investigation or to handle -- for IAB to handle it as a
16  unit level investigation or to inactivate the case.
17  BY MR. DEVEREUX:
18  Q.   All right.  To the best of your knowledge, you
19  stated earlier, and correct me if I'm wrong, that you do
20  not know if anything had -- if any investigation had
21  been opened on Kenneth Collins after his arrest; is that
22  correct?
23  A.   Correct.  I don't know.  I didn't look for that
24  information.
25  Q.   When you mentioned that you used the term